Lincoln SMITH, et al., Respondents,

v.

BROWN & WILLIAMSON TOBACCO CORPORATION, Appellant.

No. WD 65542.

Missouri Court of Appeals,
Western District.

Dec. 16, 2008.

Rehearing Denied Jan. 27, 2009.

Robert H. Klonoff, Washington, DC, Casey O. Housley, Kansas City, MO, for Appellant.

Kenneth B. McClain, II, Independence, and Gregory A. Leyh, Gladstone, MO, for Respondents.

Before: HAROLD L. LOWENSTEIN, P.J., JAMES M. SMART, J., and ROBERT G. ULRICH, SR. J.

ROBERT G. ULRICH, Senior Judge.

Brown & Williamson Tobacco Corporation (B & W) appeals the judgment entered in favor of the survivors of Barbara Smith and against B & W under Missouri's wrongful death statute for claims of personal injury based on negligence and product defect. § 537.080.[1] B & W presents ten points on appeal. B & W asserts in its first five points and ninth point that the trial court erred in denying its motion for

1. All statutory references are to RSMo 2000 unless otherwise stated.

judgment notwithstanding the verdict for various reasons. B & W asserts in its sixth point that the trial court erred in instructing the jury on comparative fault after B & W withdrew the affirmative defense. B & W asserts in its seventh and eighth points that the trial court erred in denying its motion for a new trial on punitive damages. Finally, B & W asserts in its tenth point that the trial court erred in denying its motion for judgment notwithstanding the verdict, its motion for new trial, and its request for remittitur on punitive damages. The judgment is affirmed in part, reversed in part, and the case is remanded.

### FACTS

This case involves a wrongful death action brought by the survivors of a deceased longtime smoker against a tobacco company. § 537.080. In the light most favorable to the jury verdict, the facts are as follows. Barbara Smith was born on May 13, 1927. She began smoking Lucky Strike cigarettes in 1942. After smoking Lucky Strikes for one to two years Ms. Smith switched to Kool cigarettes, manufactured by B & W.

In January 1964, the Surgeon General of the United States issued his first report on smoking and health. The report concluded that smoking causes fatal diseases, including cancer. The report also advised the public that the best way to reduce the risk of death and diseases associated with smoking is to quit smoking. Congress enacted the Federal Cigarette Labeling and Advertising Act (FCLAA) in 1965. The FCLAA required every package of cigarettes to bear the warning: "Caution: Cigarette Smoking May Be Hazardous To Your Health." The warning was modified in 1969 to read: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous To Your Health." The warning was changed again in 1985 to a system of four rotating warnings, including: "Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy" and "Quitting Smoking Now Greatly Reduces Serious Health Risks."

Ms. Smith developed angina in the early 1980s.[2] In 1990, a physician informed Ms. Smith that she had "respiratory trouble" that was the beginning stage of emphysema. The same doctor told Ms. Smith that she was "going to have to quit smoking because it was going to kill her if she didn't." She quit smoking that year. Ms. Smith was diagnosed with lung cancer in 1992. Part of one lung was removed, and Ms. Smith was apparently cancer free thereafter.

Ms. Smith brought suit against B & W in Jackson County, and the case was transferred to the United States District Court, Western District of Missouri, in 1996. B & W was granted summary judgment as to certain of her negligence and strict liability claims. On May 12, 2000, Ms. Smith died from a heart attack at age 73. After her death, all remaining claims in federal court were dismissed with prejudice.

In March 2003, the survivors of Barbara Smith, her husband Lincoln Smith[3] and their children, brought suit against B & W in Jackson County under the Missouri Wrongful Death Act (section 537.080) to recover damages for her death, which resulted from heart disease. The petition alleged claims for negligence, strict liabili-

---

**2.** Angina is chest pain resulting from the heart muscle not receiving adequate oxygen.

**3.** Ms. Smith and Lincoln Smith were married in 1942 and remained married for 58 years until her death in 2000.

ty, fraudulent concealment, and conspiracy.

B & W plead comparative fault as an affirmative defense and performed discovery regarding Ms. Smith's fault. After completion of discovery, B & W withdrew its comparative fault affirmative defense. At trial, B & W protested the jury's receiving a comparative fault instruction. Over B & W's objection, the court gave the jury a comparative fault instruction.

Trial was had in January 2005.[4] The jury returned a verdict for B & W on the fraudulent concealment and conspiracy claims. It returned a verdict for Ms. Smith's survivors on the negligence and strict liability claims, awarding $2 million in compensatory damages. The jury further found that Ms. Smith was 75% at fault; accordingly, the trial court reduced the compensatory damages to $500,000. The jury also found that B & W was liable for "aggravating circumstances" and assessed $20 million in punitive damages. B & W's timely appeal followed.

Additional facts are set forth in the analysis as needed.

### STANDARD OF REVIEW FOR POINTS I–V

■■■ The standard of review for a trial court's denial of a motion for judgment notwithstanding the verdict is whether a submissible case was made. *Payne v. Cornhusker Motor Lines, Inc.,* 177 S.W.3d 820, 832 (Mo.App. E.D.2005). In order to make a submissible case, the plaintiff must present substantial evidence for every fact essential to liability. *Id.* "In determining whether a submissible case was made, this court views the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the prevailing par-

ty." *Id.* The jury is the sole judge of witness credibility and the weight and value of testimony. *Moran v. Hubbartt,* 178 S.W.3d 604, 609 (Mo.App. W.D.2005). Further, the jury may believe or disbelieve any portion of witness testimony. *Id.* Review of whether substantial evidence exists is *de novo. Kenney v. Wal–Mart Stores, Inc.,* 100 S.W.3d 809, 814 (Mo. banc 2003). Substantial evidence is evidence, "which if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Id.* (quotation marks and citations omitted). A motion for judgment notwithstanding the verdict should be granted "only when reasonable minds cannot differ as to the ultimate disposition of the case." *Moran,* 178 S.W.3d at 609. (quotation marks and citations omitted). Granting a judgment notwithstanding the verdict is a drastic action, and an appellate court will not overturn a jury's verdict unless there are no probative facts to support it. *Blue v. Harrah's N. Kansas City, LLC,* 170 S.W.3d 466, 472 (Mo.App. W.D.2005).

### POINT I

In its first point, B & W claims the trial court erred in denying its motion for judgment notwithstanding the verdict on Ms. Smith's survivors' claim for failure to warn and for heart disease, COPD/Emphysema, and addiction. It asserts that Ms. Smith's survivors failed to state a claim as to those theories and injuries under the Wrongful Death Act because those claims were fully adjudicated on the merits against Ms. Smith during her lifetime when the federal district court dismissed her complaint with prejudice.

Before her death, Ms. Smith brought suit against B & W and another tobacco

---

4. Ms. Smith was deposed on November 20–21, 1996. Excerpts of her testimony were read to the jury during the trial.

company in federal court alleging multiple claims. B & W was granted summary judgment as to certain of these claims. Ms. Smith brought four strict liability claims: (1) Count I alleged cigarettes were unreasonably dangerous; (2) Count II alleged that there were inadequate warnings prior to 1970; (3) Count III alleged a defective design because cigarettes are addictive and cause health problems; and (4) Count VI alleged that cigarettes are defective because they are addictive. B & W was granted summary judgment as to Count II. The court determined that Ms. Smith could not prove causation; that is, had there been warnings prior to 1970, Ms. Smith would not have altered her behavior and, thus, the lack of warning prior to 1970 did not cause Ms. Smith's health problems. Ms. Smith brought three negligence claims: (1) Count IV alleged negligent testing, research, advertising, and promotion; (2) Count V alleged defendants negligently warned consumers of health hazards in a manner that diluted the effect of the Surgeon General's warning; and (3) Count IX alleged negligent misrepresentation through concealment. Ms. Smith voluntarily withdrew Count V. B & W was granted summary judgment as to part of Count IV and Count IX. Regarding Count IV, B & W was granted summary judgment as to the claims of negligent advertising and promotion. The court determined no evidence was presented that Ms. Smith saw or was motivated to smoke Kool cigarettes by advertising and promotion. B & W was further granted summary judgment as to Count VII, which alleged a breach of express warranty, Count XI, which alleged fraudulent misrepresentation, and Count X, which alleged civil conspiracy.

Ms. Smith's survivors' wrongful death petition contained four counts. Count I alleged negligence. It asserted that B & W breached three duties: (1) the duty to warn before 1969; (2) the duty to establish a reasonable dose; and (3) the duty to create a safer cigarette. Count II alleged a strict liability claim that cigarettes were defective and unreasonably dangerous. Count III alleged fraudulent concealment, and Count IV alleged conspiracy.

The causes were presented to the jury in three verdict forms. Part I was for the concealment claim, Part II was for the conspiracy claim, and Part III was for the failure to warn, negligent design, and failure to warn claim. The jury returned the following verdict: Part I in favor of B & W, Part II in favor of B & W, and Part III in favor of Ms. Smith's survivors.

At issue in this point are the negligence and strict liability failure to warn claims. These claims were asserted in both the federal action and the subsequent wrongful death action.[5] B & W was granted summary judgment on these claims in the federal court action after the trial court determined that Ms. Smith was unable to prove causation, that she would have altered her behavior had she been warned. Because of this, B & W argues that Ms. Smith's survivors were statutorily prohibited from asserting the same claims against it under the Missouri wrongful death statute. Section 537.080 states, in relevant part:

1. Whenever the death of a person results from any act, conduct, occurrence, transaction, or circumstance which, *if death had not ensued, would have entitled such person to recover damages* in

---

5. Ms. Smith's survivors concede this by stating the following in their brief: "However, in this new wrongful death action, the state court allowed the wrongful death plaintiffs to pursue claims which the federal court judge dismissed on summary judgment in the personal injury action."

respect thereof, the person or party who, or the corporation which, *would have been liable if death had not ensued* shall be liable in an action for damages, notwithstanding the death of the person injured, which damages may be sued for . . .

(emphasis added). B & W asserts that, as her claims were adjudicated in federal court, Ms. Smith would have been precluded from asserting them in Missouri state court. Because Ms. Smith would have been precluded from asserting them, B & W reasons, her survivors are also precluded from asserting them. Thus, they conclude that JNOV should have been granted as to the failure to warn claims.

### History of Wrongful Death Statutes

The first wrongful death statute appeared in England in 1846.[6] Elizabeth Clark, *Impacts of Modern Life Support Techniques on Wrongful Death Actions Brought After Final Personal Injury Judgments*, 16 U. PUGET SOUND L.REV. 711, 715 (1993). Known as Lord Campbell's Act, it is the progenitor of wrongful death statutes in the United States and Canada. *Id.* Entitled "[a]n act for compensating the families of persons killed by accidents," the act provided as follows:

> [W]hensoever the Death of a Person shall be caused by wrongful Act, Neglect or Default, and the Act, Neglect, or Default is such as would (if Death had not ensued) have entitled the Party injured to maintain an Action and recover Damages in respect thereof, then and in every such Case the Person who would have been liable if Death had not ensued shall be liable to an Action for Damages,

notwithstanding the Death of the Person injured.

*Id.* Nearly all states' wrongful death statutes utilize wording from Lord Campbell's Act. *Id.* at 715–16. Despite this, and as will be shown, *infra*, this language has been interpreted in wildly divergent ways.

### Missouri Cases Addressing This Issue Are Not Dispositive

In support of its argument, B & W cites three cases, which are categorized into two groups. The first two cases involve situations where the decedent, had he or she lived, would not have been able to bring suit because the defendant's actions were protected by some form of immunity. In *Campbell v. Callow*, 876 S.W.2d 25 (Mo. App. S.D.1994), a father brought suit under the wrongful death act against the mother of their deceased child. *Id.* at 26. The child was killed in an automobile accident wherein the vehicle, driven by mother, collided with a bridge while child was a passenger. *Id.* The trial court dismissed the suit because of the parental immunity doctrine. *Id.* The Southern District relied upon the following language from *Klein v. Abramson*, 513 S.W.2d 714, 717 (Mo.App. 1974):

> The clear meaning of [the wrongful death statute] is that the legislature saw fit to condition the right to sue for wrongful death upon the primary fact that the decedent could have maintained an action for damages for the injuries had he survived. If such condition cannot be shown, no cause of action for the wrongful death exists.

*Id.* at 28. The Southern District then noted that the child died before the paren-

---

**6.** There is apparently some debate regarding whether an action for wrongful death existed at English common law. As it does not impact the analysis in this case, the matter is not addressed. A discussion of the matter is con- tained in *Long v. McKinney*, 897 So.2d 160, app. at 179–80 (Miss.2004), and *Storm v. McClung*, 334 Or. 210, 47 P.3d 476, 482 n. 4 (2002).

tal immunity doctrine had been abolished. *Id.* It stated that, had the child survived, the parental immunity doctrine would have precluded the child's suit against her mother. *Id.* The dismissal was affirmed. *Id.*

In *Miller v. Smith*, 921 S.W.2d 39 (Mo. App. W.D.1996), parents filed a wrongful death action against a police officer. *Id.* at 42. The parents' son committed suicide by fatally shooting himself in the head after being arrested for driving while intoxicated. *Id.* The parents alleged the police officer negligently failed to restrain and protect the son after placing him under arrest and, with deliberate indifference, deprived the son of his right to be protected while in custody. *Id.* at 42–43. The trial court entered summary judgment in favor of the police officer. *Id.* at 43. This court noted that the "clear intent of [the wrongful death statute] is to restrict the right to sue under the wrongful death statute to situations where the decedent could have brought a suit for damages for decedent's injuries." *Id.* at 44 (citing *Campbell*, 876 S.W.2d at 28). On appeal, parents challenged the grant of summary judgment on the basis of the official immunity doctrine. *Id.* at 45. The appellate court upheld the trial court's determination that the police officer's actions were protected by the official immunity doctrine. *Id.* at 46. The grant of summary judgment was affirmed. *Id.* at 48.

These cases do not resolve the issue presented and are not applicable in the case *sub judice.* In the immunity cases, the decedent would never have been entitled to bring a cause of action because a form of immunity protected the defendant's actions. In this case, however, Ms. Smith was entitled to bring a cause of action. In fact, she did so in federal court before her death. The question presented is not whether Ms. Smith's survivors should have been prevented from bringing a wrongful death action because Ms. Smith was never entitled to bring suit for her damages. Instead, the question is whether Ms. Smith's survivors should have been prevented from asserting claims based on failure to warn because Ms. Smith adjudicated these claims during her lifetime and, thus, would have been precluded from reasserting them.

The third case B & W relies upon involves a situation where the decedent settled with the defendant prior to his death and the decedent's family was precluded from bringing a wrongful death action because of the settlement. In *Strode v. St. Louis Transit Co.*, 197 Mo. 616, 95 S.W. 851 (1906), the deceased driver was driving a wagon that was struck by a streetcar. *Id.* at 851. The driver did not appear to be injured initially but died 54 days after the accident from injuries caused by the accident. *Id.* A few days after the accident, the driver entered into a settlement with the streetcar company wherein the driver released any claims he might have against the streetcar company. *Id.* at 852. At the time he entered into the settlement, the driver was aware that he had sustained injuries from the accident. *Id.* Despite this, he signed the settlement. *Id.* Under the terms of the settlement, the driver's employer was compensated while the driver received no compensation. *Id.* The driver's children brought suit against the streetcar company. *Id.* at 851. The Missouri Supreme Court determined that the release was valid and, had the driver survived, would have precluded the driver from bringing suit against the streetcar company. *Id.* at 853. The driver's children argued that the driver's cause of action and their cause of action, under the wrongful death statute, were two independent causes of action. *Id.* The Missouri Supreme Court stated:

In other words, the contention is made that our statutes create two separate and independent causes of action, one in the deceased, and another and different one in the widow and minor children, the latter of which cannot be compromised, settled, or adjusted by the deceased in his lifetime, and this is the only seriously contested point in the case here. . . .

*Id.* Because of the settlement, the Missouri Supreme Court determined that the driver's children could not bring a wrongful death action against the streetcar company. *Id.* It stated:

We then confront, in direct and unmistakable terms the question as to whether or not, where a person is injured through the negligence or default of another, and before death, makes a settlement with the wrongdoer, can his widow or children yet maintain an action for the death and accrued damage, if any, by reason thereof. This question, we feel constrained, under the authorities and our statutes to answer in the negative. Such answer is right in principle and in our judgment right under a fair and reasonable construction of the statutes. Our statutes never contemplated that there should be two such independent and distinct causes of action in cases of death resulting from a wrongful act, as would authorize a recovery by the injured party in his lifetime, and afterwards another and further recovery by the widow and children in case of his death. Yet this is the force and effect of plaintiff's contention. If, one injured by the negligence of another, can, before death, settle with the tort-feasor, and yet leave a cause of action against the tort-feasor in favor of his wife and children, he can bring suit, recover judgment and receive payment of the judgment, and yet leave this cause of action, if death was in any way a result of the alleged tort. In other words, the alleged negligence might have reduced him to a condition nigh unto death, but with sufficient time before death to sue for and collect damages for his bodily ailments, and he thereafter die, and still leave in full force an action for damages for injuries growing out of the same negligent act, to be enforced by his wife and children as the case may be. To this proposition we have been unable to give our assent. Whether the cause of action given to the widow or children, be denominated a transmitted right, a survival right, or an independent cause of action, it yet remains true that the foundation and gist of each and all is the negligent act which produced the injury. The negligent act was the basis at common law for the cause of action in the husband, and it is likewise the gist and basis of the cause of action in favor of the widow or children, or of the administrator as in some states provided.

*Id.* It further stated that Missouri courts "look upon the right of the widow and children as a transmitted right and not strictly an independent right of action." *Id.* After reviewing prior Missouri cases, the court concluded:

From the above it clearly appears that our court recognizes the right of action involved in the case at bar as purely a transmitted right of action. That is to say, the right of action which first existed in deceased, but which, under the terms of the common law, would have died with the deceased, but for these statutes which have preserved and transmitted the same. Our court has not looked upon it as a separate and distinct cause of action. Being a right of action which first existed in the deceased, it necessarily follows that this right of action could be terminated by the deceased in his lifetime either by an adjustment and settlement thereof or by

an adjudication in the courts. In either of which cases, at the death of the deceased, whether a settlement of the right of action was made by an adjustment out of court or by adjudication in court, there would be no right of action to be transmitted. And such adjustment or adjudication would be a bar to any subsequent action.

*Id.* at 854. It quoted, with approval, language from the Supreme Court of Indiana:

[The Indiana wrongful death statute] provides in terms that the action may be maintained by the personal representatives of the deceased for the wrongful act or omission of another if the deceased might have maintained an action, had he lived, for such wrongful act or omission; that is to say, if the deceased, at the time of his death, might have maintained such action, but the deceased having prosecuted to final judgment an action for such wrongful act or omission, and the judgment having been paid and received by him, he at the time of his death could not have maintained an action for such wrongful act or omission, as the right of action in his favor had merged into the judgment which was satisfied, hence no action exists in favor of the personal representatives of the deceased by virtue of the latter section. . . . It was certainly not the intention of the Legislature that where the person guilty of the wrong has been once subjected to a suit by the injured party in his lifetime, and compelled to pay all the damages resulting from the injuries sustained by the wrongful act, he should again be liable to an action in favor of the personal representatives of the injured party after his death, and be again compelled to respond in damages for the same act. . . . It is contended that the [Indiana wrongful death statute] gives a new right of action in favor of the administrator for the benefit of the widow and children, if any, or the next of kin. This is true in a certain sense. Without the statute the action could not be maintained, but in order that it may be maintained the intestate must have had a right of action against the person whose wrongful act or omission caused the injury which he could have maintained had he lived, and when, as in this case, the injured party has prosecuted an action for damages on account of the injury to final judgment, and the judgment has been satisfied prior to his death, he, if he had lived, could not have prosecuted an action against the person causing the injury for the same act or omission.

*Id.* at 854–55. It also noted:

Whether the right of action is a transmitted right or an original right; whether it be created by a survival statute or by a statute creating an independent right, the general concensus of opinion seems to be that the gist and foundation of the right in all cases is the wrongful act, and that for such wrongful act but one recovery should be had, and that if the deceased had received satisfaction in his lifetime, either by settlement and adjustment or by adjudication in the courts no further right of action existed. There are, however, a few cases to the contrary.

*Id.* at 856. The Missouri Supreme Court concluded:

We therefore conclude, whether the action is under the second or third section of the damage act, a settlement and adjustment or an adjudication in court, by deceased during his lifetime, is a bar to any action by the widow or children, and in this case the release in evidence is a complete bar to this action. . . .

*Id.*

Initially, *Strode* appears to be applicable to this case and to resolve the issue. It

does not answer the question presented, however, because the Missouri Supreme Court has changed its understanding of the wrongful death statute. *O'Grady v. Brown*, 654 S.W.2d 904 (Mo. banc 1983), greatly impacts the utility of *Strode* as precedent. "In 1983, the Supreme Court of Missouri announced a major shift in its interpretation of Missouri's wrongful death statute." *Howell v. Murphy*, 844 S.W.2d 42, 46 (Mo.App. W.D.1992). "In *O'Grady v. Brown*, 654 S.W.2d 904 (Mo. banc 1983), the court announced that the wrongful death statute should not be so strictly construed as to avoid the wrongful death statute's purposes." *Id.* The Missouri Supreme Court stated:

Respondents assert that this statute must be "strictly construed" because it is "in derogation of the common law." We do not agree. The wrongful death statute is not, strictly speaking, in "derogation" of the common law. Derogation is defined as "[t]he partial abrogation or repeal of a law, contract, treaty, legal right, etc." or as a "lessening, weakening, curtailment, impairment," detraction or taking away of a power or authority. **3 Oxford English Dictionary 232** (1933). Wrongful death acts do not take away any common law right; they were designed to mend the fabric of the common law, not to weaken it. Remedial acts are not strictly construed although they do change a rule of the common law. *Steggall v. Morris*, 363 Mo. 1224, 258 S.W.2d 577, 582 (1953). We must therefore apply the statutory language "with a view to promoting the apparent object of the legislative enactment." *United Air Lines v. State Tax Commission of Missouri*, 377 S.W.2d 444, 451 (Mo. banc 1964).

*O'Grady*, 654 S.W.2d at 907–08. The *O'Grady* court identified three purposes of Missouri's wrongful death statute: (1) providing compensation to bereaved plaintiffs for their loss; (2) ensuring that tortfeasors pay the consequences of their actions; and (3) generally deterring harmful conduct that might lead to death. *Howell*, 844 S.W.2d at 46. It determined that providing compensation to bereaved plaintiffs was the "manifest purpose" of the statute. *O'Grady*, 654 S.W.2d at 908.

The issue in *O'Grady* was whether parents could maintain a wrongful death action for the death of a stillborn child. Prior caselaw held that an action for the wrongful death of an unborn fetus could not be maintained because a fetus was not a person within the meaning of the statute. *Id.* at 906. The *O'Grady* court determined that a fetus is a person within the meaning of the statute. *Id.* at 910. It examined what it meant for a decedent to be "entitled ... to recover damages" from the defendant "if death had not ensued." *Id.* At the time of injury and death, the child was not yet born and, thus, could not maintain a cause of action. Before the wrongful death statute was amended in 1979, the statute used the phrase, "entitled to maintain an action and recover damages." *Id.* This earlier version had been interpreted to require that the decedent be able to "maintain an action" at the time the injury was sustained. *Id.* Other prior cases interpreted the earlier version to require that the decedent be able to maintain an action at the time of death as opposed to the time of injury. *Id.* The *O'Grady* court's interpretation of the revised version rejected both of these interpretations. *Id.* It stated that the wrongful death statute creates a new cause of action and does not revive an action belonging to the decedent. *Id.* In contrast to the holding of *Strode*, the Missouri Supreme Court held that: "The right of action thus created is neither a transmitted right nor a survival right." *Id.* It determined that the statute "does not condition recovery

upon the existence of a right to sue at either the time of the injury or the time of the death." *Id.* The test set forth by the *O'Grady* court is that "a cause of action for wrongful death will lie whenever the person injured would have been entitled to recover from the defendant *but for* the fact that the injury resulted in death." *Id.* at 910–11. The court stated: "But for the fact that the injuries resulted in death, the child would have been born and 'entitled to recover' from respondents." *Id.* at 911. It determined that the cause of action asserted by the parents were included within the terms of the Missouri wrongful death statute. *Id.*

The impact of *O'Grady* is to nullify the reasons asserted for the holding in *Strode.* Thus, while the Missouri Supreme Court has not specifically stated that *Strode* is no longer to be followed, its holding is premised upon an interpretation of the Missouri wrongful death statute that no longer applies. *Strode* does not resolve the issue presently before the court.

■ Neither is the test set forth in *O'Grady* and re-articulated in subsequent caselaw helpful. Under Missouri's wrongful death statute, "the right to sue for wrongful death is conditioned on the fact that the decedent could have maintained an action for damages for the injuries sustained had he or she survived." *Super v. White,* 18 S.W.3d 511, 515 (Mo.App. W.D.2000)(citing *Campbell,* 876 S.W.2d at 28). One interpretation of this standard is that, had Ms. Smith survived, she could not have maintained an action for damages because she had previously asserted such action in federal court, which was resolved by the court's dismissal with prejudice, and thus her survivors were precluded from re-asserting a second action against the same tortfeasors for the same conduct. Another interpretation of this rule is that Ms. Smith could have, and in fact did,

maintain an action for damages. This second interpretation is supported by *Super,* which relied upon an immunity case, and stated: "Hence, for the appellants to succeed on their wrongful death actions against the respondents, based on their claims of medical malpractice, they were required to show the requisite elements of a medical malpractice claim." *Id.* at 515. This interpretation suggests that survivors need only show the elements of an underlying cause of action the decedent could have brought, regardless whether the decedent had already asserted the cause of action before death.

B & W also cites, without elaborating, *Schmelzer v. Central Furniture Co.,* 252 Mo. 12, 158 S.W. 353 (1913). Notably, some sources cite *Schmelzer* for the proposition that Missouri has adopted the view that personal injury litigation prevents a wrongful death action for the injured person's death. 22A AM.JUR.2D *Death* § 141 (2006); 22A AM.JUR.2D *Death* § 144 (2006); Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death,* 26 A.L.R.4th 1264, § 3[a] (1983). Gulbis also cites *Schmelzer* as being a case "in which the prior personal injury litigation was decided adversely to the injured person apparently in a trial on the merits" where the court "held that the wrongful death beneficiaries were precluded from relitigating the issue of liability in a subsequent wrongful death action, and that therefore the wrongful death claim was barred." Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death,* 26 A.L.R.4th 1264, § 6 (1983).

Although not acknowledged by these outside sources, *O'Grady* greatly decreases *Schmelzer*'s value as precedent just as it does with *Strode.* The first section of the *Schmelzer* opinion bears the heading: "1.

Transmitted Cause of Action." The first sentence of the opinion is: "Plaintiff concedes that if a final and valid judgment on the merits has been rendered against her husband in the former case she could not recover in this action. This is undoubtedly true." 158 S.W. at 354. *Strode* is cited for this proposition. The issue in *Schmelzer* was whether a final and valid judgment on the merits had been rendered against the plaintiff's husband as plaintiff claimed that the judgment entered against her husband was void because it was entered fifteen days after his death without suggestions of death having been filed and without the cause being revived in the name of his widow, children, or administrator. *Schmelzer*, 158 S.W. at 354. The court concluded that the judgment entered against plaintiff's husband was not void. *Id.* at 355. It held that a final judgment had been entered against plaintiff's husband, and it was a bar to the prosecution of a wrongful death action. *Id.* The court reached its conclusion after relying on *Strode* and the interpretation of the wrongful death statute discussed in *Strode*. *O'Grady* impacts *Schmelzer* in the same manner that it impacts *Strode* and, thus, *Schmelzer* does not resolve the issue presented.

### A Survey Of Cases From Other Jurisdictions Reveals No Clear Rule

With Missouri caselaw providing little guidance, jurisprudence from other states is examined.[7] A survey of caselaw on this

---

7. B & W has also cited *Stern v. Internal Medicine Consultants, II, L.L.C.*, 452 F.3d 1015 (8th Cir.2006). The facts of *Stern* are strikingly similar to those of *Strode*. In *Stern*, an adult son was a patient of defendant doctors for four years. *Id.* at 1016. His condition was erroneously diagnosed as hemorrhoids. *Id.* After leaving the doctors' care, son learned that he had a cancerous tumor in his colon that had metastasized to his liver and that his condition was terminal. *Id.* Son filed a malpractice complaint against the doctors. *Id.* Son eventually settled with the doctors, executed a release of claims, and dismissed his malpractice suit. *Id.* Son died, and son's mother brought a wrongful death action against the doctors, alleging the same negligence as was the subject of the malpractice suit, but requesting different damages. *Id.* The trial court granted summary judgment in favor of doctors, after determining that son's release precluded mother's wrongful death action. *Id.* On appeal, the Eighth Circuit examined the issue under Missouri law. *Id.* at 1017. The court concluded that the issue was answered by *Strode* and that the grant of summary judgment was correct. *Id.*

Mother argued that *Strode* "is no longer good law because the damages that are now available to wrongful death plaintiffs were not included in the statute as it then existed." *Id.* at 1018. The court rejected this argument, stating that it confuses a cause of action with a measure of damages. *Id.* Mother also argued in her brief that *Strode* did not apply "because it treated a wrongful death action as a right transmitted from the decedent's cause of action as opposed to a new and independent cause of action." *Id.* at n. 3. The court did not discuss this argument because she abandoned the position at oral argument. *Id.*

The Eighth Circuit determined that, under Missouri law, mother's "claim is dependent upon whether she can satisfy the statutory requirement that her son could have pursued a claim at the time of his death." *Id.* at 1018–19. This is contrary to *O'Grady*, although *O'Grady* is not cited in the opinion. *O'Grady*, 654 S.W.2d at 910 (stating that the wrongful death statute "does not condition recovery upon the existence of a right to sue at either the time of the injury or the time of the death").

Mother also argued "Missouri law does not condition her cause of action on the status of her son's claim at the time of his death, but rather upon whether her son ever had a viable claim." *Stern*, 452 F.3d at 1020. In support of this argument, mother cited *Gramlich v. Travelers Insurance Co.*, 640 S.W.2d 180 (Mo.App. E.D.1982). In *Gramlich*, one of the issues was "whether the time-bar of the employee's malpractice action operated to bar his widow's wrongful death action." *Stern*, 452 F.3d at 1020. The Eastern District "held

issue reveals a majority and a minority rule. The issue in most of the cases reviewed turned on statutory construction. Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 1[a] (1994). Likewise, the issue before this court must be determined by construing Missouri's wrongful death statute.

The Restatement of Judgments summarizes the rule as follows:

> When a person has been injured by an act which later causes his death and during his lifetime brought an action based on that act:
>
> (1) If the action resulted in judgment against the injured person, it precludes a wrongful death action by his beneficiaries to the same extent that the person himself would have been precluded from bringing another action based on the act, unless the judgment was based on a defense that is unavailable against the beneficiaries in the second action.
>
> (2) If the action resulted in judgment in favor of the injured person:
>
> (a) If a wrongful death action is permitted only when the decedent had a claim at the time of his death, the judgment precludes such an action to the same extent that the person himself would have been precluded from bringing another action based on the act.
>
> (b) If a wrongful death action is permitted even though the decedent had obtained a judgment for his personal injuries, the judgment precludes recovery of damages in the wrongful death action for such elements of loss as could have been recovered by the decedent in his action.
>
> (3) Issues determined by a judgment for or against a person in an action based on an act which later causes his death are conclusive in a subsequent action for causing his death.

RESTATEMENT (SECOND) OF JUDGMENTS § 46 (1982). Its Comment summarizes the rationales employed as follows:

> *b. Rationale.* The claim for wrongful death that arises in favor of the decedent's family, dependents, or representative can be characterized as either "derivative" from the injured person's own claim or "independent" of it. If the claim for wrongful death is treated as wholly "derivative," the beneficiaries of the death action can sue only if the decedent would still be in a position to sue. In this approach, the decedent's

---

that the applicable statute of limitations is that specifically written for wrongful death actions." *Id.* The Eighth circuit stated that *Gramlich* did not answer the question currently before it, and, even if it did, the issue was decided in *Strode* and *Strode* controls. *Id.* This proposition is contrary to that expressed, *supra.*

The court also relied upon section 537.085, which "allows a defendant to raise as a defense to a wrongful death claim any defense that would have been available in a cause of action the decedent could have brought." *Id.* at 1019. The court concluded that the defendant doctors could have asserted the release as an affirmative defense against son and, thus, could assert it as a defense against mother. *Id.* Mother asserted that not all de-

fenses may be asserted, and this is an example of an impermissible defense. *Id.* at n. 4. The court responded by stating that section 537.085 says the defendants may assert *any* defense, and thus all defenses are included. *Id.* While this proposition is not discussed in depth in this opinion, it is notable that *Gramlich* holds that a defendant may not assert that the statute of limitations has run for the underlying tort as a defense in a wrongful death cause of action. This indicates that not all defenses that might have been asserted against the decedent fall within the purview of section 537.085.

For these reasons, and the rationale expressed in this opinion deciding a similar issue, the opinion of the Eighth Circuit in *Stern* is not persuasive and is not followed.

action for personal injuries during his lifetime has the same consequences as it does under the survival statute. See § 45. Accordingly, settlement of the decedent's personal injury claim or its reduction to judgment for or against the alleged tortfeasor extinguishes the wrongful death claim against that tortfeasor. Similarly, issue preclusion applicable against the decedent is applicable also against the claimant in the wrongful death action. If, on the other hand, the claim for wrongful death is treated as wholly "independent," the decedent's disposition of his personal injury claim would have no effect on the wrongful death claim. The situation would be as though the injured person and his beneficiaries each had a separate legal interest in his life, assertable by separate action.

The authorities dealing with the question are in profound conflict. (Moreover, they frequently confuse survival of the decedent's personal injury claim and the incidence of the wrongful death action.) In the distinct majority of jurisdictions, the rule is that the wrongful death action is "derivative," i.e., an action by the beneficiaries under the wrongful death statute is permitted only if the decedent had a claim at the time of his death. On this interpretation of the applicable wrongful death statute, the injured person and his statutory beneficiaries are in effect successively eligible representatives to bring an action for loss resulting from the tortious act. A judgment in an action by the decedent for his injuries has the same preclusive effects on them as it has on him.

*Id.*

## The Majority Position

The majority rule generally holds that personal injury litigation prevents a wrongful death action for the injured person's death.[8] This rule has several variations. Several cases "have expressed the view that a judgment in prior personal injury litigation either in favor of or adverse to the person injured extinguishes any claim for the injured person's wrongful death which might otherwise have been brought by the decedent's survivors and thus bars a subsequent wrongful death action." Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 3[a] (1983). Courts expressing this view include interpretation of wrongful death statutes in the following states: Arkansas,[9] Illinois,[10]

---

**8.** 22A Am.Jur.2d *Death* § 141 (2003)(citing *Wilson v. Kremer*, 433 Pa.Super. 79, 639 A.2d 1219 (1994); *Schlavick v. Manhattan Brewing Co.*, 103 F.Supp. 744 (N.D.Ill.1952)(applying Indiana law); *Perry's Adm'r v. Louisville & Nashville R.R. Co.*, 199 Ky. 396, 251 S.W. 202 (1923); *Harris v. Ill. Cent. R.R. Co.*, 111 Miss. 623, 71 So. 878 (1916); *Edwards v. Interstate Chem. Corp.*, 170 N.C. 551, 87 S.E. 635 (1916); *Kelliher v. New York Cent. & R.R. Co.*, 212 N.Y. 207, 105 N.E. 824 (1914); *Schmelzer v. Cent. Furniture Co.*, 252 Mo. 12, 158 S.W. 353 (1913)); Elizabeth Clark, *Impacts of Modern Life Support Techniques on Wrongful Death Actions Brought After Final Personal Injury Judgments*, 16 U. Puget Sound L.Rev. 711, 716 (1993); Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 2[a] (1983) ("A number of courts have taken the view that a judgment in previous personal injury litigation extinguishes any basis for a subsequent wrongful death claim...."); Restatement (Second) of Judgments § 46 Reporter's Note (1982) ("The clear weight of authority is that a prior judgment for or against the decedent precludes a wrongful death action by his beneficiaries.").

**9.** *Simmons First Nat'l. Bank v. Abbott*, 288 Ark. 304, 705 S.W.2d 3 (1986); *Matthews v. Travelers Indem. Ins. Co.*, 245 Ark. 247, 432 S.W.2d 485 (1968).

**10.** *Fountas v. Breed*, 118 Ill.App.3d 669, 74 Ill.Dec. 170, 455 N.E.2d 200 (1983).

Indiana,[11] Kentucky,[12] Mississippi,[13] New York,[14] North Carolina,[15] Pennsylvania,[16] South Carolina,[17] and Vermont.[18]

Other cases state that the wrongful death action is barred when the personal injury litigation results in a judgment favorable to the injured person.[19] Courts expressing this view include interpretation of wrongful death statutes in the following

states: Arkansas,[20] Florida,[21] Indiana,[22] Illinois,[23] Kentucky,[24] New York,[25] North Carolina,[26] Texas,[27] and Vermont,[28]

Some cases hold that where "the prior personal injury litigation was decided adversely to the injured person apparently in a trial on the merits, ... the wrongful death beneficiaries were precluded from relitigating the issue of liability in a subse-

**11.** *Schlavick v. Manhattan Brewing Co.*, 103 F.Supp. 744 (D.C.Ill.1952)(applying Indiana law).

**12.** *Perry's Adm'r v. Louisville & Nashville R.R. Co.*, 199 Ky. 396, 251 S.W. 202 (1923).

**13.** *Harris v. Illinois Cent. R.R. Co.*, 111 Miss. 623, 71 So. 878 (1916).

**14.** *Doe v. State*, 189 A.D.2d 199, 595 N.Y.S.2d 592, 596–97 (N.Y.App.Div.1993); *In re Joint E. & S. Dist. Asbestos Litig. v. Celotex Corp.*, 726 F.Supp. 426 (E.D.N.Y.1989); *Standard Accident Ins. Co. v. Newman*, 2 Misc.2d 348, 47 N.Y.S.2d 804 (N.Y.App. Term 1944), *aff'd*, 268 A.D. 967, 51 N.Y.S.2d 767 (N.Y.App.Div. 1944); *Lanning v. Erie R.R. Co.*, 265 A.D. 576, 40 N.Y.S.2d 404 (N.Y.App.Div.1943), *aff'd*, 291 N.Y. 688, 52 N.E.2d 587 (1943); *Fontheim v. Third Ave. Ry. Co.*, 257 A.D. 147, 12 N.Y.S.2d 90 (N.Y.App.Div.1939); *Kelliher v. New York Central & Hudson River R.R. Co.*, 212 N.Y. 207, 105 N.E. 824 (1914); *McGahey v. Nassau Elec. R.R. Co.*, 51 A.D. 281, 64 N.Y.S. 965 (N.Y.App.Div.1900), *aff'd*, 166 N.Y. 617, 59 N.E. 1126 (1901); *Littlewood v. Mayor of New York*, 89 N.Y. 24 (N.Y.1882); *Dibble v. New York & Eric R.R. Co.*, 25 Barb. 183 (N.Y.App.Div.1857).

**15.** *Edwards v. Interstate Chem. Corp.*, 170 N.C. 551, 87 S.E. 635 (1916).

**16.** *McCullough v. Phila., Newtown & N.Y.R.R. Co.*, 81 Pa.Super. 318 (Pa.Super.Ct.1922); *McCafferty v. Pa. R.R. Co.*, 193 Pa. 339, 44 A. 435 (1899).

**17.** *Price v. Richmond & D.R. Co.*, 33 S.C. 556, 12 S.E. 413 (1890).

**18.** *Legg v. Britton*, 64 Vt. 652, 24 A. 1016 (1892).

**19.** 22A Am.Jur.2d *Death* § 142 (2006)(citing *Varelis v. Nw. Mem. Hosp.*, 167 Ill.2d 449, 212 Ill.Dec. 652, 657 N.E.2d 997 (1995)(barring wrongful death action, even though the judgment in the personal injury action was not final and was subject to modification by the trial court at the time of the injured party's death); *Edwards v. Interstate Chem. Corp.*, 170 N.C. 551, 87 S.E. 635 (1916); *Kling v. Torello*, 87 Conn. 301, 87 A. 987 (1913)).

**20.** *Simmons First Nat'l Bank v. Abbott*, 288 Ark. 304, 705 S.W.2d 3 (1986).

**21.** *Variety Children's Hosp. v. Perkins*, 445 So.2d 1010 (Fla.1983).

**22.** *Schlavick v. Manhattan Brewing Co.*, 103 F.Supp. 744 (D.C.Ill.1952)(applying Indiana law).

**23.** *Varelis v. Nw. Mem. Hosp.*, 167 Ill.2d 449, 212 Ill.Dec. 652, 657 N.E.2d 997 (1995); *Kessinger v. Grefco, Inc.*, 251 Ill.App.3d 980, 191 Ill.Dec. 356, 623 N.E.2d 946 (1993).

**24.** *Perry's Adm'r v. Louisville & Nashville R.R. Co.*, 199 Ky. 396, 251 S.W. 202 (1923).

**25.** *Fontheim v. Third Ave. Ry. Co.*, 257 A.D. 147, 12 N.Y.S.2d 90 (N.Y.App.Div.1939); *Kelliher v. New York Cent. & Hudson River R.R. Co.*, 212 N.Y. 207, 105 N.E. 824 (1914); *McGahey v. Nassau Elec. R.R. Co.*, 51 A.D. 281, 64 N.Y.S. 965 (N.Y.App.Div.1900), *aff'd*, 166 N.Y. 617, 59 N.E. 1126 (1901); *Littlewood v. New York*, 89 N.Y. 24 (N.Y.1882).

**26.** *Edwards v. Interstate Chem. Corp.*, 170 N.C. 551, 87 S.E. 635 (1916).

**27.** *Suber v. Ohio Med. Prods., Inc.*, 811 S.W.2d 646 (Tex.App.1991).

**28.** *Legg v. Britton*, 64 Vt. 652, 24 A. 1016 (1892).

quent wrongful death action, and that therefore the wrongful death claim was barred." Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 6 (1983). Courts expressing this view include interpretation of wrongful death statutes in the following states: California,[29] Florida,[30] Louisiana,[31] and Washington.[32]

The majority rule also encompasses releases. If the injured person releases his or her personal injury claims while alive, the majority rule holds that a subsequent wrongful death action is barred. Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 2[b] (1983). States with cases asserting this proposition include New York[33] and Rhode Island.[34]

A series of Mississippi cases "taken together appear to have adopted the rule that a judgment in a revived personal injury action in favor of the decedent's representative does not bar a subsequent wrongful death action, although actual recovery of personal injury compensation during the injured party's lifetime bars a subsequent suit for wrongful death." Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 3[b] (1983)(citing *Hamel v. S. Ry. Co.*, 108 Miss. 172, 66 So. 426 (1914); *Harris v. Illinois Cent. R.R. Co.*, 111 Miss. 623, 71 So. 878 (1916)).

The general rule barring the subsequent wrongful death action is reached for a number of reasons. Some cases cite multiple rationales, while others rely on a sole rationale. Certain courts hold the view that the death statute at issue does not confer a new cause of action but instead provides for the survival of the decedent's cause of action. 22A Am.Jur.2d *Death* § 142 (2006)(citing *Kling v. Torello*, 87 Conn. 301, 87 A. 987 (1913)). This view also holds that the adoption of true survival statutes "did not affect the principle that a release or a recovery by the injured party in his or her lifetime will bar a suit, by his or her next of kin or personal representative, for the death." 22A Am. Jur.2d *Death* § 142 (2003)(citing *Fontheim v. Third Ave. Ry. Co.*, 257 A.D. 147, 12 N.Y.S.2d 90 (N.Y.App.Div.1939), appeal granted, 257 A.D. 948, 13 N.Y.S.2d 281 (N.Y.App.Div.1939)). Courts in Arkansas[35] and Texas[36] have softened this ratio-

---

**29.** *Secrest v. Pac. Elec. Ry. Co.*, 60 Cal.App.2d 746, 141 P.2d 747 (Cal.Dist.Ct.App.1943).

**30.** *Collins v. Hall*, 117 Fla. 282, 157 So. 646 (1934).

**31.** *Sellers v. Seligman*, 496 So.2d 1154 (La.Ct.App.1986)(Wrongful death action by decedent's sons against manufacturers of mask and protective clothing was precluded by adverse determination in decedent's previous suit against manufacturers for disability, pain and suffering, and other injuries decedent allegedly suffered as a result of having contracted silicosis while working as sand blaster, where survival statute did not provide right to beneficiary's survival action when decedent fully litigated and loss action arising from same alleged tort.).

**32.** *Frescoln v. Puget Sound Traction, Light & Power Co.*, 225 F. 441 (D.C.Wash.1915)(applying Washington law).

**33.** *Dibble v. New York & Eric R.R. Co.*, 25 Barb. 183 (N.Y.App.Div.1857).

**34.** *Hall v. Knudsen*, 535 A.2d 772 (R.I.1988).

**35.** *Matthews v. Travelers Indem. Ins. Co.*, 245 Ark. 247, 432 S.W.2d 485 (1968)(noting that an action for wrongful death was to some extent derivative).

**36.** *Suber v. Ohio Med. Prods., Inc.*, 811 S.W.2d 646 (Tex.App.1991)(determining that the wrongful death statute was derivative because a defense to a decedent's cause of action for his own injuries is applicable in a subsequent action for wrongful death).

nale, by finding that the wrongful death action is to some extent derivative.

Other courts interpret the wrongful death statute at issue to require that the decedent have a right of action against the tortfeasor at the moment of death for a suit to be brought for the decedent's wrongful death.[37] Courts expressing this rationale for applying the majority rule include interpretation of wrongful death statutes in the following states: Illinois,[38] Indiana,[39] Kentucky,[40] Mississippi,[41] New York,[42] Oklahoma,[43] and Vermont.[44]

The court in *Littlewood v. Mayor of New York*, 89 N.Y. 24 (N.Y.1882), held that New York's wrongful death statute did not intend to allow a wrongful death suit where the injured person received a judgment for his personal injuries within his lifetime. While acknowledging that the damages for the two causes of action are different and distinguishable, it found legislative intent to allow a wrongful death

suit only if no personal injury suit had been brought during the decedent's lifetime. The condition precedent is that, but for the injured person's death, he or she would have been entitled to maintain an action and recover damages.

In *Variety Children's Hospital v. Perkins*, 445 So.2d 1010 (Fla.1983), a wrongful death action was brought by the decedent's personal representative. The court held that the suit was barred by a personal injury action prosecuted during the decedent's lifetime, which had been based on the same tortious conduct. In the personal injury action, the minor decedent had recovered damages for injuries that included future expenses, and decedent's parents had recovered for past and future medical expenses. The court stated: (1) the decedent did not have a right of action against the tortfeasor at the moment of death because of the prior cause of action; (2) the paramount purpose of Florida's wrong-

**37.** 22A Am.Jur.2d *Death* § 142 (2006) ("The Restatement of Judgments provides that when a person has been injured by an act which later causes his or her death and during his or her lifetime brought an action based on that act which resulted in judgment in favor of the injured person ... if a wrongful-death action is permitted only when the decedent had a claim at the time of his or her death, the judgment precludes such an action to the same extent that the person himself would have been precluded from bringing another action based on the act...."); Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 2[a] (1983)(Some courts reason "that a condition precedent to the maintenance of a wrongful death action is the existence of a claim which the decedent could have sued upon but for his death" and a final adjudication of the injury before the decedent's death negates this condition precedent.).

**38.** *Kessinger v. Grefco, Inc.*, 251 Ill.App.3d 980, 191 Ill.Dec. 356, 623 N.E.2d 946 (1993); *Fountas v. Breed*, 118 Ill.App.3d 669, 74 Ill. Dec. 170, 455 N.E.2d 200 (1983).

**39.** *Schlavick v. Manhattan Brewing Co.*, 103 F.Supp. 744 (D.C.Ill.1952)(applying Indiana law).

**40.** *Perry's Adm'r v. Louisville & Nashville R.R. Co.*, 199 Ky. 396, 251 S.W. 202 (1923).

**41.** *Harris v. Ill. Cent. R.R. Co.*, 111 Miss. 623, 71 So. 878 (1916).

**42.** *Doe v. State*, 189 A.D.2d 199, 595 N.Y.S.2d 592, 596–97 (N.Y.App.Div.1993); *Fontheim v. Third Ave. Ry. Co.*, 257 A.D. 147, 12 N.Y.S.2d 90 (N.Y.App.Div.1939).

**43.** *Haws v. Luethje*, 503 P.2d 871 (Okla.1972) (finding that the release barred the subsequent wrongful death action because a condition precedent to the maintenance of a wrongful death action is that the injured person have a right of action against the tortfeasor at the moment of death).

**44.** *Legg v. Britton*, 64 Vt. 652, 24 A. 1016 (1892).

ful death state is to prevent a tortfeasor from evading liability and that purpose is not served by allowing a double recovery; and (3) allowing the case to be relitigated in a wrongful death action would create many additional problems involving the lack of repose, discouragement of settlement, interests of unborn heirs, and res judicata. *Id.* at 1012.

*Variety* reveals two other rationales used for the general rule. Some courts reason that the purpose of the wrongful death statute is to prevent a tortfeasor from evading liability, and allowing double recovery from the tortfeasor does not serve this purpose. Courts expressing this rationale for applying the majority rule include interpretation of wrongful death statutes in Florida,[45] New York,[46] and Pennsylvania.[47] Others cite the problems raised by allowing relitigation. These dangers include lack of repose, discouragement of settlement, interests of unborn heirs, and res judicata. Courts expressing this rationale for applying the majority rule include interpretation of

wrongful death statutes in Florida[48] and North Carolina.[49]

Where the courts follow the majority rule in situations where the personal injury litigation during the decedent's life resulted in a judgment for the alleged tortfeasor defendant, issues of res judicata and collateral estoppel are often mentioned in subsequent wrongful death litigation involving the same cause of injury. A judgment for the defendant in an action for personal injuries brought by the injured persons has been held to preclude an action for wrongful death alleged to have resulted from those injuries. 22A AM. JUR.2D *Death* § 144 (2003). This conclusion can be based "either on the analogy furnished by the rule and its reasons prevailing in the case of a judgment in favor of the injured party, or on independent grounds, such as res judicata or collateral estoppel."[50] Courts reaching this conclusion include interpretation of wrongful death statutes in Arkansas,[51] California,[52] Florida,[53] Illinois,[54] New York,[55] and Tex-

**45.** *Variety Children's Hosp. v. Perkins*, 445 So.2d 1010 (Fla.1983).

**46.** *Dibble v. New York & Eric R.R. Co.*, 25 Barb. 183 (N.Y.App.Div.1857).

**47.** *McCullough v. Phila., Newtown & N.Y.R.R. Co.*, 81 Pa.Super. 318 (Pa.Super.Ct.1922) (stating that the right to sue for wrongful death was made subject by statute to the condition that no suit for damages had been brought by the party injured within his lifetime and noting that the legislative intent in making this condition was to prevent the injustice of calling upon a defendant to respond twice in damages for the same negligent act).

**48.** *Variety Children's Hosp. v. Perkins*, 445 So.2d 1010 (Fla.1983).

**49.** *Edwards v. Interstate Chem. Corp.*, 170 N.C. 551, 87 S.E. 635 (1916).

**50.** 22A AM.JUR.2D *Death* § 144 (2006)(citing *Collins v. Hall*, 117 Fla. 282, 157 So. 646 (1934) and *Schmelzer v. Cent. Furniture Co.*,

252 Mo. 12, 158 S.W. 353 (1913) for res judicata and *Brown v. Rahman*, 231 Cal. App.3d 1458, 282 Cal.Rptr. 815 (1991) for collateral estoppel).

**51.** *Simmons First Nat'l Bank v. Abbott*, 288 Ark. 304, 705 S.W.2d 3 (1986).

**52.** *Secrest v. Pac. Elec. Ry. Co.*, 60 Cal.App.2d 746, 141 P.2d 747 (Cal.Dist.Ct.App.1943)(noting that the verdict in the prior adjudication negatived the conditions necessary to charge the defendant with responsibility for the decedent's death).

**53.** *Collins v. Hall*, 117 Fla. 282, 157 So. 646 (1934)(applying the doctrine of estoppel by judgment).

**54.** *Kessinger v. Grefco, Inc.*, 251 Ill.App.3d 980, 191 Ill.Dec. 356, 623 N.E.2d 946 (1993).

**55.** *In re New York Asbestos Litig.*, 738 F.Supp. 66 (E.D.N.Y.1990) (Wrongful death and personal injury claims against asbestos-products

as.[56]

In *Frescoln v. Puget Sound Traction, Light & Power Co.*, 225 F. 441 (D.C.Wash.1915)(applying Washington law), the court held that under the doctrine of estoppel by judgment, a judgment against the injured person in his personal injury suit precluded relitigation of the issue in a subsequent wrongful death action. In *Frescoln*, the decedent, within his lifetime, brought suit for personal injuries. The matter was decided after his death by the court's entry of JNOV in favor of the defendant. Although the court recognized that the elements of recovery were different in the wrongful death action, it stated that the plaintiff's right of recovery under both claims was based on the assumption that the defendant was negligent. Given that the prior adjudication found in favor of the defendant as to the negligence count, the court held that the adverse judgment in the first suit was res judicata as to the wrongful death action. Unless and until the first judgment was reversed, the court concluded, the wrongful death claim could not be maintained. *Id.* at 444.

In *Evans v. Celotex Corp.*, 194 Cal. App.3d 741, 238 Cal.Rptr. 259 (1987), a worker filed a personal injury suit for injuries resulting from occupational exposure to asbestos products manufactured by defendant. A general defense verdict was entered in defendant's favor. The worker subsequently died as a result of his occupational exposure to asbestos. The worker's widow and children brought a wrongful death suit against the defendant. The court held that the suit was barred by collateral estoppel. The issues regarding the cause of injury in the wrongful death action were identical to the issues in the personal injury action, even though the causes of action were different. Further, the plaintiffs' interests in the wrongful death action were identical to the worker's interests in his action and had been adequately represented.

## The Minority Position

The minority rule generally holds that the prosecution or satisfaction of either a personal injury action or wrongful death action does not bar prosecution of, and recovery on, the other.[57] As with the majority rule, the minority rule is stated in a variety of ways. Some courts utilizing the minority rule "express the view that a judgment in favor of an injured person in personal injury litigation does not bar a subsequent claim for the injured person's wrongful death." [58] Courts expressing this

---

manufacturers brought by widow and personal representative of estate of laborer exposed to asbestos would be collaterally estopped by judge's order dismissing with prejudice against one manufacturer laborer's prior personal injury action, where judge's order was final judgment, and widow and personal representative stood in no better position relative to asbestos-products manufacturer than laborer would have had if he had survived accident.).

**56.** *Suber v. Ohio Med. Prod., Inc.*, 811 S.W.2d 646 (Tex.App.1991).

**57.** 22A Am.Jur.2d *Death* § 141 (2003)(citing *Walker v. Roney*, 407 Pa.Super. 620, 595 A.2d 1318 (1991); *Simmons First Nat'l Bank v.*

*Abbott*, 288 Ark. 304, 705 S.W.2d 3 (1986); *Rowe v. Richards*, 32 S.D. 66, 142 N.W. 664 (1913), *overruled on other grounds in part by Ulvig v. McKennan Hosp.*, 56 S.D. 509, 229 N.W. 383 (1930)).

**58.** 22A Am.Jur.2d *Death* § 143 (2003)(citing *Thompson v. Wing*, 70 Ohio St.3d 176, 637 N.E.2d 917 (1994)(holding recovery in a medical malpractice action by the decedent during his or her lifetime does not bar a subsequent wrongful-death action); *Brown v. Rahman*, 231 Cal.App.3d 1458, 282 Cal.Rptr. 815 (1991); *Dayhuff v. Brown & Allen*, 150 Ga. 291, 103 S.E. 458 (1920); *McCarthy v. William H. Wood Lumber Co.*, 219 Mass. 566, 107 N.E. 439 (1914); *Ohnesorge v. Chicago City Ry. Co.*, 259 Ill. 424, 102 N.E. 819

view include interpretation of wrongful death statutes in the following states: California,[59] Georgia,[60] Illinois,[61] Massachusetts,[62] Nebraska,[63] New Jersey,[64] Ohio,[65] and Oklahoma.[66] The federal maritime wrongful death statute is also interpreted in this manner.[67]

Other courts apply the minority rule when the judgment in the personal injury action is adverse to the injured party.[68] Courts expressing this view include interpretation of wrongful death statutes in the following states: California,[69] Georgia,[70] Massachusetts,[71] and Ohio.[72]

(1913), *overruled in part on other grounds by Nudd v. Matsoukas*, 7 Ill.2d 608, 131 N.E.2d 525 (1956)); Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 2[a] (1983) ("Some authorities have adopted the view that a judgment in favor of the injured person in a personal injury suit commenced within the injured person's lifetime does not extinguish the basis for a subsequent wrongful death claim by the injured person's survivors."); RESTATEMENT (SECOND) OF JUDGMENTS § 46 (1982)(stating in the Reporter's Note:

The jurisdictions that permit a subsequent action by the beneficiaries are a minority but perhaps a growing one, particularly given the potential influence of *Sea–Land Services, Inc. v. Gaudet, supra*. Of these jurisdictions, the only authorities supporting the proposition that the death action beneficiaries can sue even though the decedent lost his personal injury action seem to be *De Hart v. Ohio Fuel Gas Co.*, 84 Ohio App. 62, 85 N.E.2d 586 (1948), and *Kaiser Foundation Hospitals v. Superior Court*, 254 Cal. App.2d 327, 62 Cal.Rptr. 330 (1967), the latter being inconsistent with *Secrest v. Pac. Elec. R.R.*, 60 Cal.App.2d 746, 141 P.2d 747 (1943). The more widely held view in the jurisdictions that allow the subsequent action is that the beneficiaries of the wrongful death action have what amounts to a claim for supplemental damages following a judgment in favor of the decedent. *See Sea–Land Servs., Inc. v. Gaudet, supra*, and authorities cited therein.).

59. *Secrest v. Pac. Elec. Ry. Co.*, 60 Cal.App.2d 746, 141 P.2d 747 (Cal.Dist.Ct.App.1943); *Blackwell v. Am. Film Co.*, 189 Cal. 689, 209 P. 999 (1922).

60. *Dayhuff v. Brown & Allen*, 150 Ga. 291, 103 S.E. 458 (1920).

61. *Ohnesorge v. Chicago City R. Co.*, 259 Ill. 424, 102 N.E. 819 (1913), *overruled on other grounds by Nudd v. Matsoukas*, 7 Ill.2d 608,

131 N.E.2d 525 (1956), *overruled on other grounds by Alvis v. Ribar*, 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886 (1981) *as stated in Gardner v. Geraghty*, 98 Ill.App.3d 10, 53 Ill. Dec. 517, 423 N.E.2d 1321 (Ill.App.Ct.1981).

62. *McCarthy v. William H. Wood Lumber Co.*, 219 Mass. 566, 107 N.E. 439 (1914); *Clare v. New York & New Eng. R.R. Co.*, 172 Mass. 211, 51 N.E. 1083 (1898).

63. *Hindmarsh v. Sulpho Saline Bath Co.*, 108 Neb. 168, 187 N.W. 806 (1922).

64. *Alfone v. Sarno*, 87 N.J. 99, 432 A.2d 857 (1981), *overruled on other grounds by LaFage v. Jani*, 166 N.J. 412, 766 A.2d 1066 (2001).

65. *Thompson v. Wing*, 70 Ohio St.3d 176, 637 N.E.2d 917 (1994) (holding recovery in medical malpractice action does not bar subsequent wrongful death action); *Mahoning Valley. Ry. Co. v. Van Alstine*, 77 Ohio St. 395, 83 N.E. 601 (1908).

66. *Schmidt v. Moncrief*, 194 Okla. 377, 151 P.2d 920 (1944).

67. *Sea–Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974)(pertaining to a maritime wrongful death action), *overruled on other grounds by Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

68. 22A AM.JUR.2D *Death* § 144 (2003)(citing *DeHart v. Ohio Fuel Gas Co.*, 84 Ohio App. 62, 85 N.E.2d 586 (1948)).

69. *Kaiser Found. Hosp. v.Super. Ct. of Los Angeles County*, 254 Cal.App.2d 327, 62 Cal. Rptr. 330 (1967).

70. *Spradlin v. Georgia R. & E. Co.*, 139 Ga. 575, 77 S.E. 799 (1913).

71. *McCarthy v. William H. Wood Lumber Co.*, 219 Mass. 566, 107 N.E. 439 (1914); *Clare v.*

In New Jersey, when a person has been injured by an act that later causes the person's death and for which the person successfully sued, if a wrongful-death action is permitted even though the decedent had obtained a judgment for his or her personal injuries, the judgment precludes recovery of damages in the wrongful-death action for such elements of loss as could have been recovered by the decedent in his or her action. *Alfone v. Sarno*, 87 N.J. 99, 432 A.2d 857, 867 (1981), *overruled on other grounds by LaFage v. Jani*, 166 N.J. 412, 766 A.2d 1066 (2001).

The general minority rule allowing the subsequent wrongful death action is followed in several jurisdictions for numerous reasons. Some courts focus on the fact that the damages recoverable differ in personal injury and wrongful death cases.[73] Courts in California,[74] Georgia,[75] and Nebraska[76] have expressed this rationale. In *Winding River Village Condominium Ass'n, Inc. v. Barnett*, 218 Ga.App. 35, 459 S.E.2d 569 (1995), a child who nearly drowned when she gained access to a condominium swimming pool recovered for the injuries she sustained in a suit against the condominium association and realty service. The child subsequently died, allegedly from the same genesis of her injuries, and a wrongful death suit was brought. The Georgia court held that that wrongful death action was not extinguished because of the suit during the child's life because the damages recoverable in the wrongful death action, consisting of the full value of the life of the child and expenses resulting from the death of the child, were not recoverable in the prior personal injury action. *Id.* at 571. A New Jersey court applied the minority rule after determining that the purpose New Jersey's wrongful death statute is to compensate for the survivor's pecuniary losses. *Alfone v. Sarno*, 87 N.J. 99, 432 A.2d 857 (1981), *overruled on other grounds by LaFage v. Jani*, 166 N.J. 412, 766 A.2d 1066 (2001). Other courts have stated that the "danger of double recovery does not offer a persuasive public policy reason for barring a subsequent wrongful death action, since courts are capable of distinguishing the elements of damage attributable to the injuries and the elements of damage sustained by the injured person's survivors on account of his death." Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 2[a] (1983). Some courts find that the wrongful death beneficiaries are not in privity with the injured party who brought the earlier personal injury suit and, accordingly, an adverse determination in the

---

*New York & New Eng. R.R. Co.*, 172 Mass. 211, 51 N.E. 1083 (1898).

72. *De Hart v. Ohio Fuel Gas Co.*, 84 Ohio App. 62, 85 N.E.2d 586 (1948); *Johnson v. Cleveland C. & S.L.R. Co.*, 21 Ohio C.C. (N.S.) 268 (1905).

73. Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 2[a] (1983)(Some courts reason "that a personal injury claim is distinct from a wrongful death claim in that the elements of damage recoverable in each are distinguishable.").

74. *Blackwell v. Am. Film Co.*, 189 Cal. 689, 209 P. 999 (1922) (noting that the only pertinent inquiry in the connection between the personal injury and wrongful death action is whether the injury sustained by the decedent was the proximate cause of his death-decedent recovered in the personal injury action).

75. *Spradlin v. Georgia Ry. & Elec. Co.*, 139 Ga. 575, 77 S.E. 799 (1913)(finding no estoppel because the damages differ).

76. *Hindmarsh v. Sulpho Saline Bath Co.*, 108 Neb. 168, 187 N.W. 806 (1922)(noting that the elements of damage are not duplicative in personal injury and wrongful death actions).

personal injury suit does not bar the subsequent wrongful death suit. *Id.* Courts in California [77] and Massachusetts have expressed this view.[78]

Other courts hold that a release of personal injury claims does not bar a subsequent wrongful death action because the wrongful death action is wholly distinct from the personal injury claim.[79] Courts in the following states have expressed this rationale: California,[80] Massachusetts,[81] Oklahoma,[82] and Ohio.[83] The federal maritime wrongful death statute is also interpreted in this manner.[84]

The Restatement of Judgments Comment summarizes the rationales for the minority rule as follows:

*c. Beneficiaries' claim "independent."* In a substantial minority of states, the wrongful death statute has been construed as creating a cause of action in favor of the beneficiaries that is independent, in some degree, of the decedent's claim for his injuries. The question is how "independent" the claim should be. In a very few jurisdictions, the claim is wholly independent in that the beneficiaries under the death statute can recover even though the decedent had prosecuted an action for his personal injuries and suffered adverse judgment on the merits. In the other jurisdictions, the beneficiaries' claim is independent only in that a recovery by the decedent in his personal injury action does not preclude a further action

---

77. *Kaiser Found. Hosps. v.Super. Ct. of Los Angeles County*, 254 Cal.App.2d 327, 62 Cal. Rptr. 330 (1967).

78. *McCarthy v. William H. Wood Lumber Co.*, 219 Mass. 566, 107 N.E. 439 (1914)

79. Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death*, 26 A.L.R.4th 1264, § 2[b] (1983)(citing *Gilmore v. S. Ry. Co.*, 229 F.Supp. 198 (D.C.La.1964) (applying Louisiana law and holding that a release of personal injury claims was not a bar to a subsequent wrongful death suit because the prospective right of action belonged to the decedent's family and not the decedent); *Robison v. Leigh*, 153 Cal.App.2d 730, 315 P.2d 42 (Cal. Dist.Ct.App.1957)).

80. *Secrest v. Pac. Elec. Ry. Co.*, 60 Cal.App.2d 746, 141 P.2d 747 (Cal.Dist.Ct.App.1943).

81. *McCarthy v. William H. Wood Lumber Co.*, 219 Mass. 566, 107 N.E. 439 (1914) (noting that the wrongful death claim arose only after the death of the decedent–the court pointed out that although the administrator acted as the plaintiff in both cases, in the personal injury action he represented the estate, while in the death action he represented the beneficiaries– as such, the different suits were brought in different capacities, and the court concluded that the personal injury action was

not res judicata as to the death action because of the lack of the identity of parties); *Clare v. New York & New Eng. R.R. Co.*, 172 Mass. 211, 51 N.E. 1083 (1898)(noting that a judgment in a previous personal injury suit did not extinguish a subsequent wrongful death claim, since the two claims were different and distinguishable).

82. *Schmidt v. Moncrief*, 194 Okla. 377, 151 P.2d 920 (1944)(noting that the wrongful death claim came into existence only at the time of the decedent's death, and only in favor of his beneficiaries).

83. *De Hart v. Ohio Fuel Gas Co.*, 84 Ohio App. 62, 85 N.E.2d 586 (1948)(noting that the rights of beneficiaries in a wrongful death action begin only after the injured person's death and that the injured person's actions could only affect his claim as opposed to that of his beneficiaries); *Mahoning Valley Ry. Co. v. Van Alstine*, 77 Ohio St. 395, 83 N.E. 601 (1908)(rejecting contention that allowing the subsequent wrongful death action results in double recovery).

84. *Sea–Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974)(finding they were two different claims so there was no res judicata), *overruled on other grounds by Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

by the beneficiaries. The decedent is in effect treated as having represented the beneficiaries so far as concerns determining the liability of the alleged tortfeasor. . . .

In any event, double recovery of damages is not permitted. In some jurisdictions this is done by defining the measures of recovery in the respective actions in mutually exclusive terms. In others, where the measures of damage overlap, the beneficiaries are precluded from seeking items of damage recoverable by the decedent in his action.

As between treating the death action as wholly independent (so that the beneficiaries can recover even if the decedent lost his action) and treating it as independent in that the beneficiaries can recover their additional damages, the latter view is not only predominant but more just. To allow the beneficiaries to sue when the decedent lost his personal injury action subjects the defendant to two suits over the question of his liability, with the possibility of inconsistent results. It also allows what seems worse than double recovery, an opportunity by one member of a family to recover a loss that was legally refused when sought by another. Furthermore, such a rule has the result that the alleged tortfeasor is bound by the determination of liability if he loses, under the rule of § 29, but does not gain exoneration if he wins, which is anomalous given the community of interest among his adversaries. To preclude the beneficiaries by the outcome of the decedent's action, on the other hand, gives recognition to the substantial coextensiveness of the social and economic interests in the two actions and to the fact that the decedent had every incentive to litigate effectively. At the same time, it permits a "second look" at the damage question when death has intervened after the first action went to judgment.

RESTATEMENT (SECOND) OF JUDGMENTS § 46 CMT. C (1982).

Many courts applying the minority rule recognize that collateral estoppel is still applicable. This includes courts interpreting the wrongful death statute of the following states: California,[85] Indiana,[86] Massachusetts,[87] New Jersey,[88] and North

---

**85.** *Secrest v. Pac. Elec. Ry. Co.*, 60 Cal.App.2d 746, 141 P.2d 747 (Cal.Dist.Ct.App.1943) (noting that a prior judgment adverse to the injured person barred a subsequent action for his wrongful death under the doctrine of estoppel by judgment, but that a judgment in favor of the injured person in a personal injury action commenced within his lifetime did not bar a subsequent wrongful death action brought by his representatives).

**86.** *Richter v. Asbestos Insulating & Roofing*, 790 N.E.2d 1000 (Ind.Ct.App.2003); *Small v. Centocor Inc.*, 731 N.E.2d 22 (Ind.Ct.App. 2000); *Tom v. Voida*, 654 N.E.2d 776 (Ind.Ct. App.1995).

**87.** *McCarthy v. William H. Wood Lumber Co.*, 219 Mass. 566, 107 N.E. 439 (1914) (noting that the wrongful death claim arose only after the death of the decedent– the court pointed out that although the administrator acted as the plaintiff in both cases, in the personal injury action he represented the estate, while in the death action he represented the beneficiaries– as such, the different suits were brought in different capacities, and the court concluded that the personal injury action was not res judicata as to the death action because of the lack of the identity of parties).

**88.** *Alfone v. Sarno*, 87 N.J. 99, 432 A.2d 857 (1981) (finding that the basis for a wrongful death action is not extinguished by a previous personal injury suit, but noting that under general principles of fairness and res judicata, a judgment adverse to the decedent in a personal injury action would bar a subsequent wrongful death action. "The court pointed out that it would not be fair to one charged with liability for a wrongful act to successfully defend the personal injury suit and still be subsequently required to defend a second time, possibly years later, for death resulting from the same injuries. Although the wrong-

Dakota.[89] This also includes interpretation of the federal maritime wrongful death statute.[90] Courts in California [91] and Georgia [92] have determined that collateral estoppel is not applicable.

Similarly, courts disagree regarding whether res judicata is available. Courts in California,[93] Indiana,[94] and South Carolina [95] have determined that res judicata is not applicable to bar a subsequent wrongful death action because the personal injury action and wrongful death action do not have an identity of causes of action. A court in California [96] has stated that the

parties in the two actions are not in privity with one another. A court in Louisiana [97] determined that res judicata is not applicable because the wrongful death cause of action does not exist until the decedent's death. Courts in Indiana [98] have found that res judicata is applicable.

The Restatement of Judgments Reporter's Note states the following:

> The problem of issue preclusion does not arise if a wholly "independent" action is allowed; there is no issue preclusion against the beneficiaries. *See Kaiser*

ful death beneficiaries may not have been parties to the prior personal injury action, the court said, their interests were fully protected, since the decedent had every incentive and opportunity to litigate the liability issues fully and effectively. Among the issues which could be precluded by a prior adverse determination, the court said, were issues of negligence or comparative negligence, proximate cause of the injury, the duty of the defendant to the decedent, the defendant's immunity from suit, and the issues of strict and vicarious liability." Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death,* 26 A.L.R.4th 1264, § 6 (1983)), *overruled on other grounds by LaFage v. Jani,* 166 N.J. 412, 766 A.2d 1066 (2001).

89. *Gerrard v. Larsen,* 517 F.2d 1127 (8th Cir.1975)(applying North Dakota Law)(stating that there cannot be collateral estoppel unless the parties from both actions are in privity with one another and factors to consider include the beneficiaries' functional control or right to control the administrator of the estate and whether they possessed interests in the decedent's estate such that the administrator could be considered as protecting their financial interests in the first litigation).

90. *Sea–Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974)(observing that the survivors were bound by the prior litigation concerning the decedent's lost wages, since the issue appeared to have been fully litigated by the decedent), *overruled on other grounds by Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

91. *Kaiser Found. Hosps. v.Super. Ct. of Los Angeles County,* 254 Cal.App.2d 327, 62 Cal. Rptr. 330 (1967)(no res judicata since no identity of causes of action or parties and no collateral estoppel, even though the issue of negligence was decided adversely to the injured person in the prior litigation, because the wrongful death claimant was not a party to or in privity with the injured party)(noting that this decision is contrary to *Secrest v. Pac. Elec. Ry. Co.,* 60 Cal.App.2d 746, 141 P.2d 747 (Cal.Dist.Ct.App.1943) but distinguishing *Secrest* ).

92. *Spradlin v. Ga. Ry. & Elec. Co.,* 139 Ga. 575, 77 S.E. 799 (1913)(no estoppel because the damages differ).

93. *Kaiser Found. Hosps. v.Super. Ct. of Los Angeles County,* 254 Cal.App.2d 327, 62 Cal. Rptr. 330 (1967).

94. *Tom v. Voida,* 654 N.E.2d 776 (Ind.Ct.App. 1995).

95. *Deaton v. Gay Trucking Co.,* 275 F.Supp. 750 (D.C.S.C.1967).

96. *Kaiser Found. Hosps. v.Super. Ct. of Los Angeles County,* 254 Cal.App.2d 327, 62 Cal. Rptr. 330 (1967).

97. *Rajnowski v. St. Patrick Hosp. of St. Charles,* 768 So.2d 88 (La.Ct.App.2000).

98. *Richter v. Asbestos Insulating & Roofing,* 790 N.E.2d 1000 (Ind.Ct.App.2003); *Small v. Centocor Inc.,* 731 N.E.2d 22 (Ind.Ct.App. 2000).

*Foundation Hospitals v. Superior Court, supra.* The question can arise, however, when the beneficiaries may bring a "supplemental" action for wrongful death after the decedent has brought a personal injury action. If the decedent lost on the question of liability in his personal injury action, that determination is preclusive against the beneficiaries. If the decedent won, the beneficiaries can invoke issue preclusion in their favor under the rule of § 29. They are bound, however, by issues resolved adversely to the decedent, particularly determinations concerning the amount of damage he sustained. Their contentions as to damage must take the prior determination as an established premise. *See Sea–Land Services, Inc. v. Gaudet, supra.*

RESTATEMENT (SECOND) OF JUDGMENTS § 46 REPORTER'S NOTE (1982).

As is abundantly clear from the above survey of the law, courts in other jurisdictions have applied diverse rules for divergent reasons. Courts in the same state have applied contradictory rules for differing reasons, explaining the lack of consistency by noting that cases holding otherwise are distinguishable. An examination of caselaw from other jurisdictions provides many options, but no clear answer to the question.

### The Wrongful Death Action Was Not Barred By The Terms of Section 537.080 In This Case

 After considering the exhaustive research, this court concludes that section 537.080 does not bar the wrongful death action filed in this case, despite Ms. Smith having brought a personal injury action during her lifetime for injuries resulting from the same cause of her death. A wrongful death cause of action is created by statute. *State ex rel. Griffin v. Belt,*

941 S.W.2d 570, 572 (Mo.App. W.D.1997). The language of the statute governs when a wrongful death action may be brought.

The language at issue in section 537.080 is "which, if death had not ensued, would have entitled such person to recover damages in respect thereof." This is strikingly similar to the following language from Lord Campbell's Act: "would (if Death had not ensued) have entitled the Party injured to maintain an Action and recover Damages in respect thereof." *Suber by Suber v. Ohio Med. Prod., Inc.,* 811 S.W.2d 646, 653 (Tex.App.1991). One interpretation of this language, utilized by early English cases is that the decedent must have been able to bring suit at the time of injury or death. *Sea–Land Serv., Inc. v. Gaudet,* 414 U.S. 573, 580–81, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), *overruled on other grounds by Miles v. Apex Marine Corps.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). "Since Lord Campbell's Act became the prototype of American wrongful-death statutes, most state statutes contained nearly identical language and have been similarly interpreted by state courts." *Id.* at 581, 94 S.Ct. 806.

Dean Prosser articulates a different interpretation. Prosser asserts that this language simply means that the underlying act committed by the defendant must be tortious. *Id.* at n. 8. He has stated:

> It is not at all clear, however, that such provisions of the death acts ever were intended to prevent recovery where the deceased once had a cause of action, but it has terminated before his death. The more reasonable interpretation would seem to be that they are directed at the necessity of some original tort on the part of the defendant, under circumstances giving rise to liability in the first instance, rather than to subsequent changes in the situation affecting only the interest of the decedent.

*Id.* (citing WEST PROSSER, THE LAW OF TORTS, § 127, at 911 (4th ed.1971)). Although acknowledging that it was adopting a minority view, this is the approach endorsed by the United States Supreme Court in interpreting a federal maritime wrongful death action. *Id.* at 579–82, 111 S.Ct. 317. The Prosser interpretation of the language at issue seems more logical.

Moreover, in *O'Grady* the Missouri Supreme Court declared that Missouri's wrongful death statute should not be so strictly construed as to avoid the wrongful death statute's purposes. It directed courts to apply the wrongful death statutory language " 'with a view to promoting the apparent object of the legislative enactment.' " *O'Grady*, 654 S.W.2d at 908 (citation omitted). The *O'Grady* court identified the three purposes of Missouri's wrongful death statute: (1) providing compensation to bereaved plaintiffs for their loss; (2) ensuring that tortfeasors pay the consequences of their actions; and (3) generally deterring harmful conduct that might lead to death. *Id.* at 909. It determined that providing compensation to bereaved plaintiffs was the "manifest purpose" of the statute. *Id.* at 908. Finding that Ms. Smith's survivors' wrongful death cause of action was not barred by Ms. Smith's suit in federal court is consistent with this "manifest purpose."

Review of the majority rule reveals that a vast number of courts employing the majority rule hold that a wrongful death action is barred by personal injury litigation because they interpret the wrongful death statute at issue to be transmitted or derivative.[99] Another popular interpretation is that the wrongful death statute at issue requires the decedent to have been able to bring a cause of action at the time of his or her death. *O'Grady* firmly establishes that neither of these two interpretations applies to the Missouri wrongful death statute. It stated that the wrongful death statute creates a new cause of action and does not revive an action belonging to the decedent. *Id.* at 910. The Missouri Supreme Court stated: "The right of action thus created is neither a transmitted right nor a survival right." *Id.* It also determined that the statute "does not condition recovery upon the existence of a right to sue at either the time of the injury or the time of the death." *Id.* Thus, these two rationales are not applicable and do not weigh in favor of holding that Ms. Smith's survivors' wrongful death action was barred by the language in section 537.080.

Rationale used by courts adopting the minority approach include that the damages recoverable in a wrongful death ac-

---

**99.** Numerous cases determine that the wrongful death statute at issue is derivative because the defendants are able to assert against the survivors any defense they might have asserted against the decedent. *See, e.g., Wells v. Radiator Specialty Co.*, 413 F.Supp.2d 778, 782 (S.D.Miss.2006); *Crowder v. Am. Eagle Airlines, Inc.*, 118 Fed.Appx. 833, 836 (5th Cir.2004); *Lee v. Thompson*, 859 So.2d 981, 987 (Miss.2003); *Sosebee v. Hillcrest Baptist Med. Ctr.*, 8 S.W.3d 427, 433 (Tex.App.1999); *Nelson v. Am. Nat'l Red Cross*, 26 F.3d 193, 199 (D.C.Cir.1994); *White v. Lunder*, 66 Wis.2d 563, 225 N.W.2d 442, 448 (1975). *O'Grady* clearly established that Missouri's wrongful death state creates an independent

cause of action; one that is not transmitted. And yet, section 537.085 provides:

> On the trial of such action to recover damages for causing death, the defendant may plead and prove as a defense any defense which the defendant would have had against the deceased in an action based upon the same act, conduct, occurrence, transaction, or circumstance which caused the death of the deceased, and which action for damages the deceased would have been entitled to bring had death not ensued.

No party argues, however, that this statutory provision renders Missouri's wrongful death statute derivative.

tion differ from damages recoverable in a personal injury cause of action and that the wrongful death action is wholly distinct from the personal injury claim. This is compelling. Pursuant to section 537.085, damages may be recovered in a wrongful death action for, among other things, pecuniary losses incurred by decedent's death, including, as provided by section 537.090, funeral expenses, and for "the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support" the decedent would have provided. Moreover, section 537.100 provides a statute of limitations for wrongful death action, separate from the statute of limitations applicable to the underlying personal injury action. *See, e.g., Denton v. Soonattrukal*, 149 S.W.3d 517, 519 n. 4 (Mo.App. S.D.2004).

Likewise, there is a logical inconsistency in holding that something a decedent does during his or her lifetime bars a wrongful death cause of action. The following language from the South Dakota Supreme Court in *Rowe v. Rich-ards*, 35 S.D. 201, 151 N.W. 1001, 1006 (1915), is insightful:

> We must confess our inability to grasp the logic of any course of so-called reasoning through which the conclusion is drawn that the husband simply because he may live to suffer from a physical injury and thus become vested with a cause of action for the violation of his own personal right, has an implied power to release a cause of action-one which has not then accrued; one which may never accrue; and one which from its very nature cannot accrue until his death; and one which, if it ever does accrue, will accrue in favor of his wife and be based solely upon a violation of a right vested solely in the wife.

For these reasons, we hold that, pursuant to the language employed in section 537.080, the wrongful death action is not barred in this case, despite the fact that Ms. Smith brought a personal injury action for the injuries eventually resulting in her death during her lifetime.[100]

---

**100.** Issues of res judicata and collateral estoppel need to be addressed. "The concepts of res judicata and collateral estoppel are related but possess different characteristics." *Stine v. Warford*, 18 S.W.3d 601, 605 (Mo. App. W.D.2000). "Res judicata precludes the same parties from relitigating the same claim ('claim preclusion'); collateral estoppel precludes the same parties from relitigating an issue which has been previously adjudicated ('issue preclusion')." *Id.* Occasionally the term "res judicata" is used as the label for both collateral estoppel and res judicata. *Sexton v. Jenkins & Assocs., Inc.*, 152 S.W.3d 270, 273 n. 3 (Mo. banc 2004).

"The doctrine of collateral estoppel precludes the same parties from re-litigating the same issues judicially determined in a previous action." *State ex rel. Conners v. Miller*, 194 S.W.3d 911, 913 (Mo.App. W.D.2006). The Missouri Supreme Court has set forth a four prong test to be used when determining whether collateral estoppel is appropriate. *Id.* First, the issue decided in the first action must be identical to the issue in the second

action. *Id.* Second, the prior litigation must have resulted in a final judgment on the merits. *Id.* Third, the party to be estopped must have been a party or in privity with a party to the prior adjudication. *Id.* Finally, the party to the prior adjudication must have had a full and fair opportunity to litigate the issue in the prior suit. *Id.* There is no requirement that the prior and current litigation be identical causes of actions. *Hollida v. Hollida*, 190 S.W.3d 550, 554 (Mo.App. S.D.2006).

"The res judicata defense precludes not only those issues on which the court in the former suit was required to pronounce judgment, but on all points properly belonging to the subject matter of the litigation and which the parties, exercising reasonable diligence, might have brought into the case at the time." *Id.* at 555. Res judicata requires four identities: "(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons or parties to the action; and (4) identity of the quality or status of the person for or against whom the claim is made." *Id.*

Section 537.085 should be addressed. It states:

On the trial of such action to recover damages for causing death, the defendant may plead and prove as a defense any defense which the defendant would have had against the deceased in an action based upon the same act, conduct, occurrence, transaction, or circumstance which caused the death of the deceased, and which action for damages the deceased would have been entitled to bring had death not ensued.

In its reply brief, B & W cites this statute and indirectly argues that the wrongful death action should be barred because it would have been able to assert the defense of res judicata against Ms. Smith and, via

"Summarily stated, the distinction between collateral estoppel and res judicata is that collateral estoppel operates only as to issues previously litigated, but not as to matters not litigated in the prior action even if they might have properly been determined." *Id.* (quote marks and citation omitted).

As observed in the survey of law from other jurisdictions, courts employing both the majority and minority rule disagree regarding whether the defenses of collateral estoppel or res judicata may be asserted in a wrongful death cause of action when there has been a prior personal injury suit. Some courts "support the proposition that where the prior adverse personal injury judgment is based upon a factual determination negating the defendant's liability, the issue of liability may not be relitigated in a subsequent wrongful death action and that the wrongful death claim is therefore barred." Vitauts M. Gulbis, Annotation, *Judgment in favor of, or adverse to, person injured as barring action for his death,* 26 A.L.R.4th 1264, § 2[a] (1983). Other cases have held "that a judgment in favor of the injured person in his personal injury suit commenced within his lifetime collaterally estops a defendant subsequently charged with the injured person's wrongful death from relitigating the issue of negligence." *Id.*

This court's holding is based upon an interpretation of the language used in section 537.080. On appeal, B & W argues that the language of the wrongful death statute precludes the wrongful death action. B & W does not argue, however, that the wrongful death action should have been barred because, in Ms. Smith's federal action, the court determined certain facts pertaining as to B & W's liability and those questions of fact cannot be relitigated because of ordinary collateral estoppel. Nowhere in its briefs does B & W argue or even set forth the phrase collateral estoppel, set forth the elements of collateral estoppel, identify the determinative findings

of fact in the federal action, or demonstrate that the elements of collateral estoppel are satisfied. Further, B & W does not argue that Ms. Smith's survivors were in privity with her or that the personal injury suit and wrongful death action are identical causes of action so that the four elements of res judicata are satisfied, and the wrongful death action should be precluded based on ordinary res judicata. Instead, it argues that Ms. Smith, had she not died, would be precluded from reasserting her claims based on the principle of res judicata and, as Ms. Smith would have been precluded because of res judicata, her survivors are also precluded under the plain language of section 537.080. This argument is unpersuasive for the reasons stated in the opinion. Collateral estoppel and res judicata are affirmative defenses, although, in certain circumstances not present here, a trial court may raise the issue *sua sponte. Cook v. Cook,* 143 S.W.3d 709, 711 n. 2 (Mo.App. W.D.2004)(citing *Patrick v. Koepke Constr., Inc. v. Woodsage Constr. Co.,* 119 S.W.3d 551, 555 (Mo.App. E.D.2003)). Because B & W has not argued ordinary res judicata or collateral estoppel, this court will not address the question of whether the elements of res judicata or collateral estoppel were satisfied in this situation.

Neither party cited *O'Grady* in its briefs. At oral argument both parties were asked to send a letter to the court addressing the impact of *O'Grady.* Both parties complied with this request. In its letter, B & W states that, even under the minority approach, beneficiaries are barred from recovery on claims that were adjudicated against the decedent during his or her lifetime, citing various out of state cases that are addressed in this opinion, *supra.* Again, though, B & W does not argue that Ms. Smith's survivors' claims should be barred because of res judicata or collateral estoppel.

this statute, against her survivors. B & W fails to clearly articulate this argument. It does not set forth the elements of res judicata and demonstrate that they have been satisfied. It does not claim that section 537.085 encompasses the defense of res judicata.[101] Moreover, it cites section 537.085 for the first time in its reply brief. "[I]ssues not raised in an appellant's opening brief cannot be raised for the first time in the reply brief, and are not properly preserved." *Mo. Dep't of Transp. ex rel. PR Developers, Inc. v. Safeco Ins. Co. of Am.*, 97 S.W.3d 21, 39 (Mo.App. E.D.2002).

The point is denied.

### POINT II

In its second point, B & W claims the trial court erred in denying its motion for judgment notwithstanding the verdict on Ms. Smith's survivors' failure to warn claim.[102] It asserts that Ms. Smith's survivors failed to present sufficient evidence to make a submissible case on the claim because they failed to prove that the lack of any warning prior to 1969 [103] that smoking Kool cigarettes was dangerous caused Ms. Smith's death. B & W's second point is focused on the issue of causation.

 In an action for negligence, generally, a plaintiff must demonstrate: (1) the defendant has a duty to protect the plaintiff from injury; (2) defendant failed to perform the duty; and (3) the failure to perform the duty resulted in injury to plaintiff. *Hill v. Gen. Motors Corp.*, 637 S.W.2d 382, 384 (Mo.App. E.D.1982). In Missouri, a plaintiff may assert a negligent failure to warn claim pursuant to section 388 of the Restatement (Second) of Torts or a strict liability failure to warn claim pursuant to section 402A of the Restatement (Second) of Torts. *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 383 (Mo. banc 1986). While the defendant's standard of care, knowledge, and fault are relevant considerations in a negligence claim, the defendant may be found liable under a strict liability claim without regard to his knowledge or conduct. *Id.* Section 388 of the Restatement (Second) of Torts states:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

---

**101.** See the discussion in footnote 7, wherein the *Stern* court determined that the language in section 537.085 stating "any defense" is plainly interpreted so that all defenses are contemplated by the statute despite the fact that the defense that the statute of limitations has run as to the underlying tort cannot be asserted as a defense in a wrongful death action. Because this argument was not properly preserved or argued, however, the question of whether res judicata is a defense contemplated by section 537.085 will not be addressed.

**102.** B & W refers to failure to warn "claims." A review of the record indicates that Ms. Smith's survivors asserted a single failure to warn claim. This claim was rooted in a negligence theory.

**103.** The Federal Labeling and Advertising Act preempts claims against tobacco manufacturers based on their duty to warn of the risks of smoking cigarettes after 1969. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

■■■■ "Missouri has long recognized that a manufacturer has the duty to warn ultimate users of its products or articles which are inherently dangerous or are dangerous because of the use to which they are put." *Hill,* 637 S.W.2d at 384. The duty to warn for foreseeable and latent dangers is attendant to the proper and intended use of a product. *Id.* at 385. Causation in failure to warn cases requires two elements. *Arnold v. Ingersoll–Rand Co.,* 834 S.W.2d 192, 194 (Mo. banc 1992). First, the product from which the warning was missing must have caused the injured person's injuries. *Id.* Second, the plaintiff must demonstrate "that a warning would have altered the behavior" of the injured person. *Id.*

■■■■ "If there is sufficient evidence from which a jury could find that the plaintiff did not already know the danger, there is a presumption that a warning will be heeded." *Tune v. Synergy Gas Corp.,* 883 S.W.2d 10, 14 (Mo. banc 1994). This rebuttable presumption "assumes that a reasonable person will act appropriately if given adequate information." *Arnold,* 834 S.W.2d at 194. "Thus, a preliminary inquiry before applying the presumption is whether adequate information is available *absent* a warning." *Id.* It is not enough for the defendant to show that the plaintiff knew of the general dangers associated with the activity; rather, the defendant must show the plaintiff knew of the specific danger that caused the injury. *Cole v. Goodyear Tire & Rubber Co.,* 967 S.W.2d 176, 185 (Mo.App. E.D.1998).

■■ Prior courts have recognized a presumption that a "warning would be heeded only after finding that there was a legitimate jury question whether the plaintiff did not already know the danger." *Arnold,* 834 S.W.2d at 194. "[W]hen the defense is raised that the injured plaintiff had adequate knowledge of the risks so as to obviate the duty to warn, the question of the adequacy of the knowledge is a question for the jury." *Duke v. Gulf & W. Mfg. Co.,* 660 S.W.2d 404, 418 (Mo.App. W.D.1983). Given that causation is a required element of Ms. Smith's survivors' case, the burden is on them to show that lack of knowledge. *Arnold,* 834 S.W.2d at 194. "In this instance, the term 'presumption' is used to mean 'makes a prima facie case,' i.e., creates a submissible case that the warning would have been heeded." *Tune,* 883 S.W.2d at 14.

As to any assertion that the plaintiff was contributorily negligent, the Missouri Supreme Court has determined that it is "for the jury to say here whether plaintiff was negligent or not." *Bean v. Ross Mfg. Co.,* 344 S.W.2d 18, 28 (Mo. banc 1961). It further found that it is "pure speculation" to hold that, if plaintiff ignored the warnings that were available at the time of injury, he or she would have ignored warnings of the injury actually sustained had they been given. *Id.* A reviewing court may not "sift" a plaintiff's testimony, "so long as a reasonable probability appears that [the plaintiff] would have heeded a different and more adequate warning." *Id.* It concluded: "The question of causation here was for the jury." *Id.*

The second element of failure to warn causation is at issue in this point. B & W asserts that the evidence is uncontroverted that no warning prior to 1969 would have altered Ms. Smith's smoking decisions.[104]

---

**104.** In this point, B & W references Ms. Smith's federal suit and its outcome. B & W notes that this precise issue was addressed by the Federal District Court, Western District of

It further claims that Ms. Smiths' survivors failed to present evidence of what warning should have been given or that, if given, the warning would have altered Ms. Smith's smoking decisions. Because of this, it claims insufficient evidence was presented demonstrating that failure to warn prior to 1969 caused Ms. Smith's injuries.

B & W asserts four arguments. The first three arguments posit that Ms. Smith would not have heeded a warning, had it been issued prior to 1969, for various reasons. In essence, B & W argues the presumption is inapplicable to this case. First, it argues that Ms. Smith did not stop smoking from 1969 until 1990, when consumers were warned that smoking has adverse health consequences. This is because, according to her testimony, she was completely unaware of the warnings on cigarette packages or any of the research pertaining to smoking and illness until the 1990s.[105] Because Ms. Smith was completely unaware of the research or warnings until the 1990s, she would have been similarly unaware of any warning given prior to 1969. Thus, the presence of warnings would not have impacted Ms. Smith's smoking behavior. Second, B & W asserts that Ms. Smith did not quit smoking because she enjoyed smoking. B & W cites testimony given by Ms. Smith in her deposition wherein she stated she did not pay attention to research regarding the tobacco industry because she enjoyed cigarettes. Ms. Smith also testified that she never tried a low tar or low nicotine cigarette because she liked the cigarette she was smoking. Because she enjoyed smoking, B & W claims, she would not have quit if warned prior to 1969. Third, it argues Ms. Smith was unable, when asked, to specifically identify anything that anyone could have told her that would have convinced her to try quitting smoking any sooner than she did. Ms. Smith never attempted to quit smoking at any time prior to 1990, and she was successful in 1990 when she did attempt to quit.

A closer examination of the presumption, the circumstances under which it arises, and the manner in which it is rebutted is required. The rebuttable presumption as to causation in failure to warn cases is that the injured person would have heeded the warning if the injured person knew of the danger. *Cole,* 967 S.W.2d at 184. The presumption arises when sufficient evidence is presented from which a jury could find the injured person did not already know of the danger. *Id.*

Each of B & W's first three arguments assert that Ms. Smith was unaware of the health risks associated with smoking or do not claim that Ms. Smith was aware of the health risks associated with smoking. Ms.

Missouri, in the prior action brought by Ms. Smith. Based on Ms. Smith's testimony, the federal court determined that no jury could conclude inadequate warnings prior to 1969 caused Ms. Smith's injuries. Yet, B & W does not argue that these factual findings have a preclusive or binding effect or are otherwise authoritative in this matter. Absent such argument, the federal court's findings are not considered on appeal.

105. B & W also claims that the common knowledge of the health risks of smoking and the effect of nicotine in making smoking difficult to quit likewise had no effect on Ms. Smith's smoking decisions. As noted, though, the evidence in the light most favorable to the verdict is that Ms. Smith was completely unaware of the health risks associated with smoking until the 1990s. Thus, general or common knowledge is irrelevant, as Ms. Smith had no actual knowledge. Furthermore, as determined by this court recently in *Thompson v. Brown & Williamson Tobacco Corp.,* 207 S.W.3d 76, 106 (Mo.App. W.D. 2006), the fact that courts disagree regarding whether the dangers of smoking are commonly known indicates that it is improper to take judicial notice that they are.

Smith's survivors presented sufficient evidence that Ms. Smith was unaware of the specific injuries that can result from smoking. B & W did not provide any warning to consumers about the health consequences of smoking until 1966. Thus, Ms. Smith was not given any warning from 1942, the time she began smoking, until 1966. From 1966 until 1969, the FCLAA required every package of cigarettes to bear the warning: "Caution: Cigarette Smoking May Be Hazardous To Your Health." Ms. Smith testified that she remembered warnings first appearing on the side of cigarette packages in approximately 1992, and was not aware of warnings on cigarette packages before that time. She also testified that she remembered nothing about the Surgeon General's Report or what it concluded. Ms. Smith never had any rules about smoking in her home. She was permitted to smoke in her work office and the lounge of the dental school where she was employed. She testified she never worked at a place where she was not allowed to smoke. Ms. Smith testified that she did not remember her parents or her doctors talking to her about smoking. She never talked with her children about cigarette smoking and health. She testified that she did not remember any doctor ever telling her to quit smoking before the 1990s. Ms. Smith did not remember read-

ing anything in a newspaper or magazine about cigarette smoking and health until the late 1990s.

Mike Smith, Ms. Smith's son, testified that his mother "didn't have a clue" about how Kool cigarettes were designed. Toni Parker, one of Ms. Smith's daughters, testified that she had no reason to believe that her mother knew at the time she started smoking that cigarettes caused disease. She further testified that she had no reason to believe her mother learned this in the 1950s and 1960s. Ms. Parker further testified that her mother was unaware that Kool cigarettes were nicotine delivery devices.

■■■■ Given that sufficient evidence was presented from which a jury could determine that Ms. Smith did not already know of the danger of smoking Kool cigarettes, the rebuttable presumption arose. The next inquiry is whether B & W rebutted the presumption. In rebutting the presumption, simply showing that the injured person knew of the general danger is insufficient. *Id.* at 185. Instead, the defendant must show that the injured person knew of the specific danger resulting in injury. *Id.* B & W does not argue or cite evidence demonstrating Ms. Smith knew of the specific danger.[106] Once sufficient evi-

---

**106.** A peculiarity presents itself in this case. The jury found that Ms. Smith was 75% at fault, and thus her survivors' compensatory damages were reduced by 75%. In order to make that determination, the jury must have found, per the jury instructions, that "when the cigarettes were used, Barbara Smith knew of the danger as submitted in" the instructions for strict liability product defect, negligent design, and negligent failure to warn and "appreciated the danger of its use." Thus, the jury determined that Ms. Smith was aware of the dangers of smoking cigarettes. Yet, in its points relied on, B & W never cites this finding as evidence that Ms. Smith was aware of the dangers. In fact, B & W argues throughout its brief that Ms. Smith was aware

and that she was unaware of the dangers of smoking. In its brief, B & W has included a "Summary of Argument" section that is separate from its points relied on and provides a one-paragraph summary for each point. In this summary, B & W cites this implicit finding made by the jury as support for its fifth point, that it did not have a duty to Ms. Smith because the dangers of smoking are commonly known. It does not cite this implicit finding in its point relied on or the argument portion of its fifth point, however. Moreover, in its sixth point, B & W asserts it was error for the jury to be allowed to assign fault to Ms. Smith and states that its position throughout the trial was that Ms. Smith was

dence is presented from which the jury could determine the injured person was unaware of the specific danger causing his or her injury, the presumption that the injured person would have heeded the warning if given applies. *Id.* Accordingly, the injured person has made a submissible case that he or she was injured as a direct result of the defendant's selling the product without a warning. *Id.*

B & W asserts that Ms. Smiths' survivors relied solely upon the presumption that a warning would have been heeded. As noted, *supra*, the presumption alone is sufficient to make a submissible case, and relying solely on the presumption is not error.

■ In *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10 (Mo. banc 1994), the defendant contended that the injured person did not make a submissible case on a strict liability failure to warn claim.[107] The defendant asserted that the injured person "failed to show causation because the evidence fails to establish that a warning would have prevented the accident." *Id.* at 13. Specifically, the defendant argued that the second prong of causation, that a warning would have altered the behavior of those injured, was not shown. *Id.* at 14. The appellate court found that sufficient evidence was presented from which the jury could determine that the injured person did not know of the specific danger causing his injury. *Id.* Thus, the presumption that warning would have been heeded, if given, arose. *Id.* The court concluded: "In this instance, the term 'presumption' is

used to mean 'makes a prima facie case,' i.e., creates a submissible case that the warning would have been heeded. Synergy's claim to the contrary is without merit." *Id.* This is precisely what occurred in the case *sub judice.*

*Arnold v. Ingersoll–Rand Co.*, 834 S.W.2d 192 (Mo. banc 1992), is also illustrative. In *Arnold*, the defendant claimed there was insufficient evidence that the failure to warn was a cause of the injuries suffered by the plaintiffs. *Id.* at 193. Plaintiffs claimed a warning would have been heeded had it been given. *Id.* The Missouri Supreme Court discussed the presumption that a warning will be heeded if given. It stated: "The presumption that plaintiffs will heed a warning assumes that a reasonable person will act appropriately if given adequate information." *Id.* at 194. Therefore, before the presumption is applied, the court must determine whether adequate information was available absent a warning. *Id.* Courts recognize the presumption that a warning would be heeded "only after finding that there was a legitimate jury question whether the plaintiff did not already know the danger." *Id.* The plaintiff is required to prove causation and, thus, bears the burden of showing the lack of knowledge. *Id.* The court determined that the plaintiffs' evidence failed to demonstrate that a warning would have imparted additional information. *Id.* The evidence showed that the plaintiffs were aware of the risk of injury resulting from their actions. *Id.* The Missouri Supreme Court found that, because a warning would not have imparted any additional informa-

---

not at fault for being a smoker. Given that B & W does not cite this jury finding in any of its points relied on or argument sections and that throughout its brief it contends that Ms. Smith was unaware of the dangers of smoking, this court will merely note this apparent inconsistency.

107. Ms. Smith's survivors asserted a negligent failure to warn claim against B & W as opposed to a strict liability failure to warn claim. Nonetheless, the causation elements are the same for both strict liability and negligent failure to warn. *See Mothershead v. Greenbriar Country Club, Inc.*, 994 S.W.2d 80, 89 (Mo.App. E.D.1999).

tion, the presumption was rebutted and the cause should not have been submitted to the jury. *Id.* Unlike *Arnold,* evidence was presented in this case demonstrating that a warning regarding the health risks of smoking would have imparted additional information to Ms. Smith.

 B & W's first three arguments assert that a warning, had it been given, would not have been heeded for assorted reasons. Showing with certainty that the warning would have succeeded in preventing the injury is not necessary in a failure to warn case. *Hill v. Air Shields, Inc.,* 721 S.W.2d 112, 119 (Mo.App. E.D.1986). "It also is not necessary to demonstrate with certainty that warnings placed directly on the product would have been seen and heeded." *Id.* This is why the presumption exists. *Id.*

 The argument that Ms. Smith's continued smoking until 1990, some 21 years after warnings federally mandated by the FCLAA preempted failure to warn claims, demonstrates that she would not have quit smoking had she been warned prior to 1969 seems compelling at first glance. B & W argues that because Ms. Smith failed to heed the warnings given after 1969, she would have ignored them if they had been given prior to 1969. It asserts that the presumption is rebutted when there is evidence that a smoker ignored warnings that were given, citing *Waterhouse v. R.J. Reynolds Tobacco Co.,* 368 F.Supp.2d 432, 438 (D.Md.2005). This case is not binding on this court, and this court declines to follow it.

B & W also states: "Missouri law is clear that, when a person fails to heed warnings that were given, the heeding presumption is overcome," citing *Klugesherz v. American Honda Motor Co.,* 929 S.W.2d 811, 814 (Mo.App. E.D.1996). *Klugesherz* does not stand for this proposition. In *Klugesherz v. American Honda Motor Co.,*

929 S.W.2d 811, 814 (Mo.App. E.D.1996), the plaintiff conceded that he was not contending that his child, who was injured in an all terrain vehicle (ATV) accident, would have heeded a warning that he was too young to drive the ATV had it been given. Further, both the owners of the ATV and the child's parents had previously decided that their child was not permitted to ride the ATV and the child rode the vehicle in violation of this decision. *Id.* The court stated:

> Inasmuch as the purpose of the warnings was to communicate that the ATV was not suitable for someone of [the injured child's] age and those in authority had already reached and acted upon their conclusion that [the injured child] should not be permitted to use it under any circumstances, the warning was effectively already being heeded but it did not prevent the accident.

*Id.* It concluded: "In short, on this record, there is no basis for concluding that additional warnings would have altered the behavior of anyone involved in the accident. Plaintiff's own evidence refutes the presumption." *Id.* The plaintiff in *Klugesherz* conceded that the presumption did not apply. That is not the case here.

In *Grady v. American Optical Corp.,* 702 S.W.2d 911 (Mo.App. E.D.1985), employee's safety glasses, provided by his employer, shattered and injured him. The glasses had a warning that was easily removed; the warning did not state that the glass could shatter and injure the wearer's eyes, though. *Id.* at 914. The employee asserted a strict liability failure to warn claim against the safety glasses manufacturer. *Id.* at 915. The court determined that the question of whether the warning given was adequate was for the jury to decide. *Id.* at 917. Pertinent to B & W's argument, the eyeglass manufacturer in *Grady* observed that employer required its

employees to wear safety glasses while working. *Id.* at 917–18. Because of this, the manufacturer argued, if there had been a warning, employee would have nonetheless worn the glasses pursuant to the manufacturer's policy and, thus, the warning would not have altered employee's actions. *Id.* at 918. In analyzing this argument, the Eastern District observed that the rebuttable presumption arose that the warning would have been heeded because evidence was presented that the employee did not know that the safety glasses could shatter and injure his eyes. *Id.* It then stated, "In failure-to-warn cases generally, certainty that the existence of the warning would have prevented injury is not required. In the absence of compelling evidence establishing that the absence of a warning did not cause the injury the causation question becomes one for the jury." *Id.* (citation omitted). It concluded that a submissible case was presented. *Id.* The same is true here.[108]

■■■ B & W's fourth and final argument, though somewhat obliquely made, is that Ms. Smith did have actual notice of the health hazards associated with smoking. It argues that Ms. Smith was warned to stop smoking, but that she ignored these warnings. B & W cites testimony that Ms. Smith's children admonished her to quit smoking and she ignored the admonishment. As summarized, *supra,* though, evidence was presented that Ms. Smith was unaware of the danger of smoking. The presumption arises if such evidence was presented; it does not require that all the evidence indicate the injured person was unaware. Whether the injured person was unaware of the danger and thus entitled to the presumption is for the jury to decide, assuming sufficient evidence was presented from which it may conclude the injured person was unaware. Such evidence was presented in this case.

■■■ Moreover, as to all four arguments, evidence was presented from which the jury could have concluded that, independent of the presumption, Ms. Smith would have heeded a warning had it been issued prior to 1969. Linda Franco, another of Ms. Smith's daughters, testified that her mother seemed to be in very good health until 1990. In 1990, her mother was diagnosed with respiratory problems, which were identified as the beginning stages of emphysema. At this time there was also a concern that Ms. Smith might have cancer, although she was not diagnosed with cancer until 1992. Ms. Franco testified that her mother's doctor recommended that she quit smoking in 1990, and she quit immediately. Thus, evidence was presented that Ms. Smith quit smoking immediately upon being advised to do so by her doctor. The jury could have determined that she would have done likewise had she been warned by B & W prior to 1969.

The point is denied.

### POINT III

In its third point, B & W claims the trial court erred in denying its motion for judgment notwithstanding the verdict on Ms. Smith's survivors' strict liability product defect and negligent design claims. It asserts that Ms. Smith's survivors failed to present sufficient evidence to make a submissible case on those claims because they

---

**108.** Perhaps, under different circumstances, the fact that Ms. Smith failed to heed federally mandated warnings and continued to smoke from 1969 to 1990 would support an argument that a finding that she would have heeded pre 1969 warnings was against the weight of the evidence. That is not this court's inquiry, however. This court is determining whether sufficient evidence was presented from which the jury could determine that Ms. Smith would have altered her behavior had she been warned prior to 1969. For the reasons set forth, a submissible case was presented.

failed to identify or prove any specific defect in the design of Kool cigarettes that rendered them defective or unreasonably dangerous in a manner that caused Ms. Smith's death.

B & W claims that to establish liability for strict liability design defect or negligent design, Ms. Smith's survivors were required to prove that there is "something wrong" with Kool cigarettes that caused Ms. Smith's death. Instead of presenting evidence establishing this, according to B & W, Ms. Smith's survivors attacked all cigarettes in general as inherently dangerous. B & W concludes that, because Ms. Smith's survivors failed to identify or prove any specific defect in the design of the Kool cigarettes smoked by Ms. Smith that rendered them unreasonably dangerous, they failed to make a submissible strict liability defect or negligent design case.

### Strict Liability Product Defect

■ A manufacturer is liable under a strict liability product defect claim "if the product was in an *unreasonably dangerous defective condition* when *put to a reasonably anticipated use,* and the *plaintiff was damaged as a direct result* of such defective condition *as existed when the product was sold.*" *Richcreek v. Gen. Motors Corp.,* 908 S.W.2d 772, 775 (Mo.App. W.D.1995); § 537.760.[109] The Missouri Supreme Court first adopted strict tort liability in *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo.1969). *Richcreek,* 908 S.W.2d at 775. *Keener* involved a defect in a product's manufacturing process and the court adopted the strict liability rule set forth in section 402A of the Restatement (Second) of Torts.[110] *Id.* Strict liability was extended to design defects in *Blevins v. Cushman Motors,* 551 S.W.2d 602 (Mo. banc 1977). *Id.*

■ A manufacturing defect occurs when " 'something goes wrong in the manufacturing process and the product is not in its intended condition.' The product is evaluated against the producers' own stan-

**109.** Section 537.760, RSMo 2000, states:

As used in sections 537.760 to 537.765, the term **"products liability claim"** means a claim or portion of a claim in which the plaintiff seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because:

(1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and

(2) The product was used in a manner reasonably anticipated; and

(3) Either or both of the following:

(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or

(b) The product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

**110.** Section 402A of the Restatement (Second) of Torts (1965) states:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

dards, and compared to like products." *Richcreek,* 908 S.W.2d at 776. In a design defect case, however, "there is no doubt that the product is in the condition intended by the manufacturer." *Id.* In such a case, the defect is in the design given that " '[t]he manufacturer had deliberately added or omitted the challenged component and has presumably made that decision after balancing a variety of factors.' " *Id.* (citation omitted). Manufacturing defect refers to the improper assembly of an individual product whereas design defect refers to a product, by nature of its design, being unreasonably dangerous. *Id.*

■■■■ In *Blevins,* the Missouri Supreme Court "took care to stress that under a theory of strict tort liability, the focal point of the litigational process is the condition or character of the product and not the character of the defendant's conduct." *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 375 (Mo. banc 1986). "Although the focus of a products liability suit brought under a theory of strict tort liability is on the condition or character of the product rather than on the nature of the defendant's conduct, the doctrine of strict tort liability is not, nor was it ever intended to be, an enveloping net of absolute liability." *Id.* A manufacturer is not an insurer for all injuries caused by its products. *Id.*

■■■■ "[T]he primary inquiry in a design defect case is whether the product— because of the way it is designed—creates an unreasonable risk of danger to the consumer or user when put to normal use." *Id.* In a design defect case, the plaintiff must demonstrate "that the product, as designed, is unreasonably dangerous and therefore 'defective', and that the demonstrated defect caused his injuries." *Id.* at 375–76. The "heart and soul" of a strict liability design defect case is unreasonable danger and causation. *Id.* at 376. While a

plaintiff must establish that a product is defective by proving that it was unreasonably dangerous as designed, he or she "is not required to show that the manufacturer or designer is at fault." *Ray v. Upjohn Co.,* 851 S.W.2d 646, 655 (Mo.App. S.D. 1993).

■■■■ Under Missouri law pertaining to strict tort liability "the concept of unreasonable danger, which is determinative of whether a product is defective in a design case, is presented to the jury as an ultimate issue without further definition." *Nesselrode,* 707 S.W.2d at 378. Given this, the approved jury instruction for a design defect claim does not contain a definitional paragraph giving independent content to the concept of unreasonable danger. *Id.* Instead, the "jury gives this concept content by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties." *Id.* In Missouri, there is not an external standard by which to determine unreasonable danger. *Id.* "Nothing prevents the litigants from arguing that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence." *Newman v. Ford Motor Co.,* 975 S.W.2d 147, 154 (Mo. banc 1998).

■■■ "Under Missouri's strict tort liability, a product's design in deemed defective when a preponderance of evidence shows that the design renders the product unreasonably dangerous." *Stinson v. E.I. DuPont De Nemours & Co.,* 904 S.W.2d 428, 431 (Mo.App. W.D.1995). As noted by the *Stinson* court:

> In *Wilson v. Danuser Mach. Co.,* 874 S.W.2d 507 (Mo.App.1994), the Southern District recently reviewed the evidence in a design defect case to determine if the plaintiff made a submissible case

under strict liability-product defect. The court explained that "[plaintiff] had no burden to establish product failure or malfunction." *Wilson,* 874 S.W.2d at 513. He met his required burden by showing the product, a log splitter, as designed, was unreasonably dangerous and therefore "defective." *Id.*

*Id.* In *Stinson,* the defendant argued that the plaintiff must prove the defective condition and dangerous character of a product as two distinct elements of a strict liability claim. *Id.* It contended that the plaintiff did not prove that the product was defective and, therefore, did not make a submissible strict liability product defect case. *Id.* It cited a manufacturing defect case for this proposition. *Id.* The court concluded: "In Missouri, the burden of proving that a product's design is defective is satisfied when the product is proven unreasonably dangerous." *Id.* This court found that a submissible case had been presented:

> The Stinsons presented evidence that DuPont's activators, 192S and VGY1421, contained isocyanates; DuPont's products were designed to contain isocyanates; isocyanates are the second most toxic substance known in the world today; isocyanates are the most common cause of occupational asthma in this country; isocyanate exposure can create permanent lung damage; and seven percent of the people who are exposed to these kinds of isocyanates become sensitized. The Stinsons made a submissible case that DuPont's paint containing isocyanates was unreasonably dangerous and therefore "defective."

*Id.* Similarly, the court in *Ray v. Upjohn Co.,* 851 S.W.2d 646, 655 (Mo.App. S.D. 1993), found that the plaintiff presented sufficient evidence to establish the product at issue was unreasonably dangerous:

> Plaintiff presented evidence that PAPI was designed to contain isocyanates; that isocyanates are the leading cause of occupational asthma; that isocyanate exposure can create permanent disability and irreversible pulmonary injury; and that 5% of the population exposed to isocyanates will acquire permanent asthma. Plaintiff sufficiently established that PAPI was unreasonably dangerous.

■ B & W argues that in order to establish a strict liability design defect claim Ms. Smith's survivors were required to prove the existence of a feasible and safer alternative design. This court addressed this issue recently in *Thompson v. Brown & Williamson Tobacco Corp.,* 207 S.W.3d 76 (Mo.App. W.D.2006). In *Thompson,* B & W and another tobacco company[111] claimed that the plaintiff failed to make a submissible case on his strict liability product defect and negligent design claims. *Id.* at 89. B & W claimed that the plaintiff failed to identify an actionable defect in their cigarettes because he did not introduce evidence of an alternative design that would have prevented his injuries. *Id.* B & W argued that the mere fact a product is dangerous is not sufficient to establish liability; instead, B & W asserted that plaintiff must also prove that the injury was caused by a failure to use a feasible alternative design. *Id.* This court concluded: "In doing so, B & W and PM USA misstate the law in Missouri as to strict tort liability, and cite no Missouri authority that alternative design is a requirement in a negligence claim." *Id.* This court noted that Missouri has rejected both the "reasonable alternative/risk-utility" test set forth in the Restatement (Third) of Torts; Products

---

111. The other defendant was Philip Morris USA, Inc. In this court's discussion of *Thompson,* only B & W will be referenced as a defendant.

Liability, section 2(b) and the "consumer expectation test."[112] *Id.* at 89–90. In both this case and in *Thompson,* B & W cited *Siebern v. Missouri–Illinois Tractor & Equipment Co.,* 711 S.W.2d 935, 939 (Mo.App. E.D.1986), as authority for its assertion that proof of an alternative design is required. This court stated in *Thompson:* "Certainly, the plaintiff may introduce such evidence in support of showing the design was defective and therefore unreasonably dangerous, but under *Nesselrode, Newman,* and *Rodriguez* [*v. Suzuki Motor Corp.,* 996 S.W.2d 47 (Mo. banc 1999)], such is not required." *Id.* at 90 n. 5. Thus, proof of an alternative design is not required, and B & W's argument is without merit.

B & W next argues that Ms. Smith's survivors presented evidence demonstrating that Kool cigarettes are dangerous, not because of anything particular about their design, but because they are part of a category of products called "cigarettes." It asserts that Ms. Smith's survivors' evidence showed that there is nothing about Kool cigarettes that is different from any other cigarette. It cites *Richardson v. Holland,* 741 S.W.2d 751, 753 (Mo.App. S.D.1987). In *Richardson* the plaintiff claimed that a gun was defective and unreasonably dangerous because it belonged to a class of guns known as "Saturday Night Specials."[113] *Id.* The petition alleged neither a defect in manufacturing nor a defect in design causing the gun to malfunction. *Id.* The court stated:

> It was not the intention of the drafters of § 402A to propose strict liability for all harm caused by the use of products. Nor was it their intention to propose liability for all harm caused by products that might be considered (by some) to be socially undesirable because of the hazards they pose when they are perfectly made. The liability they proposed then was limited to harm caused by products because there was 'some thing wrong' with them.

*Id.* (citation omitted). The court concluded that plaintiff needed to allege a defect in the gun's manufacture or design in order to state a cause of action. *Id.* at 754.[114]

---

**112.** Pursuant to the Restatement, a product, as designed, is actionable "if the product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer, who either purchases it or uses it, with the ordinary knowledge common to the community as to its characteristics." *Nesselrode,* 707 S.W.2d at 376. This language is commonly referred to as "the consumer expectation test." *Id.* at n. 5.

**113.** The gun was:

> alleged to be a Saturday Night Special in that its principal use is for criminal activities and it has no legitimate value because: it is a small handgun with a short barrel and little or no accuracy; it is easily concealable; it is of inferior quality by reason of cheap materials and poor manufacturing; it is inexpensive; it is not accurate; and it cannot be used for legitimate activity such as target shooting, bench shooting, hunting, etc.

*Richardson,* 741 S.W.2d at 753.

**114.** B & W also states:

> The ramifications of imposing liability without any showing of something wrong with the specific product would be staggering. Liability would be imposed for entire categories of inherently dangerous products (e.g., guns, alcohol, convertibles) even though there are no design changes or warnings that could render them safer without changing their fundamental characteristics.

It cites *Richardson* for this proposition. This court recently addressed this argument in *Thompson:*

> In their reply brief, the appellants make the argument, for the first time, that for this court to decide that "a product defect claim is submissible based on a product's inherent dangers," such would result in staggering ramifications for whole categories of dangerous products such as alcohol, guns,

B & W notes that the federal government and the State of Missouri define a cigarette as tobacco wrapped in paper. 15 U.S.C. § 1332(1)(A); § 149.011(2). It asserts that Ms. Smith's survivors merely presented evidence that Kool cigarettes are dangerous solely because they belong to a class of products labeled cigarettes.[115] B & W cites certain evidence presented at trial to support its point. It claims that some of this evidence was uncontradicted. Under the standard of review, this court examines whether evidence was presented so that a submissible case was made. Appellate courts do not consider contrary evidence. *Payne*, 177 S.W.3d at 832. "The jury, as the trier of fact, was free to believe or disbelieve all, part or none of the testimony, *even if it was unimpeached or uncontradicted.*" *Harmon v. Hamilton*, 903 S.W.2d 610, 613 (Mo.App. S.D.1995)(emphasis added). The following evidence was presented.

Dr. Jeffrey Wigand, a biochemist and former director of research at B & W, testified that Kool cigarettes contained more free nicotine than any other cigarette on the market. He further stated that Kool cigarettes were traditionally known for their harshness and impact. Impact referred to the effect of nicotine on the body. Because of their harshness, the body naturally rejects the inclination to smoke them. In order to overcome the body's reaction, menthol was added to Kool cigarettes. Dr. Wigand stated: "Menthol allows you to defeat the body's normal processes and to breathe it in, not only breathe it in, but also breathe it in deeper." He further testified that B & W clearly knew that adding menthol to cigarettes ameliorated their harshness. Spearmint and peppermint were also added to ameliorate the harshness of Kool cigarettes. Dr. Wigand also stated that B & W added cumarin to its cigarettes until 1987 or 1988. Cumarin is a sweet tasting chemical substance shown to be toxic in animals. He testified that Kool cigarettes were safer after cumarin was removed from them. Moreover, he stated that different types of tobacco were blended in certain ways in Kool cigarettes to ensure certain nicotine delivery. B & W also devoted research efforts to determining how to release more nicotine in its cigarettes. Dr. Wigand testified that when he became employed by B & W he signed an agreement to not disclose trade secrets, indicating that Kool cigarettes were different from other cigarettes and their formula required protection.

Dr. David Burns, a professor of medicine and author, reviewer, or editor of every United States Surgeon General's Report on smoking and health published since 1975, testified that Kool cigarettes contain nicotine, which creates the addiction to cigarettes. He stated nicotine is the reason people smoke. He also stated

---

and motorcycles. They cite *Richardson v. Holland*, 741 S.W.2d 751 (Mo.App. S.D. 1987), in support. However, *Richardson* was later clarified by *Wilson v. Danuser Mach. Co.*, 874 S.W.2d 507 (Mo.App. S.D. 1994), which properly cited *Nesselrode*, 707 S.W.2d at 377, for the applicable standards for a strict liability defective design claim. *Wilson*, 874 S.W.2d at 513–14.

*Thompson*, 207 S.W.3d at 91 n. 7.

115. B & W also argues that, if a specific defect need not be demonstrated, liability could be imposed for entire categories of inherently dangerous products, such as guns, alcohol, or convertibles. As noted, *infra*, Ms. Smith's survivors' evidence demonstrated that Kool cigarettes were different from other cigarettes in certain ways and that these differences contributed to Ms. Smith's death. Ms. Smith's survivors were not attacking all cigarettes as inherently dangerous. Instead, they presented evidence demonstrating that Kool cigarettes were unreasonably dangerous.

that the earlier in life one starts smoking, the harder it is to break the addiction. Dr. Burns concluded that Ms. Smith was addicted to smoking.

He also testified that, since the 1950s, cigarettes have been "a highly engineered product." He stated that "very precise specifications" are used by the manufacturer with respect to what the smoker perceives she inhales when smoking a cigarette. He determined: "That's to make the cigarette more attractive, more palatable, easier to smoke." In describing the manufacturing process, Dr. Burns stated that the tobacco leaf is taken apart so that the stems and ribs can be used to make paper. It is chopped up, processed, and the constituents are removed. Then chemicals, flavoring agents, and the slurry from tobacco are added. The paper made from this process is chopped up to precise specifications and mixed back in with some of the remnants of the tobacco leaf. That is then used to make the cigarette. Dr. Burns stated that, due to the engineering of the cigarette, cigarettes made as of the time of trial "are capable of causing as much or more lung cancer than the cigarettes forty years ago."

He testified that Kool cigarettes were different from other cigarettes in the blend of tobacco used and some of the flavoring agents. He further stated that the smoke from Kool cigarettes is one of its distinguishing characteristics. This is because it contained menthol, an anesthetizing agent that numbs the back of the throat. This makes it easier to inhale more deeply and allows more nicotine to be delivered to the body. Dr. Burns concluded that Kool cigarettes are unreasonably dangerous. He stated that he held this opinion to a reasonable degree of medical certainty. Dr. Burns also testified that B & W claimed that Kool cigarettes had the most

scientifically tested filter in the world, indicating it was safer than other cigarettes.

Dr. Burns stated that about 40,000 chemicals are in cigarette smoke and that approximately 60 of these have been shown to cause cancer. He testified that these chemicals are a combination of anything that is added to native tobacco, anything that changes in the native tobacco as the cigarette is manufactured. Thus, these chemicals are the result of Kool cigarettes being more than mere tobacco wrapped in paper.

He also testified about Project Ariel, an effort by B & W in the 1960s to reduce the toxicity of smoke delivered to smokers by making engineering changes to cigarettes. B & W abandoned the project because of the difficulty in marketing a safer cigarette without admitting the current cigarette presented risks.

This is sufficient evidence to make a submissible case on the claim that B & W's cigarettes were unreasonably dangerous. The evidence presented went beyond a categorical attack on the danger of cigarettes in general. Instead, it demonstrated specific design choices by B & W that had the potential to affect Ms. Smith's health during the time period she smoked. *See Thompson*, 207 S.W.3d at 94–96.

B & W argues in its reply brief that the evidence presented indicating that Kool cigarettes are different from other cigarettes does not demonstrate that these differences rendered Kool cigarettes more likely to cause Ms. Smith's death than any other cigarette. This argument is raised for the first time in the reply brief, and is not considered on appeal. *Mo. Dep't of Transp. ex rel. PR Developers, Inc. v. Safeco Ins. Co. of Am.*, 97 S.W.3d 21, 39 (Mo.App. E.D.2002).

## Negligent Design

B & W's second point also asserts that Ms. Smiths' survivors failed to make a submissible case on their claim of negligent design because they failed to identify a specific defect in the design of Kool cigarettes that caused Ms. Smith's death. B & W's briefs, however, are focused upon the strict liability product defect claim. As to the negligent design case, B & W states: "To succeed on a negligent design claim, plaintiffs were required to prove that B & W did something wrong that caused Mrs. Smith's death." It does not articulate an argument that a specific defect is required in a negligent design case or provide authority for this assertion as to negligent design claims.

In its original briefs, B & W cites three cases as authority for its negligent design argument.[116] B & W cites *Hatch v. V.P. Fair Foundation, Inc.*, 990 S.W.2d 126, 139 (Mo.App. E.D.1999), for the proposition that "negligence is 'predicated upon failure to observe a prescribed standard of care.'" It does not set forth the standard of care governing its conduct or argue that the standard was observed. Moreover, this language is taken from a discussion in *Hatch* of a cause of action for recklessness.

B & W also cites *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 862–63 (Mo. banc 1993), for the proposition that "'but for' causation is required." Perhaps this statement could be interpreted as an argument that but for causation was not demonstrated in the case *sub judice*. This is different from the argument asserted in the point relied on, however. Further, the plaintiffs in *Callahan* asserted a medical malpractice, and not a negligent design, cause of action.

Finally, B & W states the rule that a manufacturer is not an insurer for all injuries caused by its products, citing *Nesselrode*, 707 S.W.2d at 375. This rule does not state that a manufacturer is not liable for all injuries caused by its products though, B & W fails to set forth what the delineation is pertaining to injuries for which a manufacturer is liable and those for which it is not in a negligent design case. It also does not articulate why Ms. Smith's injuries fall within the category of injuries for which it is not liable.

In its reply brief, B & W cites *Stevens v. Durbin–Durco, Inc.*, 377 S.W.2d 343, 346 (Mo.1964), for the proposition that a manufacturer is not liable as an insurer. As noted by this court in *Thompson*, *Stevens* goes on to say: "The manufacturer of a [dangerous product] properly made and free of latent defects and concealed dangers, may not be held liable merely because someone was injured while using the product." *Id.* at 347 (emphasis added). As in *Thompson*, B & W fails to address the applicability of this aspect of *Stevens*. See *Thompson*, 207 S.W.3d at 96 n. 10.

■ B & W has provided this court with little to review regarding the submissibility of the negligent design claim. It fails to cite specific relevant Missouri authority or corresponding relevant evidence to support its claim. *See Id.* at 96. B & W has not set forth the elements of a negligent design claim or argued in what manner the evidence presented was insufficient as to the elements. Appellate courts cannot become advocates for parties by speculating on arguments not clearly made. *See, e.g., Nelson v. Nelson*, 195 S.W.3d 502, 514 (Mo.App. W.D.2006).

The point is denied.

---

**116.** B & W also cites *Marzullo v. Crosman Corp.*, 289 F.Supp.2d 1337, 1343 (M.D.Fla. 2003), for the bare proposition that other jurisdictions reject liability for products with known risks. To the extent this case is contrary to the holding of this opinion, it is not followed.

## POINT IV

In its fourth point, B & W claims the trial court erred in denying its motion for judgment notwithstanding the verdict on Ms. Smith's survivors' strict liability product defect and negligent design claims. It asserts that Ms. Smith's survivors failed to make a submissible case on those claims because claims based upon the inherent risks of cigarettes are barred by federal conflict preemption.

B & W asserts that federal policy precludes banning ordinary cigarettes. Congress has expressly permitted the manufacture, sale, and marketing of cigarettes despite their well-known health risks. Because of this, according to B & W, federal law precludes liability under state law tort theories that assess damages for the general health risks of cigarette smoking, as opposed to liability for specific defects in the design of a particular cigarette.

B & W relies upon *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), wherein the Unites States Supreme Court stated:

> Congress, however, has foreclosed the removal of tobacco products from the market. . . . More importantly, Congress has directly addressed the problem of tobacco and health through legislation on six occasions since 1965. When Congress enacted these statutes, the adverse health consequences of tobacco use were well known, as were nicotine's pharmacological effects. Nonetheless, Congress stopped well short of ordering a ban.

*Id.* at 137–38, 120 S.Ct. 1291 (citations omitted). B & W argues:

> Theories of liability that seek to recover damages on the ground that all cigarettes carry health risks, or that they are inherently dangerous to smoke simply because they are cigarettes, are preempted because the only way that a cigarette manufacturer could avoid liability would be to stop selling cigarettes altogether. Federal law precludes this result because it amounts to a constructive ban.

B & W claims that, as set forth in its third point, Ms. Smith's survivors' evidence demonstrated only that all cigarettes carry the same health risks, and nothing distinguishes Kool cigarettes from ordinary cigarettes, defined as tobacco wrapped in paper. Because of this, according to B & W, federal law preempts the claim.

This court need not determine whether B & W's statement of the law is accurate. Even if it were, it must fail because, as discussed in the analysis of Point III, Ms. Smith's survivors did more than present evidence that all cigarettes carry the same health risks. Instead, they demonstrated that B & W made specific design choices that had the potential to negatively impact Ms. Smith's health. Thus, by the terms of its own argument, the point fails.

 Moreover, the strict liability product defect and negligent design claims are not preempted. The Supremacy Clause of the United States Constitution provides state laws conflicting with federal laws have no effect. *Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608. "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). Congress' intent to override state law is shown in several ways:

> We have recognized that a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, *English v. General Elec. Co.*, 496 U.S. 72, 78–79,

110 S.Ct. 2270, 2274–2275, 110 L.Ed.2d 65 (1990), or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where it is "impossible for a private party to comply with both state and federal requirements," *Id.* at 79, 110 S.Ct. at 2275, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

*Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone,* 505 U.S. at 517, 112 S.Ct. 2608.

This court addressed this argument recently in *Thompson,* 207 S.W.3d at 92–93, wherein it stated:

> We find that the opinion in *FDA* was specifically addressing the regulatory authority of the FDA, in light of its jurisdiction under the FDCA, to regulate nicotine in cigarettes as a drug, as compared with the specific statutes regulating tobacco enacted by Congress. We find nothing in our reading of *FDA* that supports B & W and PM USA's argument that Congress has preempted state law liability claims. Furthermore, we decline to accept B & W and PM USA's leap of logic that because the FDCA regulations require that products the FDA regulates must either be safe for intended use, have a therapeutic benefit that outweighs the potential for injury, or, if not, that the product be removed from the market, means that the only way for them to avoid liability for

> inherently dangerous components of their cigarettes in a state law claim would require an outright ban on their products, a result precluded under federal law.

*Id.* at 93.[117]

B & W further argues that Ms. Smith's survivors' claims are implicitly preempted. It cites *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), for this proposition. As stated by this court in *Thompson:*

> For the first time in their reply brief and in support of their claim that the opinion in *FDA* prohibits any state law claims which would amount to a ban on the sale of cigarettes, B & W and PM USA rely on *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), for differentiation of express preemption and implied conflict preemption. They contend that the holding in *Cipollone* refers to only express preemption of the duty to warn, but that implied conflict preemption read into *FDA* supports their claim. We decline to venture such a broad reading of *FDA.*

*Thompson,* 207 S.W.3d. at 93 n. 9. Ms. Smith's survivors' strict liability product defect and negligent design claims are not preempted.

The point is denied.

### Point V

In its fifth point, B & W claims the trial court erred in denying its motion for judgment notwithstanding the verdict on Ms. Smith's survivors' negligent failure to warn and negligent design claims. It asserts that Ms. Smith's survivors failed to make a submissible case on those claims because

---

**117.** To the extent B & W has cited cases from other jurisdictions that are inconsistent with this opinion, they are not followed.

they failed to show that B & W owed any duty to Ms. Smith in light of the evidence that the dangers of smoking are commonly known.

As noted, *supra*, in an action for negligence, generally, a plaintiff must demonstrate: (1) the defendant has a duty to protect the plaintiff from injury; (2) defendant failed to perform the duty; and (3) the failure to perform the duty resulted in injury to plaintiff. *Hill*, 637 S.W.2d at 384. At issue in this point is the first element, that B & W had a duty to protect Ms. Smith from injury. B & W asserts there is no duty as to a negligent design claim if the risk of injury was open, obvious, and apparent, citing *Stevens v. Durbin–Durco, Inc.*, 377 S.W.2d 343, 347 (Mo.1964). As to a negligent failure to warn claim, B & W asserts there is no duty if the risk of injury was open and obvious to the plaintiff or commonly known, citing *Young v. Wadsworth*, 916 S.W.2d 877, 878 (Mo.App. E.D.1996). It contends the health risks associated with smoking have long been matters of public knowledge and were well known during the period Ms. Smith smoked. B & W further claims that this common knowledge negates the first element of Ms. Smith's survivors' negligence claims for failure to warn and design defect.

In *Stevens*, the plaintiff was injured while using a load binder. *Stevens*, 377 S.W.2d at 344. Plaintiff was a truck driver with 16 or 17 years experience. *Id.* Plaintiff and another driver were securing a load onto a flatbed truck trailer with a chain and load binder. *Id.* The load binder's purpose was to take the slack out of the chain, allowing a tight attachment of the load to the trailer. *Id.* Plaintiff was familiar with load binders, as they were generally used in the trucking industry. *Id.* at 345. He was also aware of the risks posed by using load binders. *Id.* Immediately prior to the accident, plaintiff warned the other driver to get his head out of the way "before it tears it off." *Id.* A pipe used with the load binder struck plaintiff on the face, causing serious injury. *Id.* Plaintiff brought a negligence cause of action against the manufacturer of the load binder. *Id.* at 346. The court noted that plaintiff was a remote user of the load binder. *Id.* The Missouri Supreme Court reviewed relevant cases and stated: "the manufacturer may be liable if the defect or danger is latent or concealed, but where the danger is open, obvious and apparent, or the user had actual knowledge of the defect or danger, there is no liability on the manufacturer." *Id.* at 347. The court further stated:

> Accordingly, where the product is free of latent defects and concealed dangers; where the perilous nature of the product and the danger of using it is obvious and not concealed; where its normal functioning creates no danger not known to or appreciated by the user; where it is properly manufactured to accomplish the function for which it is designed, the manufacturer has 'satisfied the law's demands' and is under no duty to make it 'more' safe by providing a built-in safety device.

*Id.* at 348. The court determined that the "perilous nature" of the load binder was obvious and apparent to plaintiff and that use of the load binder "created no danger not known to and appreciated by plaintiff, an experienced trucker who had used load binders for years and knew and appreciated full well their dangerous characteristics and propensities." *Id.* The court held that plaintiff failed to show the existence or breach of any duty owned by the manufacturer. *Id.*

In *Young*, patient consulted a doctor, giving a history of recent complaints of light headedness, nausea, vomiting, epi-

sodes of shaking and tremors, that he experienced a "near" blackout while driving his vehicle approximately six weeks prior, and that he had an "acute blackout and fainting spell" the previous day while using a telephone at his residence. *Young*, 916 S.W.2d at 878. The doctor prescribed Xanax, recommended patient increase his meals to six per day, equipped patient with a monitor so as to monitor his heart rhythms, and encouraged patient to go on about his normal activities. *Id.* Xanax is a medication commonly used to treat depression and anxiety; it has known medical side effects of drowsiness or light-headedness. *Id.* At trial, there was no evidence that patient had filled the prescription or taken the Xanax. *Id.* That afternoon, after leaving the doctor's office, patient suffered a blackout spell while driving his vehicle and crashed into a vehicle with three occupants. *Id.* The driver of the second vehicle was killed and the two passengers were injured. *Id.* A suit for the driver's wrongful death and the passengers' injuries followed. *Id.* Plaintiffs alleged the doctor was negligent because he did not warn patient to not drive a car while taking Xanax. *Id.* The court noted that no evidence was presented that patient was of other than normal intelligence. *Id.* It further observed that patient had suffered two previous episodes of blackouts, one while driving and one the day before the accident. *Id.* Patient reported both of these episodes to the doctor so that the doctor knew patient was aware of the blackouts. *Id.* The court stated:

> It is common knowledge based on common sense that a person subject to sudden unexpected blackouts should not operate a motor vehicle. The cause of the accident was the action of [patient] in operating his vehicle when he was sub-

ject to blackouts and he knew he was subject to blackouts. There is no duty or need to warn of dangers which are open and obvious or which are commonly known.

*Id.*

■ This issue was addressed recently in *Thompson*, 207 S.W.3d at 96–106.[118] The court noted that the duty owed in negligence cases " 'is based on the foreseeable or reasonable anticipation that harm or injury is a likely result of acts or omissions.' " *Id.* at 97 (quoting *Blevins v. Cushman Motors*, 551 S.W.2d 602, 607–08 (Mo. banc 1977)). "Whether a duty exists is a matter of law, and '[f]or purposes of determining whether a duty exists, [the Missouri Supreme Court] has defined foreseeability as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it.' " *Id.* at 98 (quoting *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 (Mo. banc 2000)). Per *Thompson*, the issue presented is whether B & W had a duty to inform Ms. Smith of the dangerous properties of Kool cigarettes or whether it was relieved of that duty, as a matter of law, because it had a reason to believe she would realize the dangerous condition of its cigarettes. *Id.* at 99.

After reviewing Missouri law, this court concluded in *Thompson* that the "open and obvious" danger limitations sufficient to bar a negligence claim, as a matter of law, "relate primarily to those dangers which are visibly ascertainable." *Id.* This court noted:

> Barring a claim as a matter of law is a drastic step, and the court must be certain that the danger was so obvious that the defendant should not bear any re-

---

**118.** The analysis in *Thompson* pertained to the same two claims as in the case *sub judi-* *ce*—negligent failure to warn and negligent design.

sponsibility for resulting damage, and visual evidence is a verifiable confirmation of what is or should have been known to the injured party. This is especially so in light of Missouri's adoption of comparative fault.

*Id.* at 99–100. *Thompson* went on to examine premises liability cases in Missouri and summarized that they identify open and obvious dangers as "those visibly apparent" to the injured person or "discoverable with due care" based on the injured person's "experience with and knowledge of the condition of the property in question." *Id.* at 100.

*Thompson* also examined cases involving negligence liability for defective products and determined that the open and obvious doctrine has been applied to defeat the claim as a matter of law in cases where the products do not have a hidden danger or latent defect and where the "potential danger is discoverable by visual inspection or actual knowledge of specific potential danger based on the injured party's prior experience." *Id.* at 101. As to the applicability of the open and obvious doctrine to negligent failure to warn cases, *Thompson* examined *Young,* discussed, *supra.* It concluded: "Although the term 'common sense' was used with regard to whether a driver should know he or she should not drive if subject to blackouts, the facts of the case showed that the patient had actual knowledge of the specific danger of blacking out." *Id.* at 102.

After its exhaustive analysis of applicable caselaw, *Thompson* ultimately determined that the open and obvious exception to the duty to warn in a negligence claim "generally requires either a visibly observable open and obvious danger, or that the injured person had actual knowledge of the

specific danger." *Id.* This court stated that the dangers of smoking are not visibly observable [119] and that the next step was to establish whether the injured person had sufficient knowledge of the specific danger as to obviate the duty to warn. *Id.*

*Thompson* then set about determining the applicable standards and burden of proof in ascertaining whether the injured party had sufficient knowledge of the danger so as to obviate the duty to warn. *Id.* It discussed, *inter alia, La Plant v. E.I. Du Pont De Nemours & Co.,* 346 S.W.2d 231, 245 (Mo.App.1961). In *La Plant,* a farmer sued a chemical company for negligent manufacture and labeling of a chemical weed killer sprayed on willows, which his cows consumed, resulting in their death. *Id.* at 234. Farmer won at trial, and the chemical company appealed claiming a submissible case was not presented because the weed killer was neither inherently nor latently dangerous. *Id.* at 238. The court noted that legal duties arise out of circumstances and are based on the foreseeability or reasonable anticipation that harm or injury is the likely result of acts or omissions. *Id.* at 239. The court defined a latent danger as one that is "hidden, concealed, not visible or apparent" and noted that no evidence was presented that the farmer knew or should have known that the weed killer would cause his foliage to become dangerous to grazing cattle. *Id.* at 240. The *La Plant* court noted that the boundaries within which jurors are permitted to find foreseeability are not unlimited, but are "exceedingly broad and flexible" in Missouri. *Id.* at 241. It set forth again the standard that, if there is a probability of harm sufficiently serious that ordinary persons would take precautions to avoid it, then

**119.** B & W does not address the issue of whether the dangers of Kool cigarettes are

latent or concealed in the case *sub judice.*

failure to do so is negligence. *Id.* The test utilized by the court was that unless the facts are so strongly against the injured person "as to leave no room for reasonable minds to differ," the jury was to decide whether the chemical company's labeling of weed killer as "not hazardous to livestock" was misleading sufficient to constitute negligence. *Id.* at 241–42. The court determined that the trial court did not err in failing to direct a verdict for the chemical company. *Id.* at 242.

The *Thompson* court extracted from *La Plant* that the "standard, therefore, to take an issue away from the jury's consideration is whether the facts are so strongly against the plaintiff 'as to leave no room for reasonable minds to differ.'" *Thompson*, 207 S.W.3d at 103–04. *Thompson* also determined:

> We find that cases analyzing the application of the open and obvious exception to the duty to warn in a negligence claim support the determination that if the danger is not visibly apparent, the plaintiff must have actual knowledge of the specific danger such that no reasonable person in the same situation would assume that risk.

*Id.* at 104. It further stated "the question of the adequacy of the plaintiff's knowledge of the risk, sufficient as to obviate the defendant's duty to warn, is a question for the jury." *Id.*

 Given this framework, the question becomes whether the facts of this case allow reasonable minds to differ that Ms. Smith had sufficient knowledge to make her aware of the danger that Kool cigarettes contained nicotine and carcinogens and that they posed a risk of addiction and developing the illnesses that lead to her death, such that she could have taken precautions to avoid the danger. If so, the case is for the jury to assess fault under the comparative fault doctrine. *See id.*

B & W asserts that "there is no question that the health risks of smoking cigarettes were well known" during the period Ms. Smith smoked and that courts in Missouri and other jurisdictions "have found that the health risks of smoking cigarettes were common knowledge." It cites *Ploch v. City of St. Louis*, 345 Mo. 1069, 138 S.W.2d 1020, 1023 (1940), as acknowledgement in Missouri of the dangers associated with smoking. *Ploch* was an action to enjoin the enforcement of an ordinance taxing cigarette merchants located in the City of St. Louis. *Id.* at 1022. Plaintiff argued that the isolation of cigarettes from other merchandise, including other forms of tobacco, was an arbitrary and unreasonable classification. *Id.* at 1023. The court stated:

> In all jurisdictions the cigarette has been a favored article for isolation and classification. The sale or gift of a cigarette is prohibited in some jurisdictions. It is not a "useful commodity". The nicotine is harmful. There is no question of classification. The harmful properties of the article do the classifying.
>
> . . .
>
> Furthermore, it is common knowledge that the size and mildness of the cigarette tempt the young to indulgences which produce tobacco addicts. This justifies the isolation of cigarettes from other forms of tobacco. In some jurisdictions the sale of cigarettes is prohibited within certain distances of school houses. The taxation and regulation of the article is well illustrated in 62 A.L.R. 105. The ordinance is not a purely revenue measure, for the tax levied is such that it tends to diminish the use of the article.

*Id.* The court determined that the classification was neither arbitrary nor unreasonable. *Id. Ploch*, however, did not discuss the specific dangers associated with smok-

ing, such as heart disease from which Ms. Smith ultimately died.

B & W further cites cases from the United States Supreme Court noting the general negative connection between cigarettes and health. It also cites evidence presented at trial regarding the common knowledge of the health risks associated with smoking. B & W goes on to state: "A vast majority of the courts across the country, recognizing the widespread and decades-long publicity about the health risks related to smoking, have taken judicial notice that these risks have been matters of common knowledge for decades or have held that plaintiffs' claims have failed in light of common knowledge." It cites cases from outside jurisdictions in support of this assertion. It also cites portions of testimony given by Dr. Burns regarding public knowledge of the hazards of smoking.

In essence, B & W is asking this court to take judicial notice of the fact that the dangers of smoking are so commonly known that Ms. Smith's survivors' negligence claims should be precluded. Again, this issue was addressed in *Thompson*. As noted in that case, in this matter, the issue is not whether the public recognized a generalized health risk from smoking cigarettes. Instead, the issue is whether it was widely known that cigarettes contained addictive nicotine and carcinogens causing the ailments resulting in Ms. Smith's death. *Thompson*, 207 S.W.3d at 104. The court in *Thompson* examined the evidence presented and concluded that reasonable minds could differ as to whether public knowledge about the health risks and nicotine addiction associated with smoking was so certain and generally known that B & W had no duty to warn the plaintiff of the dangers. *Id.* at 104–06. Thus, the case was for the jury to decide

and a submissible case was presented. *Id.* at 106. The same is true for this case.

Dr. Burns testified that the studies in the 1950s wherein tar painted on the backs of mice caused cancer received widespread attention. Significant media coverage of possible risks of smoking occurred during the 1950s. By the mid to late 1960s, a substantial majority of Americans believed that cigarette smoking caused lung cancer. As testified to by Dr. Burns, the Surgeon General made a definitive statement in 1964 that there is no question that smoking causes disease, specifically lung cancer, in males. The same conclusion was reached for females three to four years later. Moreover, he stated that the media has reported for over 100 years that once a person begins to smoke it can be difficult to quit.

Dr. Burns also testified that after each Surgeon General's Report was released, the tobacco industry produced a document contending that the science is incomplete. According to Dr. Burns, in 1985, ten percent of smokers did not believe that smoking was harmful to health. In 1986, fifteen percent of smokers did not believe that a smoker was more likely to develop lung cancer, twenty-nine percent did not believe a smoker was more likely to develop heart disease, twenty-seven percent did not believe a smoker was more likely to develop chronic bronchitis, fifteen percent did not believe a smoker was more likely to develop emphysema, and eighteen percent did not believe a smoker was more likely to develop laryngeal cancer. Eight to fifteen million adult smokers in the United States did not believe significant health effects were caused by smoking as of 1989. In 1987, few consumers were aware that nicotine is addictive and is a poison. Dr. Burns also testified about cognitive dissonance, wherein a smoker denies the truthfulness of the negative research pertaining

to smoking so as to justify the decision to continue smoking. He further testified that people tend to not look at the warning label on cigarette packages. When asked, people seldom report that they acquire information pertaining to smoking for the Surgeon General's warning.

After examining expert testimony on the topic presented at trial in the case *sub judice,* this court concludes that reasonable minds could differ as to whether public knowledge about the health risks of developing disease and nicotine addition from smoking cigarettes was so certain and generally known that B & W had no duty to protect Ms. Smith from injury. Therefore, the case was for the jury to decide and a submissible case was made. This result is bolstered by the following observation in *Thompson:*

> We are further persuaded in our decision by our review of the decisions of courts in other jurisdictions, which show that there is no consensus on the issue of common knowledge of the dangers of smoking. The decisions range from courts taking judicial notice of the common knowledge of the dangers of smoking since 1964, (*Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 274 (D.R.I.2000)), to courts differentiating the general health risks of smoking from the risk of addiction to nicotine in cigarettes and finding that such is a jury question, (*Insolia v. Philip Morris Inc.,* 216 F.3d 596, 603 (7th Cir.2000)), to a refusal to give judicial recognition to something as intangible as public knowledge more than three decades prior (*Hill v. R.J. Reynolds Tobacco Co.,* 44 F.Supp.2d 837, 844 (W.D.Ky.1999)). We agree with the court in *Wright v. Brooke Group Ltd.,* 114 F.Supp.2d 797, 817 (N.D.Iowa 2000), which said: "[t]he simple fact that courts disagree about

whether or not to take judicial notice of this fact further illustrates to this court that this fact is subject to considerable dispute, such that taking judicial notice of it would be improper."

*Id.*

The point is denied.

### Point VI

In its sixth point, B & W claims that the trial court erred in instructing the jury on comparative fault. It asserts that the pleadings and evidence presented did not support giving that instruction because B & W did not assert comparative fault as an affirmative defense and did not try comparative fault by implied consent. It argues that the evidence it introduced at trial relating to Ms. Smith's knowledge or conduct related directly to rebutting Ms. Smith's survivors' case in chief.

Ms. Smith's survivors filed their petition on May 19, 2003. B & W's answer to the petition, filed July 28, 2003, alleged multiple affirmative defenses including several related to comparative fault.[120] B & W filed a motion for leave to amend its answer on October 15, 2004. It sought to withdraw many of the affirmative defenses it asserted, including those related to comparative fault. The trial court granted the motion on November 1, 2004. Ms. Smith's survivors filed an amended petition on January 14, 2005, the opening day of testimony in the trial. B & W filed its answer to the first amended petition on January 27, 2005. It did not allege comparative fault as an affirmative defense. Prior to jury deliberations, Ms. Smith's survivors requested a jury instruction on comparative fault. The instruction was given over B & W's objection. The jury's verdict assigned seventy-five percent of the fault to Ms. Smith.

120. The doctrine of comparative fault is codified in section 537.765, RSMo 2000.

B & W cites *Lester v. Sayles*, 850 S.W.2d 858, 868 (Mo. banc 1993), for the proposition that "[c]omparative fault is an affirmative defense that belongs solely to the defendant and may be asserted (or waived) only by a defendant." It asserts that the rule is such because affirmative defenses are intended to benefit and protect defendants and "not as a back-door means for plaintiffs to avoid their burdens of proof." B & W also claims that courts across the country have recognized the "common-sense" principle that a plaintiff cannot force a defendant to invoke an affirmative defense when the defendant wishes to waive the defense.[121] It acknowledges that there is an exception where comparative fault is tried by the implied consent of the parties, but asserts the exception does not apply in this case. B & W claims any evidence presented that conceivably implicated comparative fault directly related to some other issue in the case and was introduced to rebut Ms. Smith's survivors' *prima facie* case. It argues that the trial court's submitting comparative fault to the jury "allowed plaintiffs impermissibly to dictate defense strategy."

Ms. Smith's survivors claim that B & W's actions were the product of a deliberate strategy. They claim that B & W asserted comparative fault in its answer to the original petition, withdrawing the affirmative defense shortly before trial, so as to perform substantial discovery regarding Ms. Smith's fault. B & W benefited from this information and utilized it during trial but then attempted to prevent an affirmative defense instruction being given to the jury, according to Ms. Smith's survivors. They state: "B & W should not be permitted to avoid the consequences of its pleadings and trial strategies." They also assert that the issue of comparative fault was tried by consent and that "B & W wasted no opportunity to litigate comparative fault before the jury."

This court recently addressed this precise issue in *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76 (Mo.App. W.D.2006). In *Thompson*, B & W contended that the giving of a comparative fault instruction over its objection " 'permitted plaintiffs to dictate the defenses that the defendants were forced to raise.' " *Id.* at 120. The plaintiffs responded it is a tactic of cigarette company defendants to " 'initially assert comparative fault as an affirmative defense, withdraw the affirmative defense as some point close to or during trial, emphasize at trial the fault of the plaintiff and his or her 'choice' to smoke cigarettes, and then insist that the jury not be instructed on comparative fault and decide the case on an 'all or nothing' basis.' " *Id.*

The issue of whether a jury was properly instructed is a question of law and is reviewed *de novo*. *Mehrer v. Diagnostic Imaging Ctr., P.C.*, 157 S.W.3d 315, 323 (Mo.App. W.D.2005). Evidence and any inferences drawn therefrom are viewed in the light most favorable to the submission of the instruction. *Id.* "[C]omparative fault instructions may be given only where comparative fault has been raised in the pleadings as an affirmative defense." *Lester*, 850 S.W.2d at 868. One exception to this rule is where comparative fault is tried by express or implied consent of the parties. *Id.* The giving of a comparative fault instruction must be supported by substantial evidence. *Rudin v. Parkway Sch. Dist.*, 30 S.W.3d 838, 841 (Mo. App. E.D.2000). Comparative fault instructional errors are reversed " 'only where the errors are of such a nature that

---

**121.** Given that the issue is resolved, as discussed *infra*, utilizing Missouri law, cases from outside jurisdictions are of little probative value.

there is substantial potential for prejudicial effect.'" *Id.* (citation omitted). Although opening and closing statements are not to be considered as evidence at trial, reviewing authority may consider closing arguments in determining whether a contended instructional error had prejudicial effect. *Id.* at 842.

This court in *Thompson* examined the origins of the comparative fault doctrine. It noted that contributory negligence as a complete bar to a plaintiff's recovery in negligence cases was abolished in 1983. *Thompson*, 207 S.W.3d at 120–21. At that time, comparative fault, as found in the Uniform Comparative Fault Act, was adopted. *Id.* Comparative fault was codified in 1987 as section 537.765. *Id.* at 121.

*Thompson* then examined *Earll v. Consolidated Aluminum Corp.*, 714 S.W.2d 932 (Mo.App. E.D.1986), wherein the court "addressed whether comparative fault instructions should have been submitted to the jury at the request of the plaintiff, where the defendant had pled the affirmative defense of comparative fault but then chose not to submit any proposed instructions on the affirmative defense of comparative fault or contributory negligence." *Thompson*, 207 S.W.3d at 121. As read by *Thompson*, *Earll* noted that any one party, because its benefits are mutual, should not determine the application of comparative fault. *Id.* "[T]he determinative factor in deciding whether a comparative fault instruction is appropriate depends on the evidence presented in the case...." *Id.* Both *Thompson* and *Earll* noted that Rule 70.02(a) requires that "'[a]ll instructions ... shall be given or refused by the court

according to the law and the evidence in the case.'" *Id.* *Thompson* states that *Earll* held:

> [I]n a negligence case, where there is evidence from which a jury could find that a plaintiff's conduct was a contributing cause of his damages, unless the parties agree otherwise, the case should be submitted to the jury under the instructions and verdict forms approved by the Supreme Court for use in comparative fault cases regardless of whether the defendant submits an affirmative defense instruction or not.

*Id.* (quoting *Earll*, 714 S.W.2d at 937).[122]

As in the case *sub judice*, B & W relied upon *Lester v. Sayles*, 850 S.W.2d 858 (Mo. banc 1993), to support its argument in *Thompson*. As noted by *Thompson*, the issue in *Lester* was whether the trial court erred in refusing to permit the defendants to a personal injury negligence action to amend their pleadings on the day of trial to allege comparative fault and in refusing to offer a comparative fault instruction to the jury. *Thompson*, 207 S.W.3d at 122. *Lester* distinguished *Earll*, noting that, in *Earll*, the defendant actually pled comparative fault as an affirmative defense and the case was tried under the assumption that comparative fault applied. *Id.* As read by *Thompson*, *Lester* held that "'comparative fault instructions may be given only where comparative fault has been raised in the pleadings as an affirmative defense.'" *Id.* (quoting *Lester*, 850 S.W.2d at 868). As in this case, B & W argued in *Thompson* that, pursuant to this language in *Lester*, the jury should not

---

**122.** As noted by *Thompson*:

> Ultimately, the court affirmed the decision of the trial court not to submit the comparative fault instruction, because at that time, *Lippard v. Houdaille Industries*, 715 S.W.2d 491 (Mo. banc 1986), held that products liability cases could be submitted to the jury

> on an "all or nothing at all basis." *Earll*, 714 S.W.2d at 937. That case was supplanted by the legislature's enactment of section 537.765, RSMo Cum.Supp.1987. *See, Egelhoff*, 875 S.W.2d at 547.

*Thompson*, 207 S.W.3d at 121 n. 19.

have been instructed on comparative fault because B & W amended its pleadings so that comparative fault was not raised as an affirmative defense. *Id.* *Thompson* noted the differences between *Lester* and its case. *Id.* In *Lester,* the defendants sought a comparative fault instruction after failing to raise the affirmative defense. *Id.* In *Thompson,* the defendants pled comparative fault, withdrew the pleading, and then sought to prevent the giving of a comparative fault instruction. *Id.* *Thompson* characterized B & W's actions as attempting "to turn the concept of comparative fault from a shield into a sword." *Id.* *Thompson* determined that issue presented in its case differed from the issue in *Lester.* *Id.* It summarized the issue presented in its case as: "Can a defendant withdraw an affirmative defense of comparative negligence and prevent the plaintiff from seeking a comparative fault instruction when the evidence presented at trial would support such an instruction?" *Id.*

*Thompson* noted the differences between affirmative defenses as a whole and the doctrine of comparative fault. Affirmative defenses are a procedural tool defendants may use to defeat a plaintiff's action. *Id.* They aver that, even if plaintiff's claims are true, plaintiff cannot prevail because defendant has a legal basis for avoiding responsibility. *Id.* Affirmative defenses must be pled pursuant to Rule 55.08 so that plaintiffs have notice and are able to prepare for trial. *Id.* at 122–23. Comparative fault, on the other hand, "is a substantive basis of liability." *Id.* at 123. *Thompson* concluded: "To permit the defendants in this action to withdraw consideration of comparative fault from the jury in this case would negate the clear intent of the legislature and the courts to enact comparative negligence and would effectively reinstate the concept of contributory negligence." *Id.*

*Thompson* found "no support in *Lester* for the proposition that the trier of fact is precluded from considering apportionment of fault where the evidence supports the giving of a comparative fault instruction and the plaintiff so requests." *Id.* To the contrary, *Thompson* found that "the *Lester* court generally agreed that a comparative fault instruction should be given if the evidence in a case showed fault attributable to more than one party to an action." *Id.* *Thompson* went on to state:

Although a defendant may withdraw an affirmative defense, once the issue of a plaintiff's fault has been injected into the case by substantial evidence, the plaintiff may still request an instruction on comparative fault. *Monteith v. Cundall,* 830 S.W.2d 466, 469 (Mo.App. E.D.1992). "If there is evidence from which a jury could find that plaintiff's conduct was a contributing cause of her damages, parties to a negligence action are entitled to have their case submitted to the jury under comparative fault principles, absent an agreement to the contrary." *Rudin v. Parkway Sch. Dist.,* 30 S.W.3d 838, 841 (Mo.App. E.D.2000) (citations omitted). "[W]here there is evidence that the conduct of both parties combined and contributed to cause damage, the fact finder should not be precluded from comparing the respective contributions toward such causation made by each." *Id.* (quoting *Earll,* 714 S.W.2d at 936). "A comparative fault instruction must be supported by substantial evidence." *Id.* (citing *Egelhoff [v. Holt],* 875 S.W.2d [543] 548 [(Mo. 1994)]). "The determinative factor in deciding whether comparative fault is applicable in a particular case depends on the sufficiency of the evidence presented." *Id.* (citing *Earll,* 714 S.W.2d at 936). Whether substantial evidence exists is viewed in the light most favorable to the

party who offered the instruction in question. *Business Men's Assurance Co. of Am. v. Graham,* 891 S.W.2d 438, 448 (Mo.App. W.D.1994).

*Id. Thompson* then determined that substantial evidence was presented in the case currently before it. *Thompson* went on to find that B & W was not prejudiced by the giving of a comparative fault instruction because it had the opportunity to present evidence from which the jury could have found it zero percent at fault and the plaintiff one hundred percent at fault. *Id.* at 124. The court stated: "Neither do we find prejudice to the defendant, where, as here, the evidence supports a finding of partial fault attributable to the plaintiff's actions, and the plaintiff elects a potential reduction in awarded damages by requesting a comparative fault instruction, rather than risk a denial of any award." *Id.* The court concluded:

> Comparative fault is not merely an affirmative defense, which the defendants have a right and an obligation to plead if they so choose. It is a substantive basis of liability which applies to the very core of the manner in which the claim is proven or not proven, and the State of Missouri has chosen for reasons of fairness to adopt a system of comparative apportionment of fault. To permit a defendant to withdraw comparative fault from the jury's consideration would have the effect of reinstating contributory negligence as a complete bar to a plaintiff's claim.

*Id.*

 As in *Thompson,* substantial evidence was presented in the case *sub judice* to supporting the giving a comparative fault instruction. B & W does not dispute

that evidence was presented from which a jury could find that Ms. Smith's actions were a contributing cause to her damages.[123] Instead, it asserts that the evidence presented pertaining to Ms. Smith's conduct did not relate solely to comparative fault; rather, it rebutted prima facie elements of Ms. Smith's survivors' claims. It states that it presented evidence that Ms. Smith made careful, informed decisions and stayed informed about current events to negate the theory that Ms. Smith was unaware of the health risks of smoking. B & W further states that it presented evidence that Ms. Smith never attempted to quit smoking before 1990 to rebut the claim that she was addicted. It notes that it presented evidence that Ms. Smith never tried lower tar or lower nicotine cigarettes, even though they were available, to undermine the argument that Ms. Smith would have smoked a safer cigarette, had it been available. B & W claims it presented evidence that no one could have told Ms. Smith anything to convince her to quit smoking to refute the claim that a pre 1969 warning would have been heeded. Finally, B & W states that it presented evidence that Ms. Smith's heart attack and resulting death were not caused by smoking to negate the causation element of Ms. Smith's survivors' *prima facie* case.

Though not acknowledged by B & W, a review of the record further reveals B & W presented evidence that Ms. Smith continued to smoke despite federal health warnings and the known risks of smoking. Evidence was also presented that she continued to smoke because she enjoyed smoking, a reason unrelated to addiction. It also presented evidence that Ms. Smith

---

**123.** B & W notes that it stated in its closing argument it was not blaming Ms. Smith for being a smoker or seeking a reduction in damages based on comparative fault. As not-

ed, *infra,* though, there was a large amount of contrary evidence. Given the standard of review, B & W's argument does not change the outcome of this opinion.

made a choice to smoke, even after being diagnosed with heart disease.

An extended replication or discussion of the record is not necessary. As the above summary aptly demonstrates, substantial evidence was presented from which a jury could find that Ms. Smith's conduct was a contributing cause of her damages.[124] It was not error for the trial court to submit a comparative fault instruction to the jury.[125]

The point is denied.

### PUNITIVE DAMAGES (POINTS VII–X)

■ In its final four points, B & W attacks the award of punitive damages. Section 537.090 provides that in wrongful death cases "the mitigating and aggravating circumstances attending the death may be considered by the trier of facts" in assessing damages. *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996). "[A]ggravating circumstance damages in wrongful death cases are the equivalent of punitive damages and ... due process safeguards are required." *Id.* "The well-established purpose of punitive damages is to inflict punishment and to serve as an example and a deterrent to similar conduct." *Id.* "Because the remedy of punitive damages is so extraordinary and harsh, it should be applied sparingly." *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578, 590 (Mo.App. W.D.2002).

■ "Generally, the decision to award punitive damages is peculiarly committed to the jury and trial court's discretion, and the appellate court will only interfere in extreme cases." *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 661 (Mo.App. W.D.1997). When a jury awards punitive damages, both the trial court, which has the power of remittitur pursuant to section 510.263, and the appellate court review the award to ensure it is not an abuse of discretion. *Call*, 925 S.W.2d at 849. "On appellate review, an abuse of discretion is established when the punitive damage award is so disproportionate to the factors relevant to the size of the award that it reveals improper motives or a clear absence of the honest exercise of judgment." *Id.* (quote marks and citation omitted). "In other words, the amount of punitive damages must somehow be related to the wrongful act and the actual or potential injury resulting therefrom, although there is no fixed mathematical relation between the amount of actual damages and the amount of punitive damages awarded." *Id.* "Only when the amount is manifestly unjust will appellate courts interfere with or reduce the size of a verdict." *Barnett*, 963 S.W.2d at 661. A case-by-case analysis is utilized to evaluate punitive damages awards. *Id.*

■ These requirements are generally sufficient to satisfy due process. *Call*, 925 S.W.2d at 849. "Under these requirements, punitive damages are limited by the purposes for which they may be imposed, that is, to punish and to deter. These

---

**124.** B & W claims that this evidence cannot support the submission of an affirmative defense instruction on the basis of the issue being tried by implied consent. It asserts that, as the evidence was relevant to other issues, it cannot be used to support an implied consent argument. This argument fails for the reasons asserted in *Thompson*.

**125.** B & W also argues that it was prejudiced by the claimed error. It claims that the jury's assessment of 75% of the fault to Ms. Smith demonstrates the prejudice. It also states that, had it known a comparative fault instruction would be given, it would have sought to establish at trial and in argument that Ms. Smith was more than 75% at fault. Given that submitting the instruction was not error, this court need not determine whether B & W was prejudiced.

requirements prevent imposition of awards that are arbitrary and, if not present, would violate due process." *Id.* To supplement these requirements, Missouri courts have identified a nonexclusive list of factors that may be considered in determining the propriety of an award. *Id.* "[A] critical factor is the degree of malice or outrageousness of the defendant's conduct." *Id.* "Furthermore, evidence of a defendant's financial status is admissible as an indication of the amount of damages necessary to punish the defendant." *Id.* Other factors include: (1) the age of the injured party; (2) the character of the defendant; (3) the character of the injured party; (4) the injury suffered; (5) the defendant's standing or intelligence; (6) the age of the injured party; and (7) the relationship between the two parties. *Id.* at 849–50; *Barnett,* 963 S.W.2d at 666.

 "When reviewing the constitutionality of the imposition of punitive damages, the Supreme Court holds that an appellate court's review is *de novo.*" *State v. Black,* 50 S.W.3d 778, 794 (Mo. banc 2001). Liability for punitive damages and imposition thereof "invokes moral condemnation of reprehensible conduct." *Id.* Given this, the constitutionality of such punishment in a given case is reviewed *de novo. Id.*

 Whether sufficient evidence for an award of punitive damages was presented is a question of law. *Perkins v. Dean Mach. Co.,* 132 S.W.3d 295, 299 (Mo. App. W.D.2004). Evidence is reviewed to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages. *Id.* Both the evidence presented and all reasonable inferences drawn therefrom are viewed in the light most favorable to submissibility. *Id.* "A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity-that is, that it was highly probable-that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Id.* (quote marks and citation omitted).

The particular facts of this case make the analysis of punitive damages difficult. The trial was bifurcated pursuant to section 510.263, which states in relevant part:

1. All actions tried before a jury involving punitive damages shall be conducted in a bifurcated trial before the same jury if requested by any party.

2. In the first stage of a bifurcated trial, in which the issue of punitive damages is submissible, the jury shall determine liability for compensatory damages, the amount of compensatory damages, including nominal damages, and the liability of a defendant for punitive damages. Evidence of defendant's financial condition shall not be admissible in the first stage of such trial unless admissible for a proper purpose other than the amount of punitive damages.

3. If during the first stage of a bifurcated trial the jury determines that a defendant is liable for punitive damages, that jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded against such defendant. Evidence of such defendant's net worth shall be admissible during the second stage of such trial.

Ms. Smiths' survivors received favorable verdicts on their claims of negligent failure to warn, negligent design, and strict liability product defect.[126] The jury returned a verdict in favor of B & W on Ms. Smith's survivors' claims of fraudulent concealment and conspiracy. It awarded $2 million in compensatory damages. During

---

**126.** All three claims were submitted to the jury in one verdict director.

the first part of the trial, Ms. Smith's survivors presented evidence relevant to proving all of these claims, including the two intentional tort claims of fraudulent concealment and conspiracy. The compensatory damages award was reduced to $500,000 because the jury determined that Ms. Smith was 75% at fault for her injuries. During the second part of the trial, evidence was presented relevant to punitive damages for the two negligence and one strict liability claims for which the jury found B & W liable. The jury awarded $20 million in punitive damages, despite having found Ms. Smith 75% at fault for her injuries and despite finding that B & W was not liable for intentional wrongdoing. With this framework, the four points pertaining to punitive damages are addressed out of order.

## POINT IX

In its ninth point on appeal, B & W claims the trial court erred in denying its motion for judgment notwithstanding the verdict on punitive damages. It asserts that Ms. Smith's survivors failed to present the clear and convincing evidence required to make a submissible case as to punitive damages because the evidence presented did not show that its conduct that allegedly caused Ms. Smith's death was tantamount to intentional wrongdoing.

The jury found B & W liable for negligent failure to warn, negligent design, and strict liability product defect. All three claims were submitted in a single verdict director. Thus, if a submissible case as to punitive damages was not presented as to all three claims, a new trial must be granted. *Coggins v. Laclede Gas Co.,* 37 S.W.3d 335, 342 (Mo.App. E.D.2000). Given this, whether a submissible case was presented will be examined for all three claims.

Whether the evidence presented at trial was sufficient to allow a claim for punitive damages to be submitted is determined as a matter of law. *Peters v. General Motors,* 200 S.W.3d 1, 24 (Mo.App. W.D.2006). The evidence and reasonable inferences dawn therefrom are considered in a light most favorable to the plaintiff. *Id.* Any unfavorable evidence or inferences are disregarded. *Id.* Reviewing authority does not supply missing evidence or give plaintiff the benefit of speculative, unreasonable, or forced inferences. *Id.* While the evidence and inferences are viewed in the light most favorable to submissibility, the evidence must establish " 'with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference.' " *Id.* (citation omitted).

" 'Ordinarily [exemplary] damages are not recoverable in actions for negligence, because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct.' " *Id.* (citations omitted). "In a negligence case, punitive damages are awardable only if, at the time of the negligent act, the defendant knew or had reason to know that there was a high degree of probability that the action would result in injury." *Lewis v. FAG Bearings Corp.,* 5 S.W.3d 579, 583 (Mo.App. S.D.1999). "Evidence of a vague and generalized knowledge of danger is insufficient." *Id.* at 584. Instead, the "evidence must show that, at the time of the act complained of, the defendant had knowledge of a high degree of probability of injury to a specific class of persons." *Alack v. Vic Tanny Int'l of Mo., Inc.,* 923 S.W.2d 330, 339 (Mo. banc 1996). Punitive damages are properly submitted in a strict liability case only where clear and convincing evidence was presented that defendants " 'placed in commerce an unreasonably dangerous product with actual knowledge of the product's defect.' " *Peters,* 200 S.W.3d at 24 (quoting *Letz v. Turbomeca Engine Corp.,*

975 S.W.2d 155, 164–65 (Mo.App. W.D. 1997)). Both strict liability and negligence theories require evidence to be presented that " 'the defendant showed a complete indifference to or conscious disregard for the safety of others.' " *Id.* (citation omitted). " 'Conscious disregard or complete indifference' includes situations where the person doing the act or failing to act must be conscious from the knowledge of surrounding circumstances and existing conditions, that, although lacking specific intent to injure, the person's conduct or failure to act will naturally or probably result in injury." *Id.* The jury may find that the mere fact an injury occurred indicates a high degree of probability of injury. *Kaplan v. U.S. Bank, N.A.,* 166 S.W.3d 60, 73 (Mo.App. E.D.2003). Similarly, a defendant's aggressive defense at trial on the issue of breach of duty or causation may supply the complete indifference or conscious disregard element for the jury. *Id.* This is why, "to make a submissible case, there must be a judicial determination that the conduct was so egregious that it was tantamount to intentional wrongdoing and such that injury is the natural and probable consequence of the conduct." *Id.* (citation and quote marks omitted). Given this, punitive damages are appropriate only where "the defendant's conduct is outrageous due to evil motive or reckless indifference to the rights of others, which must be proven by clear and convincing evidence." *Peters,* 200 S.W.3d at 24–25.

■■■■ "To satisfy the 'clear and convincing' standard of proof, evidence must show that the defendant either knew or had reason to know that there was a high degree of probability that the defendant's conduct would result in injury." *Id.* at 25. Actual knowledge of the dangerous condition satisfies the element of reckless conduct so as to justify an award of punitive damages. *Id.* "The defendant's conduct must be tantamount to intentional wrongdoing where the natural and probable consequence of the conduct is injury." *Id.* If this is shown, the plaintiff can recover for aggravating circumstances based on the defendant's " 'complete indifference to or conscious disregard for the safety of others.' " *Id.* (citation omitted). "The clear, cogent and convincing standard of proof . . . requires evidence which instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Id.* (citation and quote marks omitted). " 'In a search for clear and convincing evidence, the circuit court must scrutinize the evidence in much closer detail than it does in cases in which the standard of proof is a mere preponderance.' " *Id.* (citation omitted). The trial court must determine whether the evidence presented, viewed as described above, " 'is sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity-that is, that it was highly probable-that the defendant's conduct was outrageous because of evil motive or reckless indifference.' " *Id.* at 25–26 (citation omitted).

■■■ A plaintiff seeking punitive damages in a negligence action " 'must show conduct more egregious than that on which the claim of negligence is based.' " *Haynam v. Laclede Elec. Co-op., Inc.,* 889 S.W.2d 148, 151 (Mo.App. S.D.1994) (citation omitted). This does not mean that the plaintiff must always prove conduct that is different from and in addition to the conduct that proves the negligence in order to make a submissible case for punitive damages. *Id.* Instead, a plaintiff may meet this burden by presenting evidence of the defendant's culpable mental state. *Id.*

B & W's sole argument pertaining to submissibility of punitive damages is that the evidence did not demonstrate that its conduct was tantamount to intentional wrongdoing, as required to support a claim for punitive damages. *Lopez,* 26 S.W.3d at 160. It argues that the jury's verdict supports the opposite conclusion. B & W notes that the jury found in its favor on the two intentional tort claims, claims for fraudulent concealment and conspiracy. B & W does not explicitly argue or cite any authority, however, for the proposition that a defendant found not liable for intentional torts but liable for negligence or strict liability cannot be assessed punitive damages for the negligence or strict liability claims. Accordingly, that the jury found B & W not liable for the intentional tort claims of fraudulent concealment and conspiracy is not dispositive.

At issue in this point is what the evidence presented established regarding B & W's conduct. Not all of B & W's conduct is examined, however, as B & W was found not liable for fraudulent concealment or conspiracy. Thus, the precise conduct at issue in this point must be identified. Neither party has challenged the jury instruction actually given to the jury. Thus, those instructions are utilized to determine what conduct of B & W must have been tantamount to intentional wrongdoing.

### Negligent Failure to Warn

In finding B & W liable for wrongful death based on failure to warn the jury must have found: (1) B & W manufactured or sold the cigarettes in the course of B & W's business; (2) the cigarettes were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics; (3) B & W did not give an adequate warning of the danger prior to July 1, 1969; (4) the product was used in a manner reasonably antic-

ipated; and (5) the cigarettes being sold or manufactured without an adequate warning prior to July 1, 1969, directly caused or directly contributed to cause Ms. Smith's death. The conduct at issue for this claim is B & W's act of manufacturing or selling unreasonably dangerous cigarettes without giving an adequate warning prior to July 1, 1969.

To the extent the jury based the award on the failure to warn claim, B & W asserts that the conduct occurred more than 35 years ago and that it has complied with the federally mandated health warnings that are legally adequate as a matter of law for the last 35 years. While that may be true, liability was based on conduct prior to 1969 and punitive damages may be awarded based on that conduct. B & W also claims that no specific evidence was presented pertaining to what warning B & W should have given, when the warning should have been given, what effect a warning would have had on Ms. Smith or any other person, or that B & W intended to harm Ms. Smith or any other person by failing to provide an earlier warning. These arguments are more suited to challenging the initial finding of liability, as opposed to punitive damages based upon the finding of liability.

The following evidence was presented pertaining to B & W's act of manufacturing or selling unreasonably dangerous cigarettes without giving an adequate warning prior to July 1, 1969, being tantamount to intentional wrongdoing. Only evidence prior to 1969 is examined. Plaintiff's exhibit 343 was a September 21, 1939, report entitled "Nicotine in Relation to the Physiological Effects of Cigaret Smoke." As to the link between smoking and cancer, the report noted that "tobacco tars" caused cancer in animals, but concluded "[m]uch of the work on animals is not applicable to man" and stated that "in more comparable

experiments recently reported the evidence was against the belief that the tobacco tars produce cancer." It stated:

> What relation, if any, these findings on our general population have to the problem of cigarette smoking is most difficult to establish. Certainly the carcinogenic effect of tobacco tars must be nil or very slight indeed or else there would certainly be many more cancers of the smoke tract than there really are.

As to nicotine and its addictiveness, the report stated:

> [I]t might be concluded that the general, world-wide, reason for smoking is largely the nicotine in the tobacco. There are those (admittedly in the minority) however who feel that possibly there are other factors, such as aroma, the psychological effects, the taste, etc. that are of equal if not greater importance as smoking attractions. To them nicotine is of importance primarily because of its possible baneful effects.

The report concluded: "Researches should be continued to bring further light on the pharmacology of nicotine and tobacco smoke."

Plaintiff's exhibit 1, a report from July 17, 1963, stated: "Moreover, nicotine is addictive." It went on to state: "We are, then in the business of selling nicotine, an addictive drug...." The report anticipated that the Surgeon General's Committee would conclude that cigarettes, "despite the beneficant effect of nicotine, have certain unattractive side effects." The side effects include causing or predisposing a smoker to lung cancer, contributing to certain cardiovascular disorders, and possibly causing emphysema. The report stated: "We challenge those charges and we have assumed our obligation to determine their truth or falsity by creating the new Tobacco Research Foundation."

Plaintiff's exhibit 148.1 was a January 4, 1954, newspaper advertisement titled "A Frank Statement to Cigarette Smokers." It was a position statement signed by major tobacco companies, including B & W. It stated:

> Recent reports on experiments with mice have given wide publicity to a theory that cigarette smoking in some was linked with lung cancer in human beings.

> Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed.

> At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.

> Distinguished authorities point out:

> 1. That medical research of recent years indicates many possible causes of lung cancer.

> 2. That there is no agreement among the authorities regarding what the cause is.

> 3. That there is no proof that cigarette smoking is one of the causes.

The advertisement goes on to state: "For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during those years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence." The advertisement concludes by stating that a Tobacco Industry Research Committee has been formed to conduct further research.

Plaintiff's exhibit 33 was a page from B & W's web site titled "Evolution of Brown & Williamson's Position on Smoking & Disease." It stated:

Brown & Williamson has for many years accepted that smoking is a major risk factor for many diseases, but had sought to point out that until a mechanism for disease causation was identified by medical science, it was handicapped in delivering on its responsibility to produce safer products. This position, which was and is consistent with the science, was nevertheless taken as a denial

We take responsibility for not more clearly communicating our position historically. In articulating our position, too often we drew a distinction between scientific causation as demonstrated by laboratory experiments, and scientific causation as demonstrated by strong and consistent epidemiological evidence. There is a distinction and it is an important one, but it is unhelpful when trying to present a credible public position on important public health issues. In fact, the articulation of our position had become an obstacle to working with the government, the public health community and in communicating with the public.

. . .

The response to Brown & Williamson's new web site and its other statements on smoking and health showed that Brown & Williamson still had not achieved its goal of clear communication and that its position was still misunderstood. In particular, as long as Brown & Williamson continued to point out that there were gaps in the scientific proof of causation and that no mechanism had yet been identified to explain the strong and consistent statistical association, it was argued by our critics that the discussion of these questions was an effort to confuse the real facts about the risks of smoking. This resulted in further examination of the position by Company scientists and further revisions to the web site during 1999 and 2000.

As reflected in Brown & Williamson's web site today, its scientists have concluded that, assessing all of the scientific evidence together, the best judgment is that smoking is a cause of disease. This judgment reflects consideration of all the evidence available to Brown & Williamson, not simply the epidemiology. It is not the result of any specific study or development.

Plaintiff's exhibit 188 was a June 13, 1969, report titled "The Aqueous Extract pH and Extractable Nicotine Studies of Major Cigarette Brands from Brown & Williamson and Some Domestic Competitive Companies." The report was the product of "an effort to understand the origins of smoke pH and the extent of its influence on smoker response." It discussed the extraction of nicotine from various smoke solutions and the nicotine content from the smoke of various cigarettes and tobacco blends. The report concluded a demand in the domestic market existed for cigarette brands that fell into the higher extractable nicotine range. It recommended, *inter alia*, the investigation of certain experimental blends to approximate the nicotine delivery available in Kool cigarettes.

Dr. Wigand testified that historically Kool cigarettes had the highest amount of nicotine compared to any other product on the market and had the highest amount of free nicotine. He further testified that B & W manipulated the delivery of nicotine in Kool cigarettes so as to deliver more nicotine.

Plaintiff's exhibit 389 was a release issued by B & W's president on October 3, 1967. It states:

Keeping accurately informed on the smoking and health controversy is an increasing problem. Many assertions are being made which tend to condemn smoking and the tobacco industry. Headlines carry these assertions as "news." Unfortunately, the other side is sometimes overlooked.

And there is another side to the controversy! The following section states and gives factual replies to 10 of the most common assertions. From these, I hope you will gain a better insight into our position as a part of a viable and responsible industry. I also hope you will add your voice in support of the soundness of our cause.

Ten assertions (i.e., "The case against smoking has been proved.") are then refuted.

Plaintiff's exhibit 144.41 was three advertisements from the 1940s. The first advertisement states that Kool cigarettes provide comfort for "smoker's throat" and taste thirty degrees cooler. The second advertisement states that Kool cigarettes will keep one from burning up and are refreshing. It further states that Kool cigarettes leave a clean, Kool taste in one's mouth. The third advertisement states that Kool cigarettes taste will "win through" the sniffles, cold, or flu and leave a Kool taste in one's mouth.

Plaintiff's exhibit 268 was a report from a 1967 conference. It stated that one of the conference's main conclusions was: "Smoking is now irreversibly associated with health." The report also listed a number of assumptions. It stated that the assumptions "were listed without any attempt to justify them or to agree on their correctness at this time." One of the assumptions was that: "If there is no inhaling, there is no lung cancer or respiratory disease."

Dr. Burns testified that many of the carcinogenic constituents in cigarette smoke have been known for over forty years, before 1969. He further testified that prior to 1969, B & W denied that smoking caused disease and denied that the evidence was sufficient to draw a scientific conclusion. Instead, it suggested that more evidence was needed and that the studies were flawed. B & W further claimed that the implications of the studies completed could not be drawn in relation to cigarettes and human beings.

Dr. Burns also testified about the Council for Tobacco Research. He stated that the tobacco companies formed this entity for the stated purpose of investigating whether tobacco caused disease. It funded a variety of research. According to Dr. Burns, the research funded was not the type that would be utilized to investigate whether smoking caused disease. The research funded was, instead, of two types. The first type examined mechanisms by which heart or lung disease might occur. The second type examined other causes of disease, besides cigarette smoking, so that B & W could identify potential factors other than cigarette smoking that would explain the resulting disease. Dr. Burns opined that this is what is done if a company is trying to find evidence to protect itself in the face of knowing that cigarettes do cause disease. He noted that the tobacco companies stated that, because eminent scientists were still receiving research grants, the question of whether cigarette smoking causes disease is still unanswered. The tobacco companies maintained their position that the answer is still unknown and must be sought up until 1998. He stated: "So, in order to preserve their ability to continue to misrepresent to the public that cigarettes hadn't been proven to be dangerous, they avoided doing any research, avoided doing research and de-

veloping products that might have actually reduced the risk for people who smoked."

Evidence was also presented that the tobacco companies knew more scientifically than the government and their refusal to share information with the government led to the government giving erroneous advice to consumers. For example, Dr. Burns testified that the conclusion nicotine and cigarette smoking were addictive was not reached until 1988 outside the tobacco industry. B & W was aware of this fact in 1963. Further, B & W was aware that switching to a lower tar and nicotine cigarette does not reduce risk. Yet, the government report from 1981 concluded that such a switch would reduce risk. Dr. Burns stated that, if the tobacco companies had shared their information, the government would not have disseminated so much erroneous advice. Plaintiff's exhibit 10, a proposal for further research dated February 13, 1962, states: "As a result of these various researches we now possess a knowledge of the effects of nicotine far more extensive than exists in published scientific literature."

■ Viewed in the light most favorable to submissibility, the evidence summarized above is not sufficient to demonstrate that B & W's conduct was tantamount to wrongdoing.[127] This evidence demonstrates that B & W was aware that nicotine is addictive and attempted to increase the amount of nicotine in Kool cigarettes so as to make Kool cigarettes more addictive and, accordingly, more profitable. The evidence also demonstrates that there were assertions that cigarettes were harmful to a smoker's health. In order to be a submissible case for punitive damages, however, the evidence must demonstrate that B & W's act of manufacturing or selling unreasonably dangerous cigarettes without giving an adequate warning prior to July 1, 1969, was tantamount to intentional wrongdoing by clear and convincing evidence. All of the pre–1969 evidence demonstrates that B & W consistently denied that cigarettes were harmful and no evidence was presented suggesting B & W was insincere in this denial. According to Dr. Burns, B & W set out intentionally to not know that smoking was harmful. Thus, it conducted the wrong type of research and attacked contrary scientific findings. In essence, it set out to remain ignorant and apparently succeeded. Further, it was unwilling to share what it had learned. B & W did not act admirably. Given the stringent standard applied to punitive damages, however, the evidence is simply insufficient. A submissible case was not made for punitive damages to be awarded for the negligent failure to warn claim.

Ms. Smith's survivors assert that this evidence demonstrates that B & W had reason to know that Kool cigarettes were addictive and caused cancer since at least 1939, more than four years before Ms. Smith began smoking Kool cigarettes. They also claim that B & W used its substantial knowledge regarding the dangers of smoking in outrageous ways. They cite B & W's increasing the amount of nicotine and using menthol to mask the harshness of cigarette smoke as examples. They claim that B & W had full knowledge of the dangers of smoking Kool cigarettes and yet "set out on a 50–year scheme to assure its smokers than Kool cigarettes were completely safe." They argue that B & W even advertised Kool cigarettes as remedies for disease.

---

**127.** Plaintiff's exhibit 150.1, cited by both parties, is not in the record submitted to this court and does not appear in the transcript's list of plaintiff's exhibits. Thus, it is not considered.

First, as discussed above, the evidence does not establish that B & W knew cigarettes were dangerous fifty years prior to suit. Second, the conduct at issue is not B & W's "scheme" to lie to smokers. That alleged conduct goes to the claims of fraudulent concealment and conspiracy, for which the jury found B & W not liable. The conduct examined to determine whether it was tantamount to intentional wrongdoing is B & W's act of manufacturing or selling unreasonably dangerous cigarettes without giving an adequate warning prior to July 1, 1969. None of the evidence cited by Ms. Smith's survivors demonstrates this clearly and convincingly.

## Negligent Design

In finding B & W liable for wrongful death based on negligent design the jury must have found: (1) plaintiffs are the husband and children of Ms. Smith; (2) B & W designed cigarettes; (3) cigarettes contained harmful constituents including nicotine; (4) B & W failed to use ordinary care to design cigarettes to be reasonably safe prior to Ms. Smith's death or prior to July 1, 1969, or to adequately warn of the risk from the harmful constituents including nicotine; and (5) such failure directly caused or directly contributed to cause the death of Ms. Smith. The conduct at issue for this claim is that B & W designed cigarettes containing harmful constituents and either failed to use ordinary care to design a safer cigarette or failed to adequately warn of the risk from the harmful constituents prior to July 1, 1969.

To the extent the jury based the award on design, B & W claims that nothing about Kool cigarettes distinguished them from any other cigarette. B & W also states that no evidence was presented that B & W intended to make Kool cigarettes more dangerous or more likely to cause injury than other cigarettes. These arguments are directed toward challenging the finding of liability and are not appropriate to challenge an award of punitive damages based upon the finding of liability. Further, the arguments were rejected in Point III.

B & W further claims that the evidence was uncontroverted that no other cigarette that Ms. Smith could have smoked would have enabled her to avoid her injuries, that Kool cigarettes were legal cigarettes that are heavily regulated and taxed, and that law cannot ban cigarettes. It claims that, under these circumstances, it should not be subjected to punitive damages. Again, these arguments are directed toward the imposition of liability and not the imposition of punitive damages based upon a finding of liability. Further, it cites no authority for its assertion that punitive damages are inappropriate in these circumstances.

B & W further notes that it complied with Missouri and federal law with respect to the marketing and sale of cigarettes. It does not explain the significance of this fact, however.

There are two possible conducts identified for this claim. As for the first conduct, the following evidence was presented pertaining to B & W designing cigarettes containing harmful constituents and failing to use ordinary care to design a safer cigarette being tantamount to intentional wrongdoing.

Plaintiff's exhibit 278 is a document from the files of British–American Tobacco Co. Ltd. It contains a report from July 16, 1966. The report is about project ARIEL, a research topic aimed at the development of a smoking device through which the smoker can receive nicotine without the byproducts of combustion and pyrolysis associated with normal cigarette smoking. The report evaluated previous research in an effort to consider the possible exploita-

tion and implementation of such a product. The device would have been similar in appearance and behavior to a conventional cigarette and would have delivered an aerosol largely composed of nicotine. Based on the preliminary research, a patent was obtained for a wide range of possible designs for the new device. The report also discussed the specific parameters of the possible designs. As to future development, the report stated: "The devices which have been made to date are still a considerable way from being acceptable and easily produced, and it would be misleading to under-estimate the amount of effort required to develop the devices to the required acceptability both in smoke quality and ease of production." It then discussed the areas in which further work was needed. Exhibit 278 also contains a report dated May 13, 1967. The report summarizes "ARIEL" as a potential design of a product that produces "a satisfying smoke which, within present knowledge, is 'healthy.'"

Plaintiff's exhibit 276 is an undated document titled "Project Greendot." The objective of the document was to "determine the practical routes to create, within a 5-year development project products which retain the attributes of a conventional cigarette in terms of appearance, smoking mechanics and taste while delivering a highly modified tar (in terms of composition, quality and dose) with a significant reduction in sidestream." A second objective was to "incorporate the influence of consumer acceptability into the design of products and to identify the markets and the degree of consumer flexibility in accepting such products." It states that British–American Tobacco's research into a highly modified smoke delivery device began twenty-five years prior with Project ARIEL. The document states that interest in Project ARIEL waned and work was halted in 1967 because "the need for such a device

was not apparent." It then states: "It is evident that in 1987 there is a strong requirement for a highly modified range of products to meet the company needs of the 1990's." It proposes that research be done so as to be able to provide the modified products in the 1990s.

Dr. Wigand testified that B & W was concerned that successfully making a safer cigarette would pose difficulties because by marketing a safer cigarette, it would imply that the current Kool was unsafe. There was also concern that developing a safer cigarette would undermine the position the tobacco industry has taken that no causality between smoking and disease exists. Further, labeling the new cigarette as safe would mean that everything else was unsafe and dangerous. He also testified that he desired to make a safer cigarette but was hindered in doing so by B & W. He was not allowed to test additives and how they change when burned as opposed to being ingested or applied to the skin, the traditional methods of testing substances for safety.

Dr. Wigand also testified about Project Airbus, a product wherein tobacco would be heated instead of burned. He stated that the project was terminated because it was technologically impossible to construct acceptable moving furnace devices. He testified about other efforts by B & W to develop a safer cigarette, including Project Nova and Project Green Dot. Dr. Wigand acknowledged that two significant problems with a safer cigarette would be consumer rejection at retail and negative reaction among government regulators.

Dr. Wigand noted that another tobacco company attempted to market a safer cigarette, called Premier. Its design was patented so that B & W could not copy its design. Further, the product failed. One reason is because the manufacturer did not

want to encounter the hassle of working extensively with the Food and Drug Administration. Another reason is that consumers reported that the cigarette tasted "foul."

Dr. Wigand noted that people have stated that there is no such thing as a truly safe cigarette. He stated that, during his employment at B & W: "My view is there would never be a safe cigarette no matter what. There could be degrees of safer. Nicotine by itself would never be safe in itself. And the negative baggage or the constituents that come along with nicotine most certainly would not be safe." Currently, "safer" cigarettes are on the market, manufactured by several tobacco companies including B & W. Yet, neither the Surgeon General nor the United State Public Health service has endorsed these products as safer and the products have disclaimers indicating that they have not been proven safer. Instead, the products bear the Surgeon General's Warning that is present on conventional cigarettes. Dr. Burns testified that no cigarette on the market today is safe. He noted that designing a safe cigarette is very difficult. This is because if one thing is changed, unintentional effects may result. Dr. Burns also testified that not only is "there is no such thing as a safe cigarette," "there's no safe level of consumption."

Dr. Burns testified that in the early 1970s, Liggett and Myers Tobacco Company attempted to develop a safer cigarette. It developed a cigarette that, by spraying a catalyst on the tobacco leaf, would burn more quickly and, as a result, would not have as many carcinogens in it. Plaintiff's exhibit 240 was a report from a sister company of B & W on a group smoking and health conference, which took place in Germany from May 5 to May 8, 1974. The report stated:

On the whole, the U.S. industry was still united, but L & M was developing a technique for reducing biological activity by direct spraying, and B & W was attempting to get agreement from the other companies not to pursue this line. The danger was that one company might get some form of endorsement from the Government for this technique.

Thus, B & W attempted to stop Liggett and Myers from conducting this research.

■■■ To reiterate, the conduct at issue for this claim is B & W designing cigarettes containing harmful constituents and failing to use ordinary care to design a safer cigarette. Viewed in the light most favorable to submissibility, the evidence establishes that B & W stopped trying to develop a safer cigarette for fear it would hurt the sales of its normal "non-safe" cigarette. Further, it attempted to persuade other tobacco companies not to pursue a safer cigarette for similar reasons. The implication is that B & W was more concerned with profits than with the development of a safe cigarette. Nonetheless, both Dr. Burns and Dr. Wigand, Ms. Smith's survivors' primary witnesses, testified that it is not possible to make a safe cigarette. The three brands currently on the market that may be characterized as "safer" have not been proven safer and still bear the Surgeon General's warning. This is not clear and convincing evidence that B & W's conduct was tantamount to intentional wrongdoing.

The second possible conduct was B & W's act of manufacturing or selling unreasonably dangerous cigarettes without giving an adequate warning prior to July 1, 1969. The evidence presented for this conduct is the same evidence discussed for the negligent failure to warn claim. This evidence is insufficient for the reasons discussed in that analysis. Thus, a submissi-

ble case was not made for the negligent design claim.

## Strict Liability Product Defect

In finding B & W liable for wrongful death based on product defect the jury must have found: (1) B & W manufactured or sold the cigarettes in the course of B & W's business; (2) the cigarettes were then in a defective condition or unreasonably dangerous when put to a reasonably anticipated use; (3) the cigarettes were used in a manner reasonably anticipated; and (4) such defective condition as existed when the cigarettes were manufactured or sold directly contributed to cause the death of Ms. Smith. Thus, the conduct at issue for this claim is B & W's act of manufacturing or selling defective or unreasonably dangerous cigarettes. In addition to the evidence discussed, *supra*, the following evidence was presented pertaining to this conduct being tantamount to intentional wrongdoing.

Plaintiff's exhibit 270, a document created August 19, 1977, explored an improved "Herzfeld" index. The document purported to be "merely an example of what such an index would involve and the sort of assumptions which must necessarily be made or implied." The report stated: "I think it demonstrates clearly that it is not a path we should encourage anyone to follow at present." The document calculated the number of deaths from lung cancer, cardiovascular disease, and bronchitis in men and women in the United Kingdom. The document then sets forth a number of assumptions it is using in making these calculations. It goes on to state: "The writer does not consider it reasonable to make all these assumptions and would argue some are not even plausible." It concluded: "It may be concluded that there is insufficient knowledge at present to enable any useful combination of smoke constituents to be made into a single index."

Plaintiff's exhibit 10 was a document titled "Notes on Group Research & Development Conference" from March 1978. It stated: "There has been no change in the scientific basis for the case against smoking. Additional evidence of smoke-dose related incidence of some diseases associated with smoking has been published. But generally this has long ceased to be an area for scientific controversy."

Plaintiff's exhibit 407 was a report written by B & W's general counsel in 1976 titled "Industry Response to Cigarette/Health Controversy." It stated:

The new filter brands vying for a piece of the growing filter marker made extraordinary claims. There was an urgent effort to highlight and differentiate one brand from the others already on the market. It was important to have the most filter traps. Some claimed to possess the least tars. In most cases, however, the smoker of a filter cigarette was getting as much or more nicotine and tar as he would have gotten from a regular cigarette. He had abandoned the regular cigarette, however, on the ground of reduced risk to health.

Dr. Wigand testified that, while he worked at B & W, the president of B & W had a favorite saying of "hook 'em young, hook 'em for life." Dr. Wigand explained that the "hook" referred to nicotine addiction. Dr. Wigand also testified that while he was employed at B & W there was an "obsession" with getting free nicotine from cigarettes. He noted that Kool cigarettes were noted for their harshness and impact and that their smoke was very harsh and irritating. Because of this, B & W added menthol to Kool cigarettes so that the smoker could breathe the smoke in and breathe deeper into the lungs.

Plaintiff's exhibit 48 was a B & W internal correspondence dated March 25, 1983. It states that from the 1930s until the 1960s, Kool cigarettes positioned itself as a specialty cigarette to be smoked for remedial or medicinal purposes. It labels Kool cigarettes as an "occasional usage cigarette."

Plaintiff's exhibit 3 is a memorandum dated August 24, 1978. Its subject is "Future Consumer Reaction to Nicotine." The memo states: "Very few consumers are aware of the effects of nicotine, e.g., its addictive nature and that nicotine is a poison." It further stated that few consumers use nicotine numbers as a basis for their purchase. The memo noted that tests have been conducted to determine the effect of including nicotine numbers in advertising, and "in every case there were adverse reactions to the ads."

Dr. Wigand testified that he was informed that B & W was going to dispute the Surgeon General's Report and the results reached by other scientific bodies in public and in litigative environments. He stated that B & W was aware that most smokers were unaware of the hazards of smoking or that nicotine was addictive, and it had an active process of creating controversy on those two issues. He also stated that he was trained to not write down anything that could potentially be used in litigation. Further, an attorney followed him around so that the conversations he had would be privileged. Dr. Wigand also testified that the minutes from meetings were sanitized before distribution so as to take out any information harmful to B & W's interests.

 This is sufficient evidence of conduct tantamount to intentional wrongdoing to submit the issue to the jury. In the light most favorable to submissibility, B & W had an active process of creating controversy regarding the health risks of smoking and planned to dispute every Surgeon General's report, regardless of what it was based upon. Further, B & W had policies of preventing harmful information from becoming available to the public and established procedures to ensure negative information did not reach the public. This rises to the level of clear and convincing.

Of the three claims, a submissible case was made only as to the strict liability product defect claim. Thus, the case is remanded to the jury for a new trial on punitive damages as to the strict liability product defect claim only.

The point is granted.

### POINTS VII, VIII, and X

In its seventh point, B & W claims that the trial court erred in denying its motion for new trial on punitive damages. It asserts that the scope of evidence the jury was permitted to consider on the issue of punitive damages violated its due process rights under the Fourteenth Amendment to the United States Constitution. In its eighth point, B & W claims that the trial court erred in denying its motion for new trial on punitive damages. It asserts that the jury instructions violated its due process rights under the Fourteenth Amendment to the United States Constitution. B & W argues that the violation stems from the trial court's refusal to give various instructions it offered. In its tenth, and final, point on appeal, B & W claims the trial court erred in denying its motion for judgment notwithstanding the verdict, its motion for new trial, and its request for remittitur on punitive damages. It asserts that the $20 million punitive damages award exceeds the amount permissible under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Given the disposition of

Point IX, these points need not be addressed.

### CONCLUSION

B & W's first six points are denied. Its ninth point is granted. B & W's seventh, eighth, and tenth point are not reached given the disposition of Point IX. The judgment is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.

LOWENSTEIN, P.J., concurs.

SMART, J., writes a dissenting opinion.

JAMES M. SMART, JR., Judge, dissenting.

While I concur with much of the majority opinion, I write separately to express disagreement with certain significant aspects. First, I am persuaded that plaintiffs failed to make a submissible case with regard to the failure-to-warn claim. Second, I disagree with the extensively developed (and in my view unnecessarily developed) hypothesis of the majority opinion that the wrongful death statutes can be construed in such a way as to allow a wrongful death claim after the decedent's personal injury claim was previously settled or adjudicated by the decedent.

### I

I will turn first to the issue of whether the state court wrongful death action was procedurally barred by a prior adjudication. This requires some extended discussion of procedural history.

Mrs. Smith filed her personal injury action (asserting thirteen claims) against Brown & Williamson in federal court in 1996. In 1999, Brown & Williamson moved for summary judgment on various grounds. The district court thereafter issued its ruling granting most of the relief sought by Brown & Williamson. At that point, ten of Mrs. Smith's claims had been ruled against her by the federal district court. Remaining were claims of design defect, negligent research and testing, and implied warranty.

In May 2000, before those remaining claims were fully resolved, Mrs. Smith passed away. Thereafter, Lincoln Smith, as personal representative, was substituted as plaintiff in order to allow him to pursue a survival action under 537.020. At that point, the parties focused on the factual issues as to whether Mrs. Smith's death resulted from lung cancer. The parties agreed that if her death had not been caused by lung cancer, but by something else, then a survival action would be proper. Otherwise, a death claim would be appropriate (assuming plaintiffs could prove that smoking caused the lung cancer), at least as to the claims that survived the summary judgment rulings of the district court.

Because the attorneys for Mr. Smith were contemplating a wrongful death claim, Brown & Williamson filed an interpleader action in an effort to force the personal representative and other family members (who were named interpleader defendants) to choose either the death claim or the survivorship claim. The trial court believed that an interpleader was unnecessary because the jury could be instructed in such a way as to avoid a risk of inconsistent adjudications. The court suggested that the personal representative and the other family members be allowed to amend the petition to assert alternate respective claims.

The parties reached an agreement, which the court adopted in an order. That agreement called for Lincoln Smith, as

personal representative, to dismiss the survival action with prejudice, and Brown and Williamson to dismiss the interpleader with prejudice. The parties were in effect agreeing that the lung cancer was the cause of death (though not agreeing that tobacco caused the lung cancer). The agreement also provided that "the fact that the survival action is dismissed with prejudice as a consequence of the interpleader action shall not be used by Brown & Williamson as a defense to a wrongful death action arising from the death of Barbara Smith, if one is filed."[1]

In March 2003, almost three years after Mrs. Smith passed away, Mrs. Smith's survivors initiated this wrongful death action in the circuit court. They alleged the three claims left over from federal court after summary judgment, and joined them with a failure-to-warn claim that had been decisively ruled against Mrs. Smith by summary judgment in federal court. Brown & Williamson's answer pleaded, *inter alia,* defenses of res judicata and collateral estoppel as a procedural bar to all the claims. Brown & Williamson relied on the language of both 537.080 and 537.085 in pleading its defenses.

Plaintiffs, acknowledging the prior dismissal with prejudice in the federal court, argued instead that the wrongful death act should be construed to permit them to relitigate the claims. The record fails to disclose why, but initially plaintiffs did *not* argue that the above-mentioned agreement with Brown & Williamson, adopted by the federal court, preserved their right to pursue the death claims. Instead, though they now suggest the agreement protects their claims, they first argued that their claims were not barred by a reasonable interpretation of the wrongful death statutes.

The plain language of section 537.080 is clear:

> Whenever the death of a person results from any act, conduct, occurrence, transaction, or circumstance which, if death has not ensued, *would have entitled such person to recover damages in respect thereof,* the person or party who, or the corporation which, would have been liable if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured, which damages may be sued for: ...

Also clear is the plain language of section 537.085:

> On the trial of such action to recover damages for causing death, the defendant may plead and prove as a defense *any defense which the defendant would have had against the deceased* in an action based upon the same act, conduct, occurrence, transaction, or circumstance which caused the death of the deceased, and which action for damages the deceased would have been entitled to bring had death not ensued.

(Emphasis added).

1. The facts concerning this agreement were unknown to this court until the parties filed supplemental appendices in the Supreme Court after the case was initially transferred. The parties do not agree as to the meaning and extent of application of the agreed order. One possible interpretation and application would be that the parties agreed that the claims that survived summary judgment motions *could* be prosecuted as death claims. For that reason, without further clarification, I cannot maintain, as I did at first, that all death claims were procedurally barred. However, my disagreement with the majority's statutory *analysis,* which at this point would seem unnecessary, remains.

Although these are two separate statutory sections, it would seem that the second is at least partially implicit in the first, and is specified separately only to clarify that all defenses, including but not limited to contributory or comparative fault, may be asserted against the death claimants. Here, the issue was whether a defense of claim preclusion may be asserted based on a prior adjudication. Although Mrs. Smith did not personally release her claims, her *personal representative (her husband, Lincoln Smith) and other family members* made the decision to allow dismissal of the remaining claims after the adverse adjudication of most of her claims. The family members, named as interpleader defendants, were part of the agreed order.

Apart from any agreement to the contrary between the parties, a procedural history involving dismissal with prejudice might compel a conclusion that the adjudicated claims were *finally* adjudicated. *See, e.g., Hope v. Klabal,* 457 F.3d 784, 788–90 (8th Cir.2006). However, in view of the uncertainty flowing from the agreed order in federal court, I am not confident that the claims *were* to be considered fully adjudicated in federal court in a way that would bar the claims in a wrongful death action in state court. Arguably, the entire purpose of the agreed order in federal court was to preserve the right of the survivors to bring a wrongful death claim. Neither I nor my colleagues were aware earlier in the case of this entire procedural history. Most likely the majority's attempt to construe 537.080 is completely unnecessary—assuming that the effect of the agreed order in federal court was to remove *any* issue as to the procedural right of the survivors to bring the wrongful death claim.

Along with believing that the majority need not even reach its extended and hypothetical construction of section 537.080, I also dissent from the construction reached, and find it necessary to register my disagreement for several reasons. First, I believe the majority's interpretation, if applied in a case where it mattered, would undermine the effect of the clear language of 537.080 and 537.085.[2]

The opinion of the majority raises, *sua sponte,* the question of whether our understanding of the wrongful death cause of action was changed by *O'Grady v. Brown,* 654 S.W.2d 904, 908–09 (Mo. banc 1983). Instead of assuming a straightforward application of the language of section 537.080, the majority wonders about *O'Grady,* then undertakes a survey of divergent jurisdictions and commentators, and decides to decide this case on the basis that it is "logically inconsistent" that "something a decedent does during his or her lifetime bars a wrongful death cause of action." If there is a logical inconsistency, it is a logical inconsistency that the General Assembly has lived with for over a hundred years, as discussed below. Moreover, the opinion of the court takes the surprising position that the defendant has waived any argument under 537.085, and so it purports to construe only 537.080, as though that section may be understood without the benefit of 537.085.

**2.** If "death had not ensued," there would have been no personal representative and no survivorship claim under 537.020. Mrs. Smith would have pursued her claim to con-clusion, and the personal representative would not have been faced with making a choice between the survivorship claim and the death claim.

A survey of other states, as the majority undertakes, is inappropriate *obiter dictum* because the language of the Missouri statute differs from that of many states. Indeed, the Missouri Supreme Court has cautioned against referring to cases decided under other death statutes because "little, if any, aid is to be had from any source other than our own statute and cases interpreting it." *Jackson v. St. L.–San Fran. Ry. Co.*, 357 Mo. 998, 211 S.W.2d 931, 934 (1948) (noting that at that time only Colorado and New Mexico copied the language of Missouri act). In any event, to the extent that other states' language is similar, the "vast majority" would hold that the settlement or adjudication of the claim by the deceased constituted a bar to the death claim. *See Simmons First Nat'l Bank v. Abbott*, 288 Ark. 304, 705 S.W.2d 3 (1986).[3] *See also* Prosser & Keeton, The Law of Torts section 127, at 955 (5th ed.1988).

Allowing the survivors of a deceased tort victim to seek recovery following the victim's death was designed, *inter alia*, to serve the purpose of accountability (so that the tortfeasor will not be better off to kill a victim than to have the victim survive). *See O'Grady v. Brown*, 654 S.W.2d 904, 908–09 (Mo. banc 1983). The General Assembly believed that society derives a benefit from having a civil means of accountability for a wrongfully caused death. *Id.* Once accountability has been served, however, the legislature did not choose to allow a subsequent action by the deceased's survivors. *Strode v. St. Louis Transit Co.*, 197 Mo. 616, 95 S.W. 851, 853 (1906).

The Missouri wrongful death statute, in both its present form and in all its earlier forms, generally rules out the scenario of the survivors of a tort victim seeking to assert a wrongful death claim after the tort victim *has already resolved* the personal injury claim.

> Whenever the death of a [tort victim] results from an act . . ., the [tortfeasor] which would have been liable if death had not ensued shall be liable . . . .

Section 537.080. Under this statute, a death action cannot be brought by the family unless the decedent could have maintained the action if the decedent had not died. The purpose of accountability is presumed to have been served when the tort victim has pursued and resolved a claim for the injuries.

In *Strode*, 95 S.W. at 853, the Missouri Supreme Court addressed the very question decided by the majority in this case, and decided it exactly the opposite of the majority's decision here:

> We then confront, in direct and unmistakable terms the question as to whether or not, where a person is injured due the negligence or default of another, and before death, makes a settlement with the wrongdoer, can his widow or children yet maintain an action for the death and accrued damage, if any, by reason thereof. This question, we feel constrained, under the authorities and our statutes to answer in the negative.

---

**3.** In *Simmons*, the Supreme Court of Arkansas determined that under the Arkansas statute, which was identical to the Missouri statute, any claim that the decedent had settled or reduced to judgment would bar a death claim by survivors. *Id.* at 4. *See also Kessinger v.*

*Grefco, Inc.*, 251 Ill.App.3d 980, 191 Ill.Dec. 356, 623 N.E.2d 946, 951 (1993) ("vast majority of other jurisdictions" reach same result where statute is phrased "if death had not ensued").

One argument made in *Strode* was that the wrongful death act was an independent or new cause of action (not a derivative cause of action), and therefore it could not be barred by the decedent's settlement of the claim. The Court addressed that argument by stating that the argument as to the category of the claim was *irrelevant* to the issue before it.

> Whether the cause of action given to the widow or children [by the statute], be denominated a transmitted right, a survival right, or an independent cause of action, it yet remains true that the foundation and gist of each and all is the negligent act which produced the injury. The negligent act was the basis at common law for the cause of action in the husband, and it is likewise the gist and basis of the cause of action in favor of the widow or children, or of the administrator as in some states provided.

*Id.* at 853. The court held that the claims of the decedent's survivors were barred. *Id.*

For this reason, the decision in *O'Grady v. Brown,* 654 S.W.2d 904 (Mo. banc 1983), cannot affect the grounds of the *Strode* decision. *O'Grady* does not mention *Strode,* or change *Strode,* or change the cases that have followed *Strode. See, e.g., Smith v. Kiel,* 115 S.W.2d 38 (Mo.App. 1938); *Schmelzer v. Central Furniture Co.,* 252 Mo. 12, 158 S.W. 353 (1913); *Campbell v. Tenet Healthcare System,* 224 S.W.3d 632 (Mo.App.2007).

The Court in *O'Grady* stated that "a cause of action for wrongful death will lie whenever the person injured would have been entitled to recover from the defendant *but for* the fact that the injury resulted in death." *Id.* at 910–11. "*But for* the fact that the injuries [to the unborn child in *O'Grady* ] resulted in death, the child would have been born alive and 'entitled to recover' from respondents." *Id.* at 911.

(emphasis in original). Thus, the ruling in *O'Grady* was a decision to enforce the language of the statute as written so that it would apply when the injury caused death, whether within or without the womb.

The majority focuses on the fact that the Court in *O'Grady* decided that, at least for some purposes, the cause of action was a "new" cause of action. *See id.* at 910. That decision did not conflict with any ruling in *Strode,* because *Strode* avoided deciding that issue. *See id.* at 910–11; *see State ex rel. Thomas v. Daues,* 314 Mo. 13, 283 S.W. 51, 54 (1926). The Court in *Strode* emphasized that it *did not matter* whether the cause of action was derivative, or a survival right, or a new cause of action. 95 S.W. at 853 (emphasis added). And, again, three pages later the Court said:

> Whether the right of action is a transmitted right or an original right; whether it be created by a survival statute *or by a statute creating an independent right,* the general consensus of opinion seems to be that the gist and foundation of the right in all cases is the wrongful act, and *that for such wrongful act but one recovery should be had, and that if the deceased had received satisfaction in his lifetime, either by settlement and adjustment or by adjudication in the courts no further right of action existed.*

*Id.* at 856 (emphasis added).

Whether a right of action under 537.080 is a transmitted right or a survival right or a new right is an issue that has popped up multiple times in the past. *See, e.g., Bates v. Sylvester,* 205 Mo. 493, 104 S.W. 73, 74 (Mo.1907). *Jackson v. St. Louis–San Francisco Ry. Co.,* 357 Mo. 998, 211 S.W.2d 931, 933 (1948); *Cummins v. Kansas City Public Service Co.,* 334 Mo. 672, 66 S.W.2d 920, 927 (1933); *State ex rel. Burns v. Whittington,* 219 S.W.3d 224, 225

(Mo. banc 2007); *Lawrence v. Beverly Manor*, WD 67920, 2008 WL 731561, 3/18/2008 slip op. There seldom seems to be an easy answer to that question, and there has always been a measure of confusion about the answer in various contexts. *See id.* But here there is no need to address the issue.

The legislature created *a specific condition* for the right to sue for wrongful death. That *condition* is that, had the tort victim survived, that victim would have been able to bring a tort action. *See Klein v. Abramson*, 513 S.W.2d 714, 717 (Mo. App.1974). There is no contention that the legislature lacks constitutional authority to place such a condition on the right to recover under the statute. The legislature created the cause of action for wrongful death in the first place. *See Glick v. Ballentine Produce, Inc.*, 396 S.W.2d 609, 614 (Mo.1965). "The legislature created the right of action where none existed before, and it may condition the right as it sees fit." *Id.* at 615. The statutory purposes are served if the tort victim survives long enough to bring and resolve a claim; and they are also served if the tort victim dies from the injury and the survivors bring the claims.

Had Ms. Smith survived, *she* could not have dismissed with prejudice her claims in federal court and proceeded to file a new suit in state court asserting claims that had been adjudicated against her. Accordingly, absent some kind of enforceable agreement, her surviving family members could not do so either.

If the majority's interpretation becomes law rather than arguably *dictum*, it will interfere with the legislative judgment. Not only does such a view threaten to place tort defendants in a difficult position procedurally, but it could have adverse effects on the rights of the tort *victim*. That is so because it could hinder the right of the injured tort victim to control her own cause of action—her own property. For example, under the majority's interpretation, if a hypothetical tort victim wished to settle her injury claim for, say, $500,000, no reasonable attorney representing the defendant tortfeasor would allow payment of such a sum without first obtaining a covenant not-to-sue from all of the victim's family members who eventually could potentially bring an action under 537.080. Under the ruling sought by the Smith family and proposed by the majority in this case, if the victim's family members are not happy with a proposed settlement, or if they were to insist on having "a piece of the settlement" as a condition of signing a covenant not-to-sue, they would effectively defeat the right of the injured person to control her own cause of action. They could do this simply by withholding their consent.

For all the foregoing reasons, though I now hold no brief for the notion that the claims of Barbara Smith's survivors in this case are necessarily procedurally barred,[4] I disagree with the majority's statutory analysis.

## II

Along with my complaints about the statutory analysis of the majority, I dissent from the majority's ruling that the failure-to-warn claim was submissible. This issue may well be the more significant reason to write separately.

The plaintiffs failed to make a submissible case on causation. My colleagues mistakenly apply the presumption that Mrs. Smith would have heeded a warning, pre-

---

4. The undersigned earlier exercised discretion, as a dissenting judge, to transfer this case to the Missouri Supreme Court. The case was retransferred to this court after briefing and argument in the Supreme Court.

sumably a package warning, if she had been given one prior to 1969.

From 1966 to 1969, every package of cigarettes warned generally that smoking "may be hazardous to your health." In 1969, federal legislation pre-empted claims and warning requirements with more specific warnings. Mrs. Smith specifically testified in her deposition that she was not interested in health research related to cigarettes, and did not pay attention to such research. She enjoyed smoking. She did not stop smoking until she was unable to keep smoking due to pneumonia resulting in part from an advanced case of emphysema. Her doctor instructed her to stop smoking, and she never took it up again. That was in 1990.

There is absolutely no testimony in the record by Mrs. Smith that if she had been given a warning prior to 1969, it would have caused her to stop then or anytime before the time she did stop. She testified she could not think of *anything* that she could have been told prior to 1990 that would have convinced her to stop smoking sooner. Indeed, she ignored *all* warnings until her illness and her doctor brought the reality of the situation home to her-in 1990. The federal district court found that the record "conclusively" demonstrated that Mrs. Smith made no effort to alter her behavior when in the prior action that, as a matter of law, *no reasonable jury could find a causal relation* between the inadequate warnings prior to 1969 and Mrs. Smith's injuries

With regard to the failure-to-warn claim, the court stated:

The fatal flaw in Plaintiff's [failure-to-warn] claim is that *the record* demonstrates that no jury could conclude inadequate warnings prior to 1969 caused Plaintiff's injuries ... *[T]he record* conclusively demonstrates that Plaintiff

made no effort to alter her behavior when presented with [the 1969 Surgeon General's] warning. Consequently, no reasonable juror could conclude that a warning offered earlier than 1969 would have altered Plaintiff's behavior ... *[C]onsequently, the lack of a warning did not cause Plaintiff to smoke cigarettes.* Defendant [Brown & Williamson Tobacco Corporation] is entitled to judgment on Count II.

The majority notes that the federal court findings in the prior case are neither binding nor authoritative here in this case. While that is true, it must be remembered that the record of Mrs. Smith's testimony in the federal court depositions was the same as the record in the court below. Because she was deceased, there was nothing that could be added to her testimony. I believe the federal court ruling granting summary judgment on the failure-to-warn claim was palpably correct in its view of the evidence and the legal effect thereof.

The law allows, in certain circumstances, a presumption that a warning would have been heeded if given. *See, e.g., Tune v. Synergy Gas.*, 883 S.W.2d 10 (Mo. banc 1994) (no warning as to the risk of overfilling a propane cylinder, which resulted in an explosion). The application of the presumption must make sense in context. *See, e.g., Estate of White v. R.J. Reynolds Tobacco Co.*, 109 F.Supp.2d 424, 432–33 (D.Md.2000); *Waterhouse v. R.J. Reynolds Tobacco co.*, 162 Fed.Appx. 231, 234–35 (4th Cir.2006); *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534, 537–38 (Pa.2003) (tobacco cases). Careful analysis must be applied in deciding whether the presumption can be appropriately applied in a tobacco case. *See Waterhouse*, 162 Fed. Appx. at 235.

There is no sensible reason to apply such a presumption in a tobacco case where the focus is on failure-to-warn *be-*

*fore 1969,* especially when the sworn testimony of the smoker conclusively defeats the notion that a warning would have had any effect. *White,* 109 F.Supp.2d at 435. The testimony here demonstrated absolutely that no warning prior to 1969 would have been effective.

Of course, warnings *after* 1969 clearly were not effective. No package warnings were *ever* effective with Mrs. Smith, nor were any other warnings or research studies of any kind, until it was too late to save Mrs. Smith from the effects of all those years of ignoring warnings. Mrs. Smith never heeded a warning until her physician, after she was already quite sick, warned her that she had no choice. By that time, she had already ceased smoking due to the pneumonia. By then the irreversible damage was done. Amazingly, the majority considers the fact that she later heeded a *personal* warning from her physician to constitute *evidence* that she would have heeded a *warning on a package* earlier. The majority completely ignores the difference in the context of the warnings. As a result, the majority has re-written the law of submissibility. It is not our duty to allow the jury to decide issues in cases that are not submissible. The federal court had it right. For these reasons, I disagree with the majority's ruling on the submissibility of the failure-to-warn claim.

### Conclusion

I believe the majority's ruling on the submissibility of the failure-to-warn case was contrary to sound principles of law. I also deem the statutory analysis of section 537.080 to be both unnecessary and erroneous to the extent that it purports to hold that the adjudication of a claim brought by a tort victim does not bar a subsequent death claim by the victim's survivors under 537.080. I therefore respectfully dissent from those aspects of the court's opinion.